**RECORD NOS. 13-3074(L); 13-3101**
**[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]**

In The

# United States Court Of Appeals For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## CHRISTIAN FERNANDO BORDA, also known as Tony; ALVARO ALVARAN-VELEZ, also known as Marcos,

*Defendants – Appellants.*

ON APPEAL FROM UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
CASE NOS. 1:07-CR-00065-1 (HON. GLADYS KESSLER)

———————————

## BRIEF OF APPELLANT
## CHRISTIAN FERNANDO BORDA

———————————

**Marcia G. Shein**
**Georgia Bar No. 639820**
**Federal Bar No. 53667**
**Elizabeth A. Brandenburg**
**FEDERAL CRIMINAL LAW CENTER**
**2392 North Decatur Road**
**Decatur, Georgia  30033**
**(404) 633-3797**

*Counsel for Appellant*
 *Christian Fernando Borda*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to F.R.A.P. 28 and District of Columbia Cir. R. 28(a)(1), undersigned Counsel hereby certifies that the following persons have an interest in the outcome of this case.

1. Alvaran-Velez, Alvaro: Defendant-Appellant, Consolidated  #13-3101

2. Amato, Maria-Claudia T.: District of Columbia Office of Attorney General

3. Balarezo, A. Eduardo: District Court Attorney for Appellant

4. Borda, Christian Fernando:  Defendant-Appellant

5. Brandenburg, Elizabeth:  Attorney for Appellant

6. Buckler, Lori:  U.S. Attorney Office, Appellate Counsel

7. Griffith, Jr., Charles Dee:  U.S. Department of Justice

8. Heller, Kirby Ann:  U.S. Department of Justice, Appellate Division

9. Hernandez, Carmen D.:  Attorney for Consolidated Appellant #13-3101

10. Kramer, A.J.:  Office of Federal Public Defender

11. Laymon, Jr., Paul Warren: U.S. Department of Justice

12. Purpura, Jr., William B.:  District Court Attorney for Appellant

13. Raymond, Robert John:  U.S. Department of Justice

14. Shein, Marcia G.:  Counsel for Appellant

15. Trosman, Elizabeth:  Assistant U.S. Attorney, Appellate Division

**(B.)  RULINGS UNDER REVIEW:**

1.      Order denying Defendants' Joint Renewed Motion for Judgment of Acquittal as to Christian Fernando Borda (1), Alvaro Alvaran-Velez (2), entered March 9, 2011, by Judge Gladys Kessler (Doc. 239).

2.      Order denying Joint Motion for New Trial as to Christian Fernando Borda (1), Alvaro Alvaran-Velez (2), entered April 27, 2011, by Judge Gladys Kessler (Doc. 250).

3.      Order as to Christian Fernando Borda (1), denying Joint Motion for Release of Grand Jury Minutes, to Vacate Verdict, and to Dismiss Indictment, entered November 27, 2012, by Judge Gladys Kessler (Doc. 377)

4.      Order as to Christian Fernando Borda (1), Alvaro Alvaran-Velez (2) denying Joint Motion to Dismiss for Brady Violations or, in the Alternative, for a New Trial, entered April 22, 2013, by Judge Gladys Kessler (Doc. 379).

**(C.)  RELATED CASES:**

This case was not previously before this Court or any other court. Counsel is unaware of any related cases pending in this Court or any other court.

# **TABLE OF CONTENTS**

**Page**:

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...............i

      B.     RULINGS UNDER REVIEW ........................................... ii

      C.     RELATED CASES ........................................................ ii

TABLE OF CONTENTS.................................................................... iii

TABLE OF AUTHORITIES .................................................................vi

GLOSSARY ....................................................................................xi

I.     STATEMENT OF JURISDICTION ...............................................1

II.    PRELIMINARY STATEMENT ....................................................1

III.   STATEMENT OF THE ISSUES ...................................................2

IV.   STATUTES AND REGULATIONS ..............................................3

V.    STATEMENT OF CASE ............................................................3

      Procedural History ............................................................3

      Statement of Facts............................................................4

VI.   SUMMARY OF THE ARGUMENT ............................................14

VII.  ARGUMENT AND CITATION OF AUTHORITY ....................................19

      I.     The evidence was insufficient to permit a rational juror to find
            guilt beyond a reasonable doubt.........................................19

            Standard of Review ........................................................19

            Argument....................................................................20

II.   The court erred in not ordering a new trial due to aggregious Brady violations ....................................................................26

      Standard of Review ..........................................................26

      Argument...........................................................................26

III.  Evidence that Mr. Borda had dealings in Europe and Mexico, not the United States, should have been turned over to the defense and admitted when requested....................................31

      Standard of Review ..........................................................31

      Argument...........................................................................31

IV.   E-mail evidence that Mr. Borda did not want drugs sent to the United States should have been admitted............................34

      Standard of Review ..........................................................34

      Argument...........................................................................34

            Relevance ..................................................................35

            Hearsay......................................................................36

V.    Mr. Borda's property in New York and Florida driver's license are not relevant to his participation in a drug importation conspiracy and create unfair prejudice connecting him to the United States.........................................................................40

      Standard of Review ..........................................................40

      Argument...........................................................................41

VI.   Evidence of Mr. Borda's prior conviction for drug trafficking was irrelevant to the question of whether Mr. Borda knowingly conspired to import drugs into the United States. This resulted in prejudicial character evidence being erroneously admitted............42

iv

Standard of Review ..................................................................42

Argument ................................................................................43

VII.    Evidence of Mr. Borda's incarceration with witness Montoya was irrelevant, prejudicial character evidence and should not have been admitted ...................................................................47

Standard of Review ..................................................................47

Argument ................................................................................47

VIII.   Co-conspirators' statements should not have been admitted when they were outside the scope of the conspiracy .........................48

Standard of Review ..................................................................48

Argument ................................................................................48

IX.     The Court erred in failing to instruct the jury that they should no longer consider as evidence exhibits and testimony mentioning a drug deal that was not part of the Government's alleged conspiracy ......................................................................52

Standard of Review ..................................................................52

Argument ................................................................................52

X.      The cumulative effect of all of the errors relating to evidence admitted to create an inference of a connection to the United States, as well as evidence kept out that is relevant to negate such a connection, warrant reversal ...................................................58

XI.     Government's Improper Closing Argument ......................................59

VIII.  CONCLUSION.......................................................................59

IX.    STATEMENT REGARDING ORAL ARGUMENT ...................................60

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Anderson v. United States*,
  417 U.S. 211 (1974)....................................................................25

*Bailey United States*,
  416 F.2d 1110 (D.C. Cir. 1969)...................................................21

*\*Brady v. Maryland*,
  373 U.S. 83 (1963)............................................ 4, 11, 12, 13, 14, 15, 26, 27
                                                       28, 29, 30, 31, 32, 38, 39, 59

*Cooper v. United States*,
  218 F.2d 39 (D.C. Cir. 1954).......................................................21

*Curley v. United States*,
  160 F.2d 229 (D.C. Cir.) *cert. denied*, 331 U.S. 837 (1947).........................21

*Kyles v. Whitley*,
  514 U.S. 419 (1995)....................................................................30

*Moore v. Illinois*,
  408 U.S. 786 (1972)....................................................................32

*Strickler v. Greene*,
  527 U.S. 263 (1999)....................................................................29

*United States v. Adkinson*,
  158 F.3d 1147 (11th Cir. 1998) ...................................................20

*United States v. Arbane*,
  446 F.3d 1223 (11th Cir. 2006) ..................................................20

*United States v. Arrington*,
  309 F.3d 40 (D.C. Cir. 2002).......................................................19

*United States v. Baugham,*
    449 F.3d 167 (D.C. Cir. 2006)...................................................................20, 37

*United States v. Bell*,
    516 F.3d 432 (6th Cir. 2008) .................................................................46

*United States v. Bowie,*
    232 F.3d 923 (D.C. Cir. 2000)...............................................................47

*\*United States v. Branham,*
    97 F.3d 835 (6th Cir. 1996) ...................................................................37

*\*United States v. Brown,*
    508 F.3d 1066 (D.C. Cir. 2007)...............................................................58

*United States v. Carson,*
    455 F.3d 336 (D.C. Cir. 2006)...............................................................49

*United States v. Chan Chun-Yin*,
    958 F.2d 440 (D.C. Cir. 1992)...............................................................25

*United States v. Copelin*,
    996 F.2d 379 (D.C. Cir. 1993)...........................................................55, 56

*United States v. Davis,*
    726 F.3d 434 (3d Cir. 2013) .................................................................45

*United States v. Edwards,*
    540 F.3d 1156 (10th Cir. 2008) ...............................................................45

*United States v. Fench,*
    470 F.2d 1234 (D.C. Cir. 1972).....................................................34, 40, 48

*United States v. Garcia,*
    413 F.3d 201 (2d Cir. 2005) .................................................................50

*United States v. Garcia–Morales,*
    382 F.3d 12 (1st Cir. 2004)...................................................................50

*\*United States v. Gilliam,*
    484 F.2d 1093 (D.C. Cir. 1973)...............................................................55

*United States v. Griffin*,
    324 F.3d 330 (5th Cir. 2003) ......................................................50

*United States v. Holland*,
    41 F. Supp. 3d 82 (D.D.C. 2014)...............................................46

*United States v. James*,
    555 F.2d 992 (D.C. Cir. 1977)....................................................44

*United States v. Jones*,
    482 F.2d 747 (D.C. Cir. 1973)....................................................58

*Unites States v. Jones*,
    67 F.3d 320 (D.C. Cir. 1995)......................................................44

*United States v. McClain*,
    440 F.2d 241 (D.C. Cir. 1971)..............................................55, 56

*United States v. Miller*,
    738 F.3d 361 (D.C. Cir. 2013)..............................................49, 51

*United States v. Moore*,
    651 F.3d 30 (D.C. Cir. 2011) ............................................... 49-50

*\*United States v. Morgan*,
    581 F.2d 933 (D.C. Cir. 1978)....................... 34, 36, 37, 40, 42, 48

*\*United States v. Nelson*,
    979 F. Supp. 2d 123 (D.D.C. 2013) *reconsideration denied*,
    59 F. Supp. 3d 15 (D.D.C. 2014) and *appeal dismissed*,
    No. 13-3108, 2014 WL 3013970 (D.C. Cir. June 17, 2014) and *appeal
    dismissed*, No. 13-3108, 2014 WL 3013970
    (D.C. Cir. June 17, 2014)................................................29, 30, 33

*United States v. Oruche*,
    484 F.3d 590 (D.C. Cir. 2007)..............................................26, 31

*United States v. Pettiford*,
    517 F.3d 584 (D.C. Cir. 2008)..............................................42, 47

*United States v. Pettiford,*
  627 F.3d 1223 (D.C. Cir. 2010)..........................................................29, 32, 34

*United States v. Price,*
  990 F.2d 1367 (D.C. Cir. 1993)..................................................................20

*United States v. Rhodes,*
  62 F.3d 449 (D.C. Cir. 1995)......................................................................56

*United States v. Simpson,*
  992 F.2d 1224 (D.C. Cir. 1993)..................................................................44

*United States v. Smith,*
  640 F.3d 358 (D.C. Cir. 2011)..............................................................50, 51

*United States v. Stover,*
  329 F.3d 859 (D.C. Cir. 2003)..............................................................50, 51

\*United States v. Tarantino,*
  846 F.2d 1384 (D.C. Cir. 1988)............................................................49, 51

*United States v. Thomas,*
  114 F.3d 228 (D.C. Cir. 1997)....................................................................52

\*United States v. Watson,*
  171 F.3d 695 (D.C. Cir. 1999)....................................................................45

**Statutes:**

18 U.S.C. § 3742(a) .................................................................................1, 3

28 U.S.C. § 1291 .........................................................................................1

**Constitutional Provisions:**

U.S. Const. amend V.....................................................................................4

U.S. Const. amend VI ..................................................................................38

**Rules:**

Fed. R. App. P. 4(b) ................................................................................1

Fed. R. Crim. P. 6(e) ..............................................................................4

Fed. R. Crim. P. 29(b) ............................................................................4

Fed. R. Crim. P. 33 .................................................................................4

Fed. R. Evid. 403 ................................................................9, 17, 43, 44

Fed. R. Evid. 404(b) ...................................................................17, 42, 47

Fed. R. Evid. 404(b)(1) .........................................................................44

Fed. R. Evid. 801(d)(2) .........................................................................36

Fed. R. Evid. 801(d)(2)(B) ....................................................................37

Fed. R. Evid. 801(d)(2)(D) .....................................................16, 36, 37, 38

Fed. R. Evid. 801(d)(2)(E) ........................................................18, 38, 49

## **<u>GLOSSARY</u>**

There are no terms contained herein which necessitate identification in a glossary.

# I.

## **STATEMENT OF JURISDICTION**

This is an appeal from the final judgment of the United States District Court for the District of Columbia, in a criminal case, pursuant to Federal Rules of Appellate Procedure. Fed. R. App. P. Rule 4(b), Title 28 U.S.C. § 1291, provides that the Court of Appeals has jurisdiction from all final decisions of the United States District Court, therefore, jurisdiction in this case properly rests in the United States Court of Appeals for the District of Columbia. Additionally, jurisdiction is invoked under the Title 18 U.S.C. § 3742(a) as it pertains to appeals of sentences under the Sentencing Guidelines.  The defendant filed a timely Notice of Appeal from the final judgment. *See* Federal Rules of Appellate Procedure Rule 4(b).

# II.

## **PRELIMINARY STATEMENT**

In Mr. Borda's initial brief, the Plaintiff/Appellee, the United States, will be referred to as "the United States," "the Government," or as "Appellee." Defendant/Appellant, Christian Borda, will be referred to as "Appellant," "Defendant," or "Mr. Borda." References to the record on appeal shall be designated with the symbol (R) and references to the Joint Appendix shall be designated with the symbol (JA).

III.

## STATEMENT OF THE ISSUES

I.      The evidence was insufficient to permit a rational juror to find guilt beyond a reasonable doubt.

II.     The Court erred in not ordering a new trial due to aggregious Brady violations.

III.    Evidence that Mr. Borda had dealings in Europe and Mexico, not the United States, should have been turned over to the defense and admitted when requested.

IV.     E-mail evidence that Mr. Borda did not want drugs sent to the United States should have been admitted.

V.      Mr. Borda's property in New York and Florida driver's license are not relevant to his participation in a drug importation conspiracy and create unfair prejudice connecting him to the United States.

VI.     Evidence of Mr. Borda's prior conviction for drug trafficking was irrelevant to the question of whether Mr. Borda knowingly conspired to import drugs into the United States. This resulted in prejudicial character evidence being erroneously admitted.

VII.    Evidence of Mr. Borda's incarceration with witness Montoya was irrelevant, prejudicial character evidence and should not have been admitted.

VIII.   Co-conspirators' statements should not have been admitted when they were outside the scope of the conspiracy.

IX.     The Court erred in failing to instruct the jury that they should no longer consider as evidence exhibits and testimony mentioning a drug deal that was not part of the Government's alleged conspiracy.

X.      The cumulative effect of all of the errors relating to evidence admitted to create an inference of a connection to the United States, as well as evidence kept out that is relevant to negate such a connection, warrant reversal.

## IV.

## STATUTES AND REGULATIONS

**18 U.S.C. § 3742(a). Review of a sentence**

(a) Appeal by a Defendant.—A defendant may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence—

(1) was imposed in violation of law;

(2) was imposed as a result of an incorrect application of the sentencing guidelines; or

(3) is greater than the sentence specified in the applicable guideline range to the extent that the sentence includes a greater fine or term of imprisonment, probation, or supervised release than the maximum established in the guideline range, or includes a more limiting condition of probation or supervised release under section 3563(b)(6) or (b)(11) than the maximum established in the guideline range; or

(4) was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable.

## V.

## STATEMENT OF CASE

### Procedural History

On December 9, 2010, after weeks of trial, Appellants Christian Borda and Alvaro Alvaran-Velez were convicted of conspiracy to distribute 5 kilograms or more of cocaine with the intent or knowledge that the cocaine would be unlawfully imported into the United States. (JA 322, 323). The Defendants moved for a judgment of acquittal at the close of the Government's case on December 1, 2010.

3

The court reserved decision on the motion pursuant to Rule 29(b). Fed. R. Crim. P. 29(b). On December 22, 2010, after the guilty verdict, Appellants renewed their Motion for Judgment of Acquittal (JA 324). Several responses and replies were submitted by the defendants and the government. The district court denied the motion on March 9, 2011. (JA 344).

After trial and the denial of the motion for judgment of acquittal, the defendants discovered evidence that the government had not turned over all of the exculpatory evidence it had in its possession. Defendants moved for a new trial pursuant to Rule 33 which the court denied on April 27, 2011. (JA 357). Defendants then moved to vacate the jury verdict and to dismiss the indictment under the Fifth Amendment's Due Process Clause and Federal Rule of Criminal Procedure 6(e) which the court denied on November 27, 2012. (JA 480). Defendants then filed a Motion to Dismiss for *Brady* violations (JA 412) and the court denied that motion on April 22, 2013 after several responsorial motions and hearings. (JA 493).

## Statement of Facts

The evidence in this case, although overwhelming in breadth, was not overwhelming in substance. The Government inundated the jury with testimony, but not relevant to the only disputed issue. The district court agreed that "the Government's evidence was not 'overwhelming." (JA 501). The only issue in

4

dispute was whether or not Mr. Borda knew or intended for drugs transported from Colombia to Mexico to end up in the United States. There was precious little evidence that had any connection to the United States. In fact, the Government felt the need to fight for the admission of such tangential evidence as Mr. Borda's purchasing property in New York and having a Florida driver's license years earlier, just to keep the mention of a tenuous connection to the United States on the minds of the jurors.

While on trial for importing drugs into the United States, the defendants did not contest that they had distributed cocaine in 2005 during the indictment period, but rather argued that they neither knew, nor intended for the cocaine to be transported or distributed to the United States.

Although the Government's evidence took several weeks to present, it primarily consisted of the testimony of two cooperating witnesses, Camilo Suarez and Juan Jaime Montoya-Estrada and the playing of Spanish language recorded conversations with English transcripts admitted as exhibits. The government's theory of the case consisted of three drug deals in 2005. The first deal, "Palm Oil One," named for the method in which the cocaine was transported out of Colombia and into Mexico on Maersk ships, took place between January and May 2005. (JA 130; JA 238). Evidence presented at trial by the government indicated that Suarez introduced Defendants to Raul "Junior"

5

Valladares, whose role was to receive defendants' cocaine in Mexico and to transport it to Mexico City, but who eventually transported the cocaine to Monterrey. (JA 140; (JA 205). At some point during his dealings with the defendants, Junior began cooperating with the DEA and was debriefed on his dealings with the defendants. Junior was missing and presumed dead and therefore unavailable to testify at trial. At trial, Suarez testified that Junior had imported part of the Palm Oil 1 cocaine into the United States. (JA 208-209).

Mr. Borda and Mr. Alvaran arranged to ship 1553 kilograms of cocaine to be accepted by Junior. Once Junior received the cocaine he took the drugs to Monterrey. (JA 205). The agreed upon price for the deal was $9,100 per kilogram: the "Mexico price." (JA 205). This is significant because the rate for transporting cocaine to the United States was much higher: 40-45%. (*Id.* at 205; JA 219). The government argued that Monterrey is two hours from the United States border with insufficient local demand for this amount of cocaine.

After Junior failed to pay for the shipment, the government's confidential informant, Camilo Suarez met with Mr. Alvaran. Suarez testified that Alvaran understood that the cocaine had been moved to Monterrey. (JA 169). Junior moved the cocaine to Monterrey then played Alvaran and Borda against each other, telling each that the other had already approved the move. (Gov. Exh. 40b p. 3-4). The government claimed that because Monterrey was two hours from

6

the border with the United States, that Borda and Alvaran must have known that the cocaine was destined to cross the border. (R. 360 p.3).

Throughout the time period of the conspiracy, Mr. Borda repeatedly rejected Suarez's offers to send cocaine to the United States: "[Borda's] response was that the responsibility of sending things over here he did not want that … that was his response on two occasions." (JA 195-196; 214-216). Borda never said yes to Suarez's offers to send drugs to the United States, but rather rejected those as too problematic with too much responsibility. (*Id.*, JA 217). Thus not engaging in the charged conspiracy. There was no agreement.

Suarez inconsistently testified, in response to different questions, that 200 kilograms of cocaine went to the United States, (JA 208), that all of the 1553 kilograms ended up in the United States, (*Id.*) and finally, that he "was not sure what he (Junior) actually did with it." (JA 213).

Mr. Borda had substantial contacts in Europe where he had conducted deals for the transportation of cocaine previously. (JA 214-216). He told Suarez about a contact, "Alex" that can move merchandise in Holland, England, and Italy. (*Id.*).

The Second Palm Oil deal was never realized, only discussed, and there was no evidence presented that it was intended to be shipped to the United States.

The final deal presented at trial was referred to as the "El Chino" load. This was named after an individual known as "El Chino" or "Chino." (JA 124-126). Suarez testified that Mr. Borda planned to transport 3,000 kilograms of cocaine to Chino in Mexico. (JA 186-187). Half of the cocaine was loaded onto a fishing boat, and intercepted off the coast of Honduras by the United States Coast Guard on board a British naval vessel. (JA 187-188; JA 239). The crew had warning of the interception when they saw a naval reconnaissance plane fly overhead and dumped the cocaine overboard. (*Id.*). No cocaine was found on board, and the fishing vessel had the capacity to travel to Europe. (*Id.* JA 245).

Evidence was presented that Mr. Borda had a driver's license in Florida and had bought property in New York. (JA 254, 262). Neither connection was tied to the allegations of drug importation or drug dealing.

Before trial, the Government filed a motion to admit prior convictions. (JA 69). Mr. Borda was convicted of conspiracy to possess with intent to distribute cocaine in the Southern District of Florida in 1998. (JA 266). He pled guilty and was sentenced to 70 months imprisonment. (*Id.*). The government alleged that this conviction for possession with intent to distribute was relevant to whether Mr. Borda knew and/or intended for cocaine to be imported to United States in the instant offense. (JA 71). The district court initially denied the motion on the basis that the conviction was so old and for a "significantly different offense." (JA 75).

The court also found the danger of unfair prejudice to substantially outweigh any probative value under Fed. R. Evid. 403. (*Id.*).

The government later argued that a cooperating witness, Montoya would testify that he met Borda in prison and that is how he knew Borda and they met up again when they were both deported back to Colombia. (JA 102).  The government further argued that the prior conviction was "intrinsically interwoven" with the instant offense because he mentioned his conviction on two occasions in recorded conversations. (*Id.* at JA 105).

The court reversed its previous ruling finding merely that the evidence was relevant and "not offered for the sole purpose of establishing Defendant's character or propensity." (JA 110). The court did not state for what purpose the evidence was permissible.

At trial, Mr. Borda moved to admit into evidence an e-mail purportedly from the government's informant, Junior.  (JA 274). This email, according to the DEA agent, was from Junior's email address, and was used to communicate with the DEA regarding his activities on behalf of the United States government. (JA 250). Junior wrote that Mr. Borda was not interested in sending drugs to the United States, but rather to Spain and Mexico. (*Id.* at JA 274-275). The email was sent on March 6, 2006. (*Id.* at JA 274). Written motions were filed for and against this motion and the court ultimately excluded the evidence.

9

During the direct examination of Camilo Suarez, evidence was brought out regarding people having nothing to do with these deals. From the beginning of his testimony he started mentioning people that did not have anything to do with these deals. When asked what happened when he "encountered Mr. Alvaran in early 2005," Suarez testified that "it was through a pilot his name was Tato and [the witness] found out that [Alvaran] and Tony, Mr. Borda had a run in with a family member, [El Ray Sombala]." (JA 115).

Montoya also discussed information that was not related to the conspiracy as charged and presented. When asked how he was apprehended, Montoya testified that he was arrested after a Mexican national was arrested in Houston, Texas, then allowed to proceed to New York where the entire organization was arrested. (JA 247). He testified that he got this information from an indictment and others in the group who told him. (*Id.*).

The district court initially admitted testimony concerning Government Exhibits 35B and 77B that were later removed from evidence as outside the scope of the conspiracy, but the court refused to give a specific jury instruction. The court admitted Exhibit 35B (JA 142, 144), and Exhibit 77B, (JA 224). More than two weeks after the admission of Government Exhibit 35B and a week after the admission of Government Exhibit 77B, the court reviewed all of the co-conspirator statements that had been presented to the jury. (JA 271). The court held that the

10

statements concerning Juarez, Florida, and Atlanta in Government Exhibits 35B and 77B were not in furtherance of the conspiracy and therefore inadmissible hearsay. (JA 273; JA 277; JA 281.1). The court took back the transcript of the recorded conversations from the jury but refused to give an instruction as to the substance of the evidence being removed from the jury's purview. (JA 282-283).

At trial, Mr. Borda moved to admit into evidence an e-mail purportedly from the government's informant, Junior.  (JA 274). This email, according to the DEA agent, was from Junior's email address and used to communication with DEA regarding his activities on behalf of the United States government. (JA 250). In the email in question, Junior writes that Mr. Borda was not interested in sending drugs to the United States, but rather to Spain and Mexico. (JA 274-275). The email was sent on March 6, 2006. (*Id.* at JA 274). Written motions were filed for and against this motion and the court ultimately excluded the evidence. (JA 278)

Counsel for the defense made repeated attempts to collect *Brady* evidence from the Government both before, during, and after trial. Before trial, the government turned over extensive but incomplete discovery. According to the district court, "the bottom line is that whether purposefully, negligently, or innocently, [the Government] was less than forthcoming in fully satisfying its discovery obligation, thereby, making the efforts of defense counsel to prepare for a long and difficult trial far more onerous than necessary." (JA 500).

In response to the Defense's request for *Brady* material, on the eve of trial, the Government turned over heavily redacted DEA-6 debriefing reports. In these reports, Junior informed the government that Borda discussed sending Colombian cocaine to Canada and Europe, and that Borda would sell his cocaine in Mexico (as opposed to sending it to the United States). (JA 84; JA 55). The Government argued, and the court agreed, that this evidence was not exculpatory *Brady* evidence. (JA 98). The court merely concluded, without explanation that *Brady* was not implicated. (*Id.*).

After trial, Mr. Borda happened upon evidence that the government had not been forthcoming on the information it had regarding Mr. Borda's intent. Almost two years of post-trial litigation ensued concerning this evidence. Many motions, responses, and replies were filed, hearings were held, and the evidence was finally turned over.[1] Litigation continued over the admissibility and *Brady* connections of this evidence. In the end, the district court denied the motion for new trial as well as the request to dismiss the charges. (JA 493).

---

[1] The key *Brady* briefs are: (1) JA 412, Defendants' Post-Hearing Memorandum in Support of Motion to Dismiss (April 30, 2012); (2) R. 360, Government's Response in Opposition (June 13, 2012); (3) JA 438, Defendants' Reply to Government's Response (July 6, 2012); (4) JA 466, Government's Response to Defendants' Reply (July 13, 2012); (5) JA 473, Defendants' Reply to Governments' Response (July 19, 2012). Other *Brady* filings include (1) JA 398, Defendants' Second Motion to Dismiss (Jan. 24, 2012); (2) JA 405, Defendants' Third Motion to Dismiss (Feb. 7, 2012).

After trial, Mr. Borda's attorneys came across a witness, Raphael Mejia who was incarcerated with Mr. Borda and a co-conspirator, H.B. According to Mejia, H.B. told Mejia that Mr. Borda "made it very clear to him and [Junior] that [Borda] did not want any cocaine sent to the United States." The district court ordered the Government to turn over additional evidence (JA 395.1).

The government then produced 82 DEA reports, the vast majority of which had never been previously disclosed by the government to the defendants. This disclosure led defendants to file two more *Brady* motions. (JA 398, 405). Several pieces of information, previously unbeknownst to the defense were uncovered in this process that were litigated post-trial. For purposes of this appeal, this discovery process led to a report of an interview with Junior where Junior told DEA Analyst, Patricia Skidmore that "unbeknownst to Borda, [Junior] and [H.B.] took an additional 100 kilograms of cocaine believing they could sell it in Houston for a larger profit." (JA 396; Hearing Feb. 10, 2012 Borda Exhibit 21, *See also* JA 503). The court denied the motion based on factual determinations of the suppressed evidence. (JA 493).

This case rested on weak links to the United States. The Government strained to make inferences to the jury that Mr. Borda had a sufficient connection to the United States by presenting outlying and irrelevant information as well as keeping exculpatory information from the defense.

13

# VI.

## SUMMARY OF THE ARGUMENT

### Issue I

**The evidence was insufficient to permit a rational juror to find guilt beyond a reasonable doubt.**

The Government did not present sufficient evidence that Mr. Borda knew or intended for drugs to be imported into the United States. The Government fought for inclusion of several minor pieces of evidence in an effort to create a tangential relationship between Borda and the United States. The Government's witnesses contradicted themselves on this issue. The evidence is based on hearsay and supposition, the Government asking the jury to infer guilt based on insufficient evidence.

### Issue II

**The Court erred in not ordering a new trial due to aggregious Brady violations.**

After trial, in response to additional *Brady* motions, the Government turned over a report of an interview with Junior where he said that "unbeknownst to Borda, [Junior] and [H.B.] took an additional 100 kilograms of cocaine believing they could sell it in Houston for a larger profit." (JA 396).

The court, in ruling on the *Brady* motions, noted that "this was quintessentially a 'jury case' in that the Government's case rested overwhelmingly

14

on the jury's evaluation of the credibility of the major witness-cooperators . . ." (JA 501). However, the court went on to deny the motion based on factual determinations of the suppressed evidence.

The court held that these statements were inadmissible hearsay. However, these statements were not hearsay as a party statement by an agent. Additionally, contradictory evidence or arguments do not make this evidence inadmissible or immaterial. The government could submit their own contradictory evidence in rebuttal if deemed necessary. The court making a credibility determination after the trial does not resolve the fact that the jury was denied this evidence in making its final determination in a close case as characterized by the trial judge.

### Issue III

### Evidence that Mr. Borda had dealings in Europe and Mexico, not the United States, should have been turned over to the defense and admitted when requested.

Reports from the DEA detailing discussions Junior, a cooperating informant in the case, had with Mr. Borda regarding his drug dealing in Europe and Mexico should have been admitted. The evidence was exculpatory because it showed that Mr. Borda was at the very least interested in sending drugs to Europe. If he is interested in such, it makes it, to whatever degree, less likely that he was importing drugs into the United States. Even if the evidence can be interpreted in different ways, it is still *Brady* evidence.

15

## Issue IV

**E-mail evidence that Mr. Borda did not want drugs sent to the United States should have been admitted.**

Evidence from the Government's initial, but unavailable cooperating witness should have been admitted. The statements Mr. Borda made to the informant regarding his intent were relevant. The fact that the email was some months after the Government's chosen time period, but within the period detailed in the indictment, does not mean it is not relevant to Mr. Borda's intent at the time of the drug shipment. Also, the informant's email to his handler was within the scope of his agency for the Government, and therefore not hearsay, but within the purview of Rule 801(d)(2)(D).

## Issue V

**Mr. Borda's property in New York and Florida driver's license are not relevant to his participation in a drug importation conspiracy and create unfair prejudice connecting him to the United States.**

Evidence that Mr. Borda owned property in the United States and had a driver's license does not have anything to do with whether he imported drugs into the United States. It does not make it any more likely that he was doing so. With so few connections to the United States, the merely mention of locations in the United States as facts in this case causes unfair prejudice.

16

## Issue VI

**Evidence of Mr. Borda's prior conviction for drug trafficking was irrelevant to the question of whether Mr. Borda knowingly conspired to import drugs into the United States. This resulted in prejudicial character evidence being erroneously admitted.**

It was error under Rules 403 and 404(b) to allow the Government to present evidence of Mr. Borda's prior conviction for a drug conspiracy. There was no question in this case of Mr. Borda's drug dealing, but rather the key issue focused on his intent to import cocaine into the United States. Proof of a prior conviction for mere conspiracy has no bearing on the element of intent to import, just as proof of possession of drugs has no bearing on one's specific intent to distribute narcotics.

## Issue VII

**Evidence of Mr. Borda's incarceration with witness Montoya was irrelevant, prejudicial character evidence and should not have been admitted.**

Montoya testified that he met Mr. Borda in federal prison and that is how they met. This testimony is only tangentially related and is not sufficiently probative to overcome the prejudice from this evidence that merely completes the story.

17

## Issue VIII

**Co-conspirators' statements should not have been admitted when they were outside the scope of the conspiracy.**

Although statements made by co-conspirators in furtherance of the conspiracy are admissible as not hearsay, when the statements are outside the scope of the conspiracy, they are inadmissible hearsay. Fed. R. Evid. 801(d)(2)(E). Statements made by Suarez and Montoya testified about drug deals with people not part of the instant conspiracy and references to the United States outside the scope of the palm oil deals. The admission of these statements prejudiced Mr. Borda by showing a connection to the United States and other drug dealers.

## Issue IX

**The Court erred in failing to instruct the jury that they should no longer consider as evidence exhibits and testimony mentioning a drug deal that was not part of the Government's alleged conspiracy.**

The district court admitted testimony and transcripts from recorded conversations related to Juarez, Mexico on the border with the United States as well as Florida. The court later excluded this testimony as outside the scope of the conspiracy. The court instructed the jury to rip out the exhibits pertaining to this information and that it was no longer in evidence but refused, on request, to instruct the jury what evidence was being excluded. This is especially problematic as the testimony on these matters had taken place one and two weeks prior to the

evidence being excluded. The jury had no idea what evidence they should no longer consider in its deliberations.

## Issue X

**The cumulative effect of all of the errors relating to evidence admitted to create an inference of a connection to the United States, as well as evidence kept out that is relevant to negate such a connection, warrant reversal.**

The errors in this case all pertained to the Government's effort to tie the drug dealing to the United States. Therefore even if the errors individually do not warrant reversal, the cumulative effect resulted in keeping out admissible evidence refuting an intent to import to the United States and admitting inadmissible evidence that impermissibly suggested a connection.

## VII.

## ARGUMENT AND CITATION OF AUTHORITY

## Issue I

**The evidence was insufficient to permit a rational juror to find guilt beyond a reasonable doubt.**

**Standard of Review**

This Court reviews sufficiency of the evidence in the light most favorable to the government and "accepts the jury's guilty verdict if we conclude that 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002).

**Argument**

Mr. Borda filed a Motion for directed verdict of acquittal. (R. 217). The evidence, while taking several weeks to present, was insufficient to prove that Mr. Borda either knew or intended for drugs to be imported to the United States. In this case, the conspiracy was defined by three separate events: (1) the first palm oil load (Palm Oil 1); (2) the second palm oil load (Palm Oil 2); and (3) the El Chino load. It is uncontroverted that Palm Oil 2 was never consummated and that the El Chino load was dumped at sea. There was no evidence presented that any cocaine dealing with either Palm Oil 2 or El Chino was ever meant for arrival in the United States. Therefore the main focus is on Palm Oil 1.

To support a conviction, the government must prove beyond a reasonable doubt that there existed an agreement between two or more person to import narcotics into the United States and that the defendants knowingly and voluntarily participated in that agreement. *United States v. Baugham*, 449 F.3d 167, 171 (D.C. Cir. 2006); *United States v. Arbane*, 446 F.3d 1223, 1228 (11th Cir. 2006). The government must prove a "meeting of the minds" to achieve the unlawful result. *United States v. Price*, 990 F.2d 1367, 1369 (D.C. Cir. 1993); *United States v. Adkinson*, 158 F.3d 1147, 1154 (11th Cir. 1998).

This Circuit has a history of carefully reviewing motions for directed verdict of acquittal. In reviewing a motion for directed verdict of acquittal, the district

20

judge must determine whether a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If the judge "concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir.) *cert. denied*, 331 U.S. 837 (1947).

Guilt, must be beyond a reasonable doubt. *Bailey United States*, 416 F.2d 1110, 1113 (D.C. Cir. 1969)(reversing and granting judgment of acquittal). *See also*, *Cooper v. United States*, 218 F.2d 39, 42 (D.C. Cir. 1954)(evidence raised suspicion, "but that is not enough") (reversing and granting judgment of acquittal).

The first palm oil deal involved the alleged transportation of 1553 kilograms of cocaine from Cartegena, Colombia hidden within drums of palm oil transported in ships operated by Maersk Lines. (JA 130; JA 238). The cocaine was received in Puerto Progreso, Mexico by a Mexican individual, Valladares, often referred to as Junior. (JA 140). Junior then took the shipment to Monterrey, Mexico. (*Id.*, (JA 205). Suarez testified that "the deal was to get the cocaine delivered in Mexico City." (JA 204). The deal was for Junior to pay for the shipment after he had sold it, and there was concern when he did not pay in a timely manner. (JA 138). Junior charged the "Mexico rate" of 18% for his services relating to receiving the cocaine in Mexico. (JA 205). This is significant because the rate for transporting cocaine

21

to the United States was much higher: 40-45%. (*Id.* at 205; JA 219). Junior paid Mr. Borda the "Mexico price" of $9100 per kilo. (JA 205).

Ten days later was the first hint that the United States being Junior's destination for the drugs when he had not paid. (*Id.* at JA 203.1). There was discussion that Junior's "market went bad because the border got harder for him." (JA 151). Mr. Borda agreed to let Junior take the cocaine to Monterrey, but only after Junior had already done so and because Junior had lied to Mr. Borda about having it "squared away" with Mr. Alvaran. (Gov. Exh. 40b p. 3-4). These discussions were all after the fact of the initial agreement, and do not show knowledge or intent to import drugs into the United States or a meeting of the minds. Further, these discussions show only that the drugs made it to Monterrey, two hours from the border with the United States and that he did not have good clients to sell the drugs to. To leap from this conversation to the inference that the drugs made it to the United States is unfounded speculation.

Although Suarez claimed that Junior had taken either some or all of the cocaine (he testified that all of it went and that 200 kilos went at different times) to New York, he testified on cross examination that he did not know what Junior did with the cocaine: "I am not sure what he actually did with it." (JA 212-213).  This is extremely important because when pressed further on cross, he could not say

what happened to the drugs. The statement that they came to New York or elsewhere in the United States was mere speculation.

Further, the district court clearly struggled with this issue. In ruling on the motion for judgment of acquittal, the court noted Suarez's testimony that all 1553 kilos went to the United States. (JA 210; JA 237). However at sentencing the court found that just 200 kilos foreseeably "or within the scope of the conspiracy" went to the United States according to Suarez's testimony. (JA 547-548). There is no explanation for this flip flop on the court's part other than sheer confusion over Suarez's inconsistent testimony on this issue. When asked three times, he testified that 200 kilos went to the United States, all 1553 kilos went to the United States, and that he did not know what Junior did with the cocaine. There is no indication which, if any, statement was true.

Additionally, Mr. Borda repeatedly rejected Suarez's offers to send cocaine to the United States: "His response was that the responsibility of sending things over here he did not want that … that was his response on two occasions." (JA 195-196; JA 215-215). He never said yes to Suarez's offers to send drugs to the United States, but rather rejected those as too problematic with too much responsibility. (*Id.*, JA 217).

There was discussion regarding the Junior's delay in paying Borda and Alvaran. Suarez explained that Junior was having trouble because the "market

23

went bad because the border got [] harder for him." (Gov. Exh. 40b p. 3-7). Borda noted that his source of cocaine in Colombia had told him that Mexicans say they will take the merchandise and pay the Mexico price then turn around and sell it on "the other side" for five or six thousand dollars more. (*Id.* at 22-23). Firstly, this is just a general discussion about something Borda's source had told him. It may even be a warning that this kind of cheating better not be going on.

The district court found that the original agreement was for Borda to get the cocaine to Junior in Puerto Progreso, and that the cocaine was then moved to Monterrey, changing the agreement. (JA 495) If the agreement changed, as the government has argued, that it then became obvious that the drugs would end up in the United States, then Borda, as a business man, would have further amended the agreement to account for increased compensation due to the increased risk in sending the cocaine to the United States. Especially in light Suarez's testimony of Mr. Borda's continued resistance to taking on that risk, it does not make sense that he would not be further compensated for the increased risk. Mr. Borda did not change the agreement to account for a United States price, but rather the agreement remained for the Mexico price, indicating that there was no understanding that the drugs would end up in the United States.

On the other hand, Mr. Borda had the structure to receive and distribute large quantities of cocaine in Europe, not the United States. (JA 214-216). In one

of the conversations Suarez testified about, Borda told Alvaran about his contact, Alex in Holland: "he's been receiving for the office for a long time. He's been living in Holland for a long time. That kiddo moves whatever he wants in Holland, whatever he wants. That kiddo will move for you in Holland [and Italy and England] 4-5000 things, like nothing." (*Id.*)

The government did not introduce any evidence that cocaine was imported into the United States: no cocaine was seized in the U.S., no money was seized in the U.S., no dates of when cocaine had been imported to the U.S., no specifics of who purchased cocaine in the U.S., no details as to the manner in which the cocaine had been imported, or no details as to the manner in which funds to purchase drugs were received.

The government spent a great deal of time cobbling together inferences in an effort to misdirect the jury from the actual lack of evidence regarding Mr. Borda's intent. However, the specific intent necessary to prove that a conspiracy existed simply cannot be proved by "piling inference upon inference." *Anderson v. United States*, 417 U.S. 211, 223-24 (1974). Actual, not constructive knowledge of importation into the United States is required for a conviction of conspiracy to import. *United States v. Chan Chun-Yin*, 958 F.2d 440, 443 (D.C. Cir. 1992). Therefore the speculation the government asked the jury to engage in was impermissible, and insufficient to sustain a guilty verdict.

## Issue II

## The court erred in not ordering a new trial due to aggregious Brady violations.

**Standard of Review**

Whether a *Brady* violation has occurred is a question of law subject to de novo review. *United States v. Oruche*, 484 F.3d 590, 596 (D.C. Cir. 2007).

**Argument**

The evidence in this case was not overwhelming in substance. The district court even agreed that "the Government's evidence was not 'overwhelming." (JA 501). The only issue in dispute was whether or not Mr. Borda knew or intended for drugs transported from Colombia to Mexico to end up in the United States. There was precious little evidence that had any connection to the United States. In fact, the Government felt the need to fight for the admission of such tangential evidence as Mr. Borda's purchasing property and having a Florida driver's license years earlier, just to keep the mention of a tenuous connection to the United States on the minds of the jurors.

In light of the dearth of evidence linking the United States, the suppression of a significant amount of evidence, including exculpatory evidence on this very issue is highly concerning. Before trial, the government turned over extensive but incomplete discovery. According to the court, "the bottom line is that whether purposefully, negligently, or innocently, it was less than forthcoming in fully

26

satisfying its discovery obligation, thereby, making the efforts of defense counsel to prepare for a long and difficult trial far more onerous than necessary." (JA 500).

In addition to the *Brady* violation alleged above and litigated pretrial, significant violations came to light after Mr. Borda was convicted. After trial, Mr. Borda happened upon evidence that the government had not been forthcoming on the information it had regarding Mr. Borda's intent. The government had been told by several of its own informants that Mr. Borda specifically stated that he did not want cocaine to end up in the United States. As this was the only question in dispute at trial, alarm bells went off, and Mr. Borda brought the situation to the attention of the court. Almost two years of post-trial litigation ensued concerning this evidence. Many motions, responses, and replies were filed, several hearings were held, and the evidence was finally turned over. Litigation continued over the admissibility and *Brady* connections of this evidence after trial. In the end, the district court denied the motion for new trial as well as the request to dismiss the charges.

Evidence presented at trial by the government indicated that Suarez introduced Defendants to Raul "Junior" Valladares, whose role was to receive defendants' cocaine in Mexico and to transport it to Mexico City, but who eventually transported the cocaine to Monterrey. At some point during his dealings with the defendants, Junior began cooperating with the DEA and was debriefed on

27

his dealings with the defendants. Junior was missing and presumed dead and therefore unavailable to testify at trial. At trial, Suarez testified that Junior had imported part of the Palm Oil 1 cocaine into the United States. (JA 190-191).

The evidence Mr. Borda's attorneys found after trial was a statement by Raphael Mejia who was incarcerated with Mr. Borda and a co-conspirator, H.B. According to Mejia, H.B. told Mejia that Mr. Borda "made it very clear to him and [Junior] that [Borda] did not want any cocaine sent to the United States." The district court ordered the government to produce "copies of all DEA-6s and their rough notes relating to HB and/or Junior." (JA 395.1).

The government then produced 82 DEA reports, the vast majority of which had never been previously disclosed by the government to the defendants. This disclosure led defendants to file two more *Brady* motions. (JA 398, 405). Several pieces of information, previously unbeknownst to the defense were uncovered in this process which was litigated post-trial. For purposes of this appeal, Appellant will focus on a report of an interview with Junior where Junior told DEA Analyst, Patricia Skidmore that "unbeknownst to Borda, [Junior] and [H.B.] took an additional 100 kilograms of cocaine believing they could sell it in Houston for a larger profit." (JA 369; Hearing Feb. 10, 2012, Borda Exhibit 21, *See also* JA 503).

The court, in ruling on the *Brady* motions, noted that "this was quintessentially a 'jury case' in that the Government's case rested overwhelmingly

on the jury's evaluation of the credibility of the major witness-cooperators . . ." (JA 501). However, the court went on to deny the motion based on factual determinations of the withheld evidence.

It is an essential constitutional right that the prosecution must disclose to criminal defendants all material, favorable evidence in its possession. *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a *Brady* violation, defendants must prove three elements: (1) the prosecution suppressed evidence either willfully or inadvertently, (2) that suppressed evidence was favorable to the accused, and (3) that the prosecution's suppression of such evidence prejudiced the accused. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010). There is no preliminary requirement that the government decide whether the evidence is admissible or not before deciding whether it qualifies as *Brady* evidence.

Evidence is favorable to the accused when it supports the defense, even when there may be a dispute as to its favorability or a reverse, inculpatory explanation for the evidence. *United States v. Nelson*, 979 F. Supp. 2d 123, 131-32 (D.D.C. 2013) *reconsideration denied*, 59 F. Supp. 3d 15 (D.D.C. 2014) and *appeal dismissed*, No. 13-3108, 2014 WL 3013970 (D.C. Cir. June 17, 2014) and *appeal dismissed*, No. 13-3108, 2014 WL 3013970 (D.C. Cir. June 17, 2014).

A defendant is prejudiced when there is a "reasonable probability" that the result of the proceeding would have been different if the prosecution had disclosed it. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The accused can demonstrate such prejudice by showing that the suppressed evidence cumulatively, "could reasonably be taken to the put the whole case in such a different light as to undermine the confidence in the verdict. *Id.* at 435.

The court held that these statements were inadmissible hearsay. However, as argued in Issue IV, these statements were not hearsay as a party statement by an agent. Further, the court held that the statements were contradicted by Skidmore's testimony as to the meaning of the report. Agent Skidmore testified at the hearing on this matter that Junior never told her that Borda did not know the palm oil load was going to the United States. (JA 397.2-397.6; JA 397.7-397.8). That may be the case, but her draft report contradicted this claim. This is "quintessentially" a jury issue. If the jury is trusted to make credibility determinations, this is one that they should have been permitted to make. Issues that boil down to credibility determinations almost by their very definition qualify as a reasonable probability of a different result according to the *Brady* calculus.

Just because there may be contradictory evidence does not make this evidence inadmissible or immaterial. *See Nelson*, 979 F. Supp. at 131-32 (holding that if the evidence at issue can be used to support the defense, it is exculpatory

regardless of whether there is another explanation that does not support the defense). The government could submit their own contradictory evidence in rebuttal if deemed necessary. The court making a credibility determination after the trial does not fix the fact that the jury was denied this evidence in making its final determination in a close case as characterized by the trial judge.

## Issue III

### Evidence that Mr. Borda had dealings in Europe and Mexico, not the United States, should have been turned over to the defense and admitted when requested.

**Standard of Review**

Whether a *Brady* violation has occurred is a question of law subject to de novo review. *United States v. Oruche*, 484 F.3d 590, 596 (D.C. Cir. 2007).

**Argument**

In response to the Defense's request for *Brady* material, on the eve of trial, the Government turned over heavily redacted DEA-6 debriefing reports. In these reports, Junior, the originating cooperating informant for the Government, noted several relevant facts about his meetings with Borda throughout their relationship regarding drug trafficking including that Borda discussed sending Colombian cocaine to Canada and Europe, and that Borda would sell his cocaine in Mexico (as opposed to sending it to the United States. (Defendant's Third Motion for Disclosure of Brady Evidence JA 84; Government's Response JA 8). The

31

Government argued, and the court agreed, that this evidence was not exculpatory *Brady* evidence. (Order, Oct. 21, 2010, JA 98). The court merely concluded, without explanation that *Brady* was not implicated. (*Id.*).

The Government has an obligation to turn over any exculpatory evidence to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Procedural due process demands that prosecutors produce to a criminal defendant all potentially exculpatory evidence, even in the absence of a specific request, to ensure that the defendant receives a fair trial. *Id.* When a prosecutor fails to provide favorable evidence that is "material to guilt or punishment, irrespective of good faith or bad faith," it is commonly called a "*Brady* violation." *Id.*; *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). The evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010) (internal citation omitted).

The court found that this evidence was not *Brady* material. Without more, it is somewhat difficult to say what aspect of the *Brady* test was found lacking. The evidence was exculpatory because it showed that Mr. Borda was at the very least interested in sending drugs to Europe. If he is interested in such, it makes it, to whatever degree, less likely that he was importing drugs into the United States. It is relevant to that fact. If legal ties to the United States such as a Florida driver's

license and property in New York make it more likely that he was importing drugs to the United States, then, likewise, discussion of sending drugs to Europe makes it less likely that he was importing drugs into the United States.

That the evidence can be interpreted in different ways does not mean it is not *Brady* evidence. *See United States v. Nelson*, 979 F. Supp. 2d 123, 131-32 (D.D.C. 2013) *reconsideration denied*, 59 F. Supp. 3d 15 (D.D.C. 2014) and *appeal dismissed*, No. 13-3108, 2014 WL 3013970 (D.C. Cir. June 17, 2014) and *appeal dismissed*, No. 13-3108, 2014 WL 3013970 (D.C. Cir. June 17, 2014).

If the evidence at issue can be used to support the defense, it is exculpatory regardless of whether there is another explanation that does not support the defense. *Id.* In *Nelson*, this court held that a dispute about what the evidence meant does not make it nonexculpatory. *Id.* The evidence at issue was an email between the defendant and an agent that was arguably ambiguous over whether the defendant was meeting the agent for drugs or sex with a minor. *Id.* Whether the evidence indicated the defendant's intent to entice a minor into sexual contact or lack thereof was a genuine question for the jury to decide and the evidence should have been admitted. *Id.*

Because this case was such a close call, and there was no overwhelming evidence that Mr. Borda intended to import drugs to the United States, this additional evidence would have created a reasonable probability that the result

would have been different. *United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010) (internal citation omitted). Mr. Borda was entitled to disclosure of nonredacted copies of these debriefing reports, and should have been permitted to reference them at trial.

### Issue IV

### E-mail evidence that Mr. Borda did not want drugs sent to the United States should have been admitted.

**Standard of Review**

Rulings on the admissibility of evidence are reviewed for abuse of discretion. *United States v. Fench*, 470 F.2d 1234, 1239 (D.C. Cir. 1972). However, where excluded evidence bears on a matter that could be determinative of guilt or innocence, an abuse of discretion can be found. *United States v. Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978).

**Argument**

At trial, Mr. Borda moved to admit into evidence an e-mail purportedly from the government's informant, Junior. (JA 274). This email, according to the DEA agent, was from Junior's email address, used to communication with DEA regarding his activities on behalf of the United States government. (JA 250). In the email in question, Junior writes that Mr. Borda was not interested in sending drugs to the United States, but rather to Spain and Mexico. (*Id.* at JA 274-275). The

email was sent on March 6, 2006. (*Id.* at JA 275). Written motions were filed for and against this motion and the court ultimately excluded the evidence.

**Relevance**

The first basis that the court cited for excluding the evidence is that it was not relevant as outside the scope of the conspiracy. (JA 278). The indictment in this case charged Mr. Borda with a conspiracy from 2005 through 2007. The email was sent in 2006. The evidence presented by the government related to transactions that occurred from January 2005 to September 2005.

It is foreseeable how relevant Mr. Borda's feelings on the subject of importing drugs to the United States would be to the charges. It was only six months later and dealt with the same major players: Borda, Alvaran, Montoya, and Junior. Therefore their subsequent dealings are relevant to their past dealings. The fact that Mr. Borda had these feelings in March 2006 does make it more likely that he felt that way in September 2005 when dealing with the same individuals to ostensibly achieve the same goals. It is within the government's purview to argue otherwise to the jury, but that does not make the evidence any less relevant. It is up to the government to argue to the jury that this evidence is less probative than the defense may want to contend, but it is still admissible for Borda to be allowed to present a complete defense.

35

In addition, it is the government's own evidence that draws this distinction. The government chose to only present evidence up until September 2005, possibly only to keep this helpful evidence out. The government should not be permitted to orchestrate the charges and evidence in order to keep exculpatory evidence from the jury.

The further point made by the court regarding the use of the pronoun "he" after speaking directly about Borda (*Id.* at JA 280), also goes to the persuasiveness of this evidence, not its relevance and admissibility. If there is any question, it is one for the jury to decide what they believe.

### **Hearsay**

Opposing party statements are not hearsay under Federal Rule of Evidence 801(d)(2) if they also meet one of five requirements. The exclusion at issue here is 801(d)(2)(D), where a statement "was made by the party's agent or employee on a matter within the scope of that relationship while it existed." Fed. Rule Evid. 801(d)(2)(D). This Circuit has noted that the rule includes the federal government as a party-opponent of the defendant in a criminal case. *United States v. Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978). The court in *Morgan*, also noted that although prior to the establishment of the Federal Rules of Evidence, the Government was not bound by statements of its agents, there is no exception for

36

the federal government in criminal cases found in Rule 801(d)(2)(D) anywhere. *Id.* at 937 n. 15.

The district court, in citing *United States v. Morgan*, 581 F.2d 933 (D.C. Cir. 1978) recognized that it was not the same hearsay exclusion raised in this case. In *Morgan*, this circuit ruled that the use of an informant's statements in a sworn affidavit supporting the request for a warrant made them admissible under Federal Rule of Evidence 801(d)(2)(B) as having been adopted by the government. *Id.* at 937. However, Mr. Borda raised subsection (D), and not (B). (JA 275). Therefore, *Morgan*, while persuasive in its inclusion of relevant evidence, is not directly on point on the issue of subsection (D).

More persuasive, is the Sixth Circuit's holding in *United States v. Branham*, 97 F.3d 835, 851 (6th Cir. 1996). In *Branham*, the statements of an informant cooperating with federal agents were held to be within the scope of the informant's agency with the government. The fact that the informant communicated regularly with the defendant in order to gain his trust and provided such information to the government, made the conversations in furtherance of the goal of the investigation. *Id.* The informant's statements trying to entrap the defendant into committing a crime were deemed admissible. *Id*.

This holding is reasonable and makes sense because the defendant's own statements or those of his agents can be used against him in his prosecution. He is

entitled to discovery of such exculpatory information under *Brady*, and he has a Sixth Amendment right to present a defense of such exculpatory information at trial.

This information is trustworthy, because Junior stated that Mr. Borda did not want drugs imported to the United States. The informant's position is one of wanting to please the government, therefore statements that do not please the government, and as a result do not assist the speaker, Junior, in his cooperation efforts are more trustworthy. The government deemed Junior's information and cooperation trustworthy when they engaged him to work for them and acted on information he provided.

As far as the district court's statements regarding these statements related to the scope of the conspiracy, 801(d)(2)(D) does not require a connection to the conspiracy as in 801(d)(2)(E), just that it be within the scope of the party's relationship with the declarant. It appears that the court confused this issue. It does not have to be within the scope of the conspiracy to be relevant to this conspiracy, and it does not have to be within the scope of the conspiracy to be admissible under 801(d)(2)(D).

Additionally, this evidence should have been admitted under Rule 807, the residual exception. To come in under the residual exception:

(1)    the statement has equivalent circumstantial guarantees of trustworthiness;

(2)    it is offered as evidence of a material fact;

(3)    it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4)    admitting it will best serve the purposes of these rules and the interests of justice.

The email evidence has equivalent circumstantial guarantees of trustworthiness as it was an email written by the government's own informant on which most of this and investigation was built. Further, the government's faith in Junior's trustworthiness was fully revealed during the post-trial *Brady* hearings in which DEA Analyst Skidmore testified about the agency's views of him as a trustworthy source as a "proactive[]" part of their investigations. (JA 397.9). Additionally, there is no reason to doubt Mr. Borda's statements at the time of discussions regarding drug dealing to an individual he would have no known reason to sugar coat his intent or involvement.

Mr. Borda's expressions to the government's confidential informant regarding his intent regarding the drugs coming to the United States was the major issue in dispute at trial, therefore this evidence was clearly offered as evidence of a material fact.

39

The evidence is more probative than other evidence on this point as Junior was unavailable at the time of trial. Any statements Mr. Borda could have made at the trial regarding his intent would not be as probative as his statements to Junior contemporaneously with the dealings between the two men. His statements to Junior at the time is much more indicative of his intent than any statements made after the fact.

Admitting the email evidence would best serve the purposes of these rules and the interests of justice as this case was a close one, with extensive evidence presented as a whole, but little evidence of Mr. Borda's intent. Evidence from the government's own chief informant should have been admitted to ensure Mr. Borda received a fair trial.

## Issue V

**Mr. Borda's property in New York and Florida driver's license are not relevant to his participation in a drug importation conspiracy and create unfair prejudice connecting him to the United States.**

### Standard of Review

Rulings on the admissibility of evidence are reviewed for abuse of discretion. *United States v. Fench*, 470 F.2d 1234, 1239 (D.C. Cir. 1972). However, where the evidentiary question bears on a matter that could be determinative of guilt or innocence, an abuse of discretion can be found. *United States v. Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978).

**Argument**

The Court erred in admitting evidence of Mr. Borda owning a house in New York and having a Florida driver's license. This evidence is not relevant to show any connection between Mr. Borda and drug importation.

Mr. Borda bought a house in New York in 1994, more than ten years before the alleged conspiracy (JA 256). He also had a driver's license in Florida in 1996. (JA 263).

The government's proposed relevance, that this evidence "has a tendency to show that Borda understood that the United States was a major market for cocaine, especially cocaine coming from Mexico," makes a cognitive leap that does not connect. These documents show that Mr. Borda had ties to the U.S., not that he had any cognitive knowledge of the drug market in the U.S. It would be no different from an American citizen, all other facts being equal, charged with drug importation. If an American was shown to be involved in the movement of cocaine from Columbia to Mexico, his driver's license and owned property, would do nothing to add to the likelihood that he knew and intended for drugs to be imported into the U.S.

Additionally, the inverse situation helps elucidate the irrelevance of this evidence.  One does not have to have any ties to the U.S. to know that it is a major drug market, just like an American does not have to have ties to Colombia to know

41

it is a major source for cocaine. Having ties to Colombia would not make that fact any more likely.

Further, this evidence is prejudicial. Because there is so little evidence connecting Mr. Borda's actions in this case to the United States, merely mentioning locations in the U.S. tying Mr. Borda to the country, draws an unfair and unrelated inference. The fact that these may be common events in life in the United States does not alleviate the prejudice. It is misleading to the jury, confusing them with a connection to the U.S. that has nothing to do with importing drugs.

### Issue VI

**Evidence of Mr. Borda's prior conviction for drug trafficking was irrelevant to the question of whether Mr. Borda knowingly conspired to import drugs into the United States. This resulted in prejudicial character evidence being erroneously admitted.**

**Standard of Review**

A claim that a district court improperly admitted evidence under Rule 404(b) is ordinarily reviewed for abuse of discretion. *United States v. Pettiford*, 517 F.3d 584, 588 (D.C. Cir. 2008). However, where an evidentiary question bears on a matter that could be determinative of guilt or innocence, an abuse of discretion can be found. *United States v. Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978).

42

**Argument**

Pretrial, the government filed a motion to admit prior convictions. (JA 69). Mr. Borda was convicted of conspiracy to possess with intent to distribute cocaine in the Southern District of Florida in 1998. He pled guilty and was sentenced to 70 months imprisonment. The government alleged that this conviction for possession with intent to distribute was relevant to whether Mr. Borda knew and/or intended for cocaine to be imported to United States in the instant offense. (JA 71). The court initially denied the motion on the basis that the conviction was so old and for a "significantly different offense." (JA 75). The court also found the danger of unfair prejudice to substantially outweigh any probative value under Fed. R. Evid. 403.

The defense filed a motion in limine to prevent mention of the prior conviction in accordance with the court's order. (JA 80). The government responded that a cooperating witness, Montoya would testify that he met Borda in prison and that is how he knew Borda and they met up again when they were both deported back to Colombia. (JA 102). The government further argued that the prior conviction was "intrinsically interwoven" with the instant offense because he mentioned his conviction on two occasions in recorded conversations. (*Id.* at JA 105).

The court reversed its previous ruling finding merely that the evidence was relevant and "not offered for the sole purpose of establishing Defendant's character or propensity." (JA 110). The court did not state what the permissible purpose was.

Federal Rule of Evidence 404 proscribes that "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Rule 403 allows for even relevant evidence to be excluded "if its probative value is substantially outweighed by a danger of … unfair prejudice." Fed. Rule Evid. 403.

This Circuit has a history of cautioning against the "highly prejudicial nature of other-crimes evidence." *Unites States v. Jones*, 67 F.3d 320, 322 (D.C. Cir. 1995). Evidence of prior convictions "is always . . . prejudicial to a defendant. It diverts the attention of the jury from the question of the defendant's responsibility for the crime charged to the improper issue of his bad character." *Id.* (quoting *United States v. James*, 555 F.2d 992, 1000 (D.C. Cir. 1977). The district court is required to reject evidence when the prejudicial effect substantially outweighs the probative value. *Id.* (citing *United States v. Simpson*, 992 F.2d 1224, 1229 (D.C. Cir. 1993) (internal citations omitted)).

Further, just as proof of a prior possession of drugs has no bearing on one's specific intent to distribute narcotics, proof of a prior conviction for conspiracy to

44

distribute cocaine has no bearing on intent to import drugs to the United States. *See United States v. Edwards*, 540 F.3d 1156, 1163 (10th Cir. 2008) ("Likewise, we are unable to discern how evidence that Defendant possessed personal-usage amounts of controlled substances is relevant to show that he intended to distribute narcotics in the instant case."); *United States v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013) (convictions for possessing cocaine were inadmissible to prove knowledge or intent in his trial for possessing with intent to distribute).

Additionally, the prejudice caused by admitting any crime connected to drugs is very high in dissimilar cases. *United States v. Watson*, 171 F.3d 695, 702-03 (D.C. Cir. 1999). In *Watson* the court noted that the prejudicial effect of admission of a prior conviction for possession of crack to prove possession of cocaine is "strong because it invites the jury to infer that [the defendant] has a propensity for drug offenses and therefore the drugs … must be his." *Id.* The permissible use of such evidence is "remotely probative" when it is only relevant to the question that the defendant knew how to sell drugs. *Id.* With a "remote" probative use and high prejudice, the evidence is not admissible.

As the court initially stated, the existence of an internal drug conspiracy conviction does not make it more likely that Mr. Borda brought drugs into the United States. The two incidents have nothing to do with each other. What is more, the Government did not present any details from the prior conviction to show that

it was similar or how it had any bearing on whether Mr. Borda knew how to get drugs into the United States. He was previously involved in distributing drugs *already in* the United States, but there was no evidence presented that had a connection to getting drugs *to* the United States. *See United States v. Holland*, 41 F. Supp. 3d 82, 91 (D.D.C. 2014) ("Because the factual proffer does not clearly establish Defendant's knowledge, the Court finds that Defendant's prior conviction has little, if any, probative value."); *United States v. Bell*, 516 F.3d 432 (6th Cir. 2008) (prior convictions for distribution were not probative of intent in instant case as prior convictions were unconnected to present charges, occurred several years previously, and were not alleged to be part of same scheme to distribute drugs or to involve similar modus operandi.).

Where Mr. Borda admitted to the drug trafficking, and there was no question of identity or knowledge of drugs in general, there is no other use this evidence can serve other than as improper character evidence. Furthermore, the court did not even cite a proper purpose in allowing the evidence.

## Issue VII

**Evidence of Mr. Borda's incarceration with witness Montoya was irrelevant, prejudicial character evidence and should not have been admitted.**

**Standard of Review**

A claim that a district court improperly admitted evidence under Rule 404(b) is ordinarily reviewed for abuse of discretion. *United States v. Pettiford*, 517 F.3d 584, 588 (D.C. Cir. 2008).

**Argument**

The evidence of Mr. Borda's prior conviction was also brought up in Mr. Montoya's testimony. (JA 248). Montoya testified that he met Mr. Borda in prison at Fort Dix in 1997 or 1998. (*Id.*).

The government argued that this evidence was intrinsic to the alleged conspiracy, however, evidence does not constitute part of crime, for purpose of rule generally prohibiting "other acts" evidence, just because it either "completes the story" or "explains the circumstances" of the charged offense. *United States v. Bowie*, 232 F.3d 923, 928 (D.C. Cir. 2000). While other circuits may have allowed such evidence to complete the story, this Circuit justifiably has found that such an exception would threaten to swallow the rule when only "tangentially related to the charged crime." *Id.*

47

Therefore, the tangential value of explaining how Montoya and Borda met, does not their being in prison together part of this offense. Nor does it override the prejudicial effect.

## Issue VIII

### Co-conspirators' statements should not have been admitted when they were outside the scope of the conspiracy.

**Standard of Review**

Rulings on the admissibility of evidence are reviewed for abuse of discretion. *United States v. Fench*, 470 F.2d 1234, 1239 (D.C. Cir. 1972). However, where excluded evidence bears on a matter that could be determinative of guilt or innocence, an abuse of discretion can be found. *United States v. Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978).

**Argument**

The scope of the conspiracy was a major issue before and during trial. The government stated during trial that it was focusing on the palm oil deal, the planned second palm oil deal, and the prospective "El Chino" deal from January 2005 through September 2005. (JA 118; 133-135). The government stated that there was information of extensive drug deals with Mr. Borda, but that they chose to focus on these three deals. (JA 119). The players in these deals, according to the government, were Borda, Chino, Alvaran, Suarez, and Junior. (JA 133).

Under Federal Rule of Evidence 801(d)(2)(E), a statement is not hearsay if it "is offered against an opposing party and ... was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements are made in furtherance of a conspiracy if they "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Types of such statements include "those that keep a coconspirator updated on the status of the business, motivate a coconspirator's continued participation, or provide background information on key conspiracy members." *United States v. Carson*, 455 F.3d 336, 367 (D.C. Cir. 2006) (citations and internal quotation marks omitted).

However statements are not permitted just because they were made by a coconspirator. Statements such as "narratives of past successes and failures," "casual comments to people outside or inside the conspiracy," *Tarantino*, 846 F.2d at 1412 (internal quotation marks omitted), or statements made after the close of the conspiracy, are not admissible under Rule 801(d)(2)(E). *United States v. Miller*, 738 F.3d 361, 374 (D.C. Cir. 2013) (internal citations omitted).

Further, statements are not permitted when offered under the guise of providing an overview at the beginning of a case. *United States v. Moore*, 651 F.3d

49

30, 59 (D.C. Cir. 2011); *See also United States v. Smith*, 640 F.3d 358, 367 (D.C. Cir. 2011) (discussing the various circuits who have held such, assuming but not deciding the issue) (citing *United States v. Garcia–Morales*, 382 F.3d 12, 17 (1st Cir. 2004); *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005); *United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003). Additionally statements regarding drug deals with different people than in the charged conspiracy are not within the scope of the conspiracy. *United States v. Stover*, 329 F.3d 859, 869 (D.C. Cir. 2003).

The Government focused the evidence and defined the conspiracy as limited to the three deals: Palm Oil One, Palm Oil Two, and El Chino. The testimony of Suarez and Montoya regarding these other conversations are not dealing with the conspiracy as defined as such.

During the direct examination of one of the major informant cooperators, Camilo Suarez, evidence was brought out regarding people having nothing to do with these deals. From the beginning of his testimony he started mentioning people that did not have anything to do with these deals. When asked the open ended question of what happened when he "encountered Mr. Alvaran in early 2005," Suarez testified that "it was through a pilot his name was Tato and [the witness] found out that [Alvaran] and Tony, Mr. Borda had a run with a family member." (JA 115). That family member was El Ray Sombala. (*Id.* at JA 120).

This testimony does not have anything to do with Palm Oil or Chino. It references a "run," meaning a drug deal with other individuals than those focused on by the Government as in *Stover*, 329 F.3d at 869. The testimony is confusing to the jury as well as dealing with tangential matters more akin to casual comments (*Tarantino*, 846 F.2d at 1412) and overview testimony (*Smith*, 640 F.3d at 367). The information regarding this "run" was clearly prior to the charged conspiracy, outside its scope temporally. *Miller*, 738 F.3d at 374.

Montoya testified that he was arrested after a Mexican national was arrested in Houston, Texas with 400 kilos of drugs, then allowed to proceed to New York where the entire organization was arrested. (JA 247). He testified that he got this information from an indictment and others in the group who told him. (*Id.*). The court allowed the evidence "subject to the government's tying it up appropriately." (*Id.*)

However, the government never presented evidence that these 400 kilos was included in the Palm Oil deal. In fact, Suarez inconsistently testified that only 200 kilos made it to New York, or all 1553 kilos, or none at all, depending on the moment. (JA 210; JA 212-213). The government never presented any physical drugs. If the takedown went as described by Montoya, the government would have had drugs or further testimony regarding this incident in Texas. Therefore it is

clear that this testimony was outside the scope of the conspiracy and extremely

prejudicial as it mentions a potential connection to the United States.

### Issue IX

**The Court erred in failing to instruct the jury that they should no longer consider as evidence exhibits and testimony mentioning a drug deal that was not part of the Government's alleged conspiracy.**

### Standard of Review

The court's refusal to give an instruction requested by the defendant is

reversible error if the instruction is substantively correct, not already covered by

other instructions given to the jury, and concerns an important point in the trial

such that the failure to give it seriously impairs the defendant's ability to present

effectively his defense. *United States v. Thomas*, 114 F.3d 228, 244 (D.C. Cir.

1997).

### Argument

Camilo Suarez testified that he had a conversation with Mr. Alvaran

concerning a drug deal that would take place in Juarez, Mexico on the border of

the United States. (JA 147; JA 165-167). The English translation transcript of this

conversation was provided to the jury as Government Exhibit 35B. Both

defendants objected that this testimony was outside the scope of the conspiracy and

not in furtherance of the government's theory of the conspiracy *i.e.* Palm Oil One

and Two and the El Chino loads. (*Id.* at 9; JA 156). Mr. Border further objected

that the conversation had nothing to do with him, but was a discussion of a future side deal between Alvaran and Suarez. (JA 144). The court allowed the testimony. (*Id.* at JA 163).

The court also allowed the government to provide the jury with Government Exhibit 77B. (JA 224). This exhibit comprised of 4 clips from conversations Suarez had with Chivo while Mr. Borda was present but on the phone with someone else part of the time. (*Id.* Trial Tr. November 23, 2010 A.M. at 13). Suarez testified to the conversations as well. This conversation had to do with Chivo, Junior's assistant in Mexico who was sending money through an account in Florida, (*Id.* Trial Tr. November 23, 2010 A.M. at 12) and with Mr. Borda being interested in moving cocaine to Juarez and Atlanta to make some quick cash. (*Id.* Trial Tr. November 23, 2010 A.M. at 15, 23). Counsel agreed that this conversation has to do with money, but that it does not relate to the conspiracy as alleged by the Government. (*Id.* Trial Tr. November 23, 2010 A.M. at 17). These clips were referred to and played for the jury. (*Id.* Trial Tr. November 23, 2010 A.M. at 48-57). Suarez testified on redirect regarding a conversation he had with Borda, a recording of which was also played for the jury. (JA 229-232). The defense objected that these conversations were not part of the charged conspiracy. (JA 220; 222, 223, 228, 233, 236). The court initially admitted the statements. (JA 224).

At the end of the evidence, more than two weeks after the admission of Government Exhibit 35B and a week after the admission of Government Exhibit 77B, the court reviewed all of the co-conspirator statements that had been presented to the jury. (JA 271). The court held that the statements concerning Juarez, Florida, and Atlanta in Government Exhibits 35 B and 77B were not in furtherance of the conspiracy and therefore inadmissible hearsay. (JA 273; 277; 281.1). The court instructed the jury to remove the portion of the transcript that dealt with this subject and told them that it was stricken from the record, but did not tell the jury the subject of the stricken material. (JA 282-283). Counsel requested such an instruction, but it was refused. (*Id.*)  The jury heard this evidence without a sufficient curative instruction to disregard it.

Preliminarily, this testimony was properly kept out because it was outside the scope of the conspiracy. As discussed in the law found in issue VIII, this evidence concerned players, places, and times not covered in the charged conspiracy. These were separate drug deals that did not affect the palm oil or Chino loads.

This is an unusual circumstance related to the length of the trial. Because the court gave the Government leeway to tie up loose ends, the jury heard the evidence, but when the court found the evidence inadmissible later, the jury never learned what was inadmissible that they should not consider. Because of the

54

unusual character of this occurrence, case law directly on point is difficult to find. There is no way to know what impact this had on the jury without a curative instruction.

However, this circumstance is analogous to situations where evidence is admitted for one purpose, but not as substantive evidence and the jury is not informed of the limited purpose. *See United States v. Gilliam*, 484 F.2d 1093, 1096 (D.C. Cir. 1973). In *Gilliam* this circuit found it error for the court to have failed to instruct the jury that evidence was admissible only to impeach a witness, and not as substantive evidence, especially in light of the fact that the prosecutor argued such a use to the jury. *Id.*

The court cited the prior ruling in *United States v. McClain*, 440 F.2d 241 (D.C. Cir. 1971)[2] that instructions should be given as to the proper use of such evidence: "Whenever prosecution evidence is introduced which is admissible only for a limited purpose, the defendant is entitled to instructions which inform the jury of the proper use which may be made of that evidence." *Gilliam*, 484 F.2d at 1097 (quoting *McClain*, 440 F.2d at 245). In *McClain,* a prior act of violence against the defendant's wife, the decedent in a manslaughter conviction, was admissible only

---

[2] *United States v. McClain*, 440 F.2d 241 (D.C. Cir. 1971) (abrogated by *United States v. Copelin*, 996 F.2d 379 (D.C. Cir. 1993) only to extent that it is not always plain error when instruction not requested).

on the issue of malice and no instruction to that effect was given. *McClain*, 440 F.2d at 245.

The danger is that the jury will use evidence improperly in deciding the issue at hand. This danger is even more concerning in circumstances where the evidence was actually excluded from evidence. But this court has discussed the danger of giving a jury evidence without instructions, again in the situation of evidence admissible only for a limited purpose: "in the absence of a limiting instruction, the defendant is invariably 'substantially prejudiced' when evidence that could also have substantive significance is admitted solely for impeachment purposes." *United States v. Copelin*, 996 F.2d 379, 384 (D.C. Cir. 1993)(overruled by *United States v. Rhodes*, 62 F.3d 449 (D.C. Cir. 1995) on the issue that such error is not plain when an instruction is not requested by the defendant). This reasoning is important because the prejudice of admitting evidence outside the scope of the conspiracy that tangentially connects to the United States, the issue at the heart of the case, cannot be overcome.

The evidence in this case did not relate to the Government's view of the conspiracy, they were offhand conversations about possible other deals that may tangentially relate to the United States, but did not have to do with the Palm Oil or Chino deals. They were excluded from evidence for this reason. Given the time between the evidence being presented to the jury on November 15 and 23 and the

56

exclusion of this evidence on December 6, almost two weeks later, a more specific charge should have been given.

There was very little evidence connecting Mr. Borda's drug trafficking activity in Colombia and Mexico to the United States. Therefore these conversations that referenced Juarez as a border town, Atlanta, and Florida, are highly prejudicial. There is not a reasonable argument that the evidence in this case tying the activity to the United States was overwhelming. The court stated several times that it was not. The government sought to inundate the jury with evidence of drug trafficking, make fleeting references to the United States, and call it conspiracy to import.

Although the court struck the evidence, the defense case was tainted from its initial inclusion and the prosecution's case was artificially bolstered by this evidence of narcotics that had nothing to do with the indicted charges. They not only admitted the statements, but also elicited testimony from Suarez regarding these matters. Failing to inform the jury of which evidence had been struck fails to ensure that the jury actually disregard it. No other instruction by the court covered this evidentiary issue therefore the evidence remained in the jury's calculus of evidence to be considered in deliberations.

## Issue X

**The cumulative effect of all of the errors relating to evidence admitted to create an inference of a connection to the United States, as well as evidence kept out that is relevant to negate such a connection, warrant reversal.**

This Court has recognized that the cumulative effect of individual errors can warrant reversal: "although certain errors standing alone might be insufficient to overturn a verdict, these errors may exert a cumulative effect such as to warrant reversal. The critical inquiry is an analysis of the 'probable impact, appraised realistically, of the particular [errors] upon the jury's factfinding function.' *United States v. Brown*, 508 F.3d 1066, 1076 (D.C. Cir. 2007) (quoting *United States v. Jones*, 482 F.2d 747, 749 n. 2 (D.C. Cir. 1973) (internal citations omitted).

The evidence tying Mr. Borda's actions to the United States was far from overwhelming. The Government felt it necessary to include evidence of property purchase by Mr. Borda in New York in 1994 and his Florida driver's license in 1996: innocent conduct that had nothing to do with the alleged conspiracy nine to eleven years later. The Government kept many documents from the defense, at least some of which indicated Mr. Borda's interest in transporting drugs to other parts of the world and not the United States. Statements outside the scope of the conspiracy were admitted and other statements, although excluded from evidence were not properly removed from the jury's consideration. An unrelated prior

conviction and incarceration was admitted even though it had no bearing on whether Mr. Borda intended to import drugs to the United States.

The cumulative effect of all of these errors left the jury with a skewed view of Mr. Borda's intent, with a real danger that he was convicted on evidence too weak to be sustained. Even if these errors individually do not warrant reversal, the weight of the errors when added together is too great. Therefore Mr. Borda respectfully requests that this Honorable Court reverse his conviction and order a new trial.

## Issue XI

### Government's Improper Closing Argument

Appellant Borda joins Appellant Alvaran-Velez's issue concerning improper closing argument by the Government.

## VIII.

## <u>CONCLUSION</u>

The Government used inferences from inadmissible evidence to try and tie Mr. Borda's actions to an intent to import to the United States. The evidence was not sufficient to sustain the conviction, and in addition to *Brady* violations, the result is a jumble of evidence presented which likely confused the jury. Mr. Borda requests that the case be reversed and remanded for a new trial.

## IX.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant states that the argument contained herein is complete, meritorious and there exists no need for oral argument; however, should the Court determine that oral argument would assist in the decision making process, Appellant requests same.

/s/ Marcia G. Shein
Marcia G. Shein
Georgia Bar No. 639820
Federal Bar No. 53667
Elizabeth A. Brandenburg
FEDERAL CRIMINAL LAW CENTER
2392 North Decatur Road
Decatur, Georgia 30033
(404) 633-3797

*Counsel for Appellant*
  *Christian Fernando Borda*

## <u>CERTIFICATE OF COMPLIANCE</u>
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

this brief contains <u>13,670</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportionally-spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u> font.


/s/ Marcia G. Shein
Marcia G. Shein

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 9th day of November, 2015, I caused this Opening Brief of Appellant Borda and Joint Appendix, to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Marcia G. Shein
Marcia G. Shein