ORAL ARGUMENT NOT YET SCHEDULED

Nos. 13-3074 (L) and 13-3101

———————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

UNITED STATES OF AMERICA,
Appellee,

v.

CHRISTIAN FERNANDO BORDA, also known as Tony, and ALVARO
ALVARAN-VELEZ, also known as Marcos,
Defendants-Appellants.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA, No. 1:07-CR-00065-1
The Honorable Gladys Kessler, United States District Judge

———————

**BRIEF AND ADDENDUM FOR THE UNITED STATES**

———————

LESLIE R. CALDWELL
    Assistant Attorney General

PAUL W. LAYMON
    Attorney
    Narcotics and Dangerous
    Drugs Section

SUNG-HEE SUH
    Deputy Ass't Attorney General

KIRBY A. HELLER
    Attorney
    Criminal Division, Appellate Section
    U.S. Department of Justice
    950 Pennsylvania Ave., N.W., #1264
    Washington, DC 20530
    (202) 307-0085

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), undersigned counsel certifies as follows:

## A.     Parties

The parties before the district court and before this Court are the United States of America and defendants-appellants Christian Fernando Borda and Alvaro Alvaran-Velez. There are no amici curiae or intervenors.

## B.     Rulings Under Review

Defendants challenge the sufficiency of the evidence, the exclusion of an email from a confidential informant to an agent in the Drug Enforcement Administration, the court's denial of their motions to dismiss the indictment or for a new trial based on the government's alleged failure to disclose exculpatory information, and alleged prosecutorial misconduct during closing arguments. Borda challenges the admission of evidence of his prior conviction, evidence that he owned property in New York and had a Florida's driver's license, and co-conspirator statements. He also challenges the court's limiting instructions after the court struck evidence from the record. Alvaran challenges the court's ruling that limited his summation. He also challenges his sentence.

Several of the district court's rulings under review can be found at 941 F. Supp. 2d 16 (April 22, 2013); 786 F. Supp. 2d 25 (April 27, 2011); and 768 F. Supp. 2d 289 (March 9, 2011).

i

## C.    Related Cases

These cases have not previously been before this Court.

/s/ Kirby A. Heller
_____
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE .................................................................... 3

    A.    Procedural History ........................................................ 3

    B.    Statement of Facts ......................................................... 3

        1.    Overview ............................................................. 3

        2.    The Palm Oil Deals ................................................ 4

        3.    The "El Chino" Deal ............................................. 10

    C.    Rulings Presented for Review ......................................... 11

SUMMARY OF ARGUMENT ................................................................ 11

ARGUMENT ........................................................................................... 18

    I.    THE EVIDENCE SUFFICIENTLY ESTABLISHED THAT BORDA AND ALVARAN KNEW THAT THE UNITED STATES WAS THE INTENDED DESTINATION OF THE COCAINE THAT THEY CONSPIRED TO DISTRIBUTE. ............................................ 18

        A.    Standard Of Review ......................................................... 19

        B.    Defendants Knew Or Intended That Five Kilograms Or More Of Cocaine Would Be Imported Into The United States. ........................................................................... 20

    II.    THE DISTRICT COURT'S EVIDENTIARY RULINGS WERE NOT AN ABUSE OF DISCRETION. ......................... 30

        A.    Standard Of Review ......................................................... 30

B. The District Court Properly Excluded Junior's 2006 Emails To His DEA "Handler." ....................................... 31

C. The District Court Did Not Abuse Its Discretion By Admitting Evidence That Borda Owned Property In New York And Had A Florida Driver's License. .............. 40

D. The Court Did Not Err By Admitting Evidence Of Borda's Prior Conviction And Imprisonment. .................. 41

III. THE DISTRICT COURT DID NOT COMMIT REVERSIBLE ERROR IN ADMITTING SUAREZ'S TESTIMONY PROVIDING BACKGROUND INFORMATION AND MONTOYA'S BRIEF MENTION OF OTHER UNRELATED DRUG TRAFFICKING. ............. 47

A. Background ................................................... 47

B. Standard Of Review ...................................... 48

C. The District Court Did Not Commit Reversible Error. ..... 49

IV. THE DISTRICT COURT SUFFICIENTLY IDENTIFIED FOR THE JURY THE EVIDENCE THAT WAS STRUCK FROM THE RECORD. ........................................... 52

A. Background ................................................... 52

B. Standard Of Review ...................................... 55

C. The District Court's Instructions Cured Any Potential Prejudice From Admitting Evidence That Was Later Struck........................................................... 55

V. THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE GOVERNMENT DID NOT VIOLATE *BRADY*. ..................................................... 58

A. Background ................................................... 59

B. Standard Of Review ...................................... 61

iv

    C.    Defendants Have Not Established Any *Brady* Violations. ................................................................. 62

        1.    The Pretrial Disclosures ........................................ 63

        2.    The Post-Trial Disclosure ..................................... 65

VI.    THE PROSECUTOR'S CLOSING ARGUMENTS WERE PROPER, AND THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING DEFENDANTS' MOTION FOR A NEW TRIAL. ................. 68

    A.    Background .................................................................... 68

    B.    Standard Of Review ....................................................... 71

    C.    Any Misstatement About The Transportation Fee Calculation Was Not Reversible Error. ........................... 71

    D.    The Prosecutor's Argument That Junior Paid Defendants In U.S. Dollars Was A Fair Inference From the Evidence. ................................................................. 74

    E.    The Prosecutor's Use Of The "Bee Container" Metaphor Was Not Misconduct. ...................................... 75

VII.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY LIMITING ALVARAN'S CLOSING ARGUMENT ON AN ISSUE LACKING EVIDENTIARY SUPPORT ................................................................................ 75

    A.    Background .................................................................... 76

    B.    Standard Of Review ....................................................... 77

    C.    Alvaran's Argument Was Not Supported By The Record. .......................................................................... 77

VIII.    THE CUMULATIVE EFFECT OF ANY ERRORS THAT ARGUABLY OCCURRED DOES NOT WARRANT REVERSAL. ......................................................................... 82

IX.   ALVARAN'S SENTENCE WAS PROCEDURALLY
REASONABLE. ........................................................................ 82

    A.   Background ........................................................................ 83

    B.   Standard Of Review ........................................................ 85

    C.   The District Court's Sentencing Findings Were
Supported By The Record. ............................................... 86

    D.   The District Court Provided A Reasoned Basis For Its
Decision. ........................................................................... 91

CONCLUSION ............................................................................... 93

CERTIFICATE OF COMPLIANCE ............................................. 94

CERTIFICATE OF SERVICE ....................................................... 95

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................2, 58, 62

*Johnson v. United States*, 347 F.2d 803 (D.C. Cir. 1965)................................. 77

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................... 67

*Lippay v. Christos*, 996 F.2d 1490 (3d Cir. 1993) ........................................... 35

*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................................... 59

*Rita v. United States*, 551 U.S. 338 (2007) ..................................................... 91

*Securities & Exchange Comm'n v. First City Financial Corp.*, 890 F.2d 1215
    (D.C. Cir. 1989) ..................................................................................... 37

*Strickler v. Greene*, 527 U.S. 263 (1999)....................................................... 62

*United States v. Alexander,* 331 F.3d 116 (D.C. Cir. 2003) .............................. 71

*United States v. Andrews*, 532 F.3d 900 (D.C. Cir. 2008) ................................ 63

*United States v. Arroyo*, 406 F.3d 881 (7th Cir. 2008) ..................................... 35

*United States v. Bisong*, 645 F.3d 384 (D.C. Cir. 2011).................................... 91

*United States v. Bostick*, 791 F.3d 127 (D.C. Cir. 2015) .............................19, 27

*United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000).................................... 43

*United States v. Branham*, 97 F.3d 835 (6th Cir. 1996) ................................... 35

*United States v. Brockenborrugh*, 575 F.3d 726 (D.C. Cir. 2009) ...................... 85

*United States v. Brodie*, 524 F.3d 259 (D.C. Cir. 2008) ................................... 62

*United States v. Brown*, 508 F.3d 1066 (D.C. Cir. 2007) ................................. 82

\*   Authorities principally relied on are marked with an asterisk.

*United States v. Brown*, 597 F.3d 399 (D.C. Cir. 2010) ..................................... 45

*United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006) .................................... 49

*United States v. Celis*, 608 F.3d 818 (D.C. Cir. 2010) .................................. 48, 82

*United States v. Chan Chun-Yin*, 958 F.2d 440 (D.C. Cir. 1992) ........................ 20

*United States v. Childress*, 58 F.3d 693 (D.C. Cir. 1995) ................................. 72

*United States v. Clarke*, 24 F.3d 257 (D.C. Cir. 1994) ...................................... 48

*United States v. Coumaris*, 399 F.3d 343 (D.C. Cir. 2005) ............................... 30

*United States v. Davis*, 377 Fed. Appx. 19 (D.C. Cir. 2010) ............................. 93

*United States v. Delaney*, 651 F.3d 15 (D.C. Cir. 2011) .................................... 85

*United States v. DeLoach*, 504 F.2d 185 (D.C. Cir. 1974) ............................ 79, 80

*United States v. Edmond*, 52 F.3d 1080 (D.C. Cir. 1995) ................................. 50

*United States v. Garrett*, 720 F.2d 705 (D.C. Cir. 1983) .................................. 50

*United States v. Gartmon*, 146 F.3d 1015 (D.C. Cir. 1998) ............................... 73

*United States v. Glover*, 681 F.3d 411 (D.C. Cir. 2012) ................................... 19

*United States v. Graham*, 162 F.3d 1180 (D.C. Cir. 1998) ............................... 89

*United States v. Hall*, 613 F.3d 249 (D.C. Cir. 2010) ...................................... 49

*United States v. Henry*, 557 F.3d 642 (D.C. Cir. 2009) .................................... 85

*United States v. Hitow*, 889 F.2d 1573 (6th Cir. 1989) ..................................... 50

\* *United States v. Hoffman*, 964 F.2d 21 (D.C. Cir. 1992) ............................ 77, 78

*United States v. Jones*, 567 F.3d 712 (D.C. Cir. 2009) ..................................... 93

*United States v. Lathern*, 488 F.3d 1043 (D.C. Cir. 2007) ............................ 39, 40

\*   Authorities principally relied on are marked with an asterisk.

*United States v. Laureys*, 653 F.3d 27 (D.C. Cir. 2011) ..................................... 20

*United States v. Lawson*, 494 F.3d 1046 (D.C. Cir. 2007) ...........................79, 81

*United States v. Locke*, 664 F.3d 353 (D.C. Cir. 2011) ..................................... 91

*United States v. Long*, 328 F.3d 655 (D.C. Cir. 2003) ...................................... 46

*United States v. Mahdi*, 598 F.3d 883 (D.C. Cir. 2010).................................... 31

*United States v. Martinez*, 476 F.3d 961 (D.C. Cir. 2007) ............................... 24

*United States v. McCarson*, 527 F.3d 170 (D.C. Cir. 2008).............................. 46

*United States v. McCoy*, 242 F.3d 399 (D.C. Cir. 2001) .................................. 91

\* *United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016) .............30, 44, 57, 63, 74

*United States v. Mejia*, 597 F.3d 1329 (D.C. Cir. 2010) .................................. 71

*United States v. Mohammed*, 693 F.3d 192 (D.C. Cir. 2012) ........................... 85

*United States v. Morgan*, 581 F.2d 933 (D.C. 1978).........................................36

*United States v. North*, 910 F.2d 843 (D. C. Cir. 1990), *superseded on other grounds on reh'g*, 920 F.2d 420 (1990) .................................................... 72

*United States v. Olejiya*, 754 F.3d 986 (D.C. Cir. 2014) ..............................85, 88

*United States v. Oruche*, 484 F.3d 590 (D.C. Cir. 2007) .................................. 61

*United States v. Pagan-Ferrer*, 736 F.3d 573 (1st Cir. 2013) .......................... 56

*United States v. Pettiford*, 627 F.3d 1223 (D.C. Cir. 2010) ............................. 62

*United States v. Pole*, 741 F.3d 120 (D.C. Cir. 2013) ...................................... 30

*United States v. Rawlings*, 522 F.3d 403 (D.C. Cir. 2008) ............................... 71

*United States v. Renteria*, 720 F.3d 1245 (10th Cir. 2013) .............................. 38

*United States v. Santana*, 342 F.3d 60 (1st Cir. 2003) ..................................... 44

\*    Authorities principally relied on are marked with an asterisk.

ix

*United States v. Santos*, 372 F.2d 177 (2d Cir. 1967)........................................ 35

*United States v. Scheffer*, 523 U.S. 303 (1998)................................................... 39

*United States v. Seiler*, 348 F.3d 265 (D.C. Cir. 2003) ..................................... 86

*United States v. Shores*, 33 F.3d 438 (4th Cir. 1994) ........................................ 50

*United States v. Stover*, 329 F.3d 859 (D.C. Cir. 2003) ..................................... 85

\* *United States v. Straker*, 800 F.3d 570, 588 n.1 (D.C. Cir. 2015), *cert. denied*,
136 S. Ct. 1170 (2016) ........................................................ 39, 44, 61, 67

*United States v. Stubblefield*, 643 F.3d 291 (D.C. Cir. 2011) ............................ 77

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) ............................. 49

*United States v. Warren*, 42 F.3d 647 (D.C. Cir. 1994) ..................................... 36

*United States v. Washington*, 106 F.3d 983 (D.C. Cir. 1997) ............................ 37

*United States v. Watson*, 171 F.3d 695 (D.C. Cir. 1999) ...........................71, 73

*United States v. White*, 116 F.3d 903 (D.C. Cir. 1997) ..................................... 55

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010) .................................... 62

*United States v. Wyche*, 741 F.3d 1284 (D.C. Cir. 2014)................................... 86

*United States v. Yildiz*, 355 F.3d 80 (2d Cir. 2004) ........................................... 35

**Statutes**

18 U.S.C. § 3553(f)............................................................................................. 84

18 U.S.C. § 3582(c)(2) ....................................................................................... 93

21 U.S.C. § 959 ..................................................................................................... 3

\*   Authorities principally relied on are marked with an asterisk.

x

21 U.S.C. § 959(a) ................................................................ 25

21 U.S.C. § 959(a)(1) (1996) ................................................. 20

21 U.S.C. § 959(a)(2) (1996) ................................................. 20

21 U.S.C. § 960 .................................................................... 3

21 U.S.C. § 963 .................................................................... 3

Fed. R. App. P. 28(i) ............................................................ 38

Fed. R. Evid. 401 ................................................................ 51

Fed. R. Evid. 403 ............................................................30, 44

Fed. R. Evid. 404(b) ........................................................... 30

Fed. R. Evid. 801(a) ........................................................... 49

Fed. R. Evid. 801(b) ........................................................... 49

Fed. R. Evid. 801(c)(2) ....................................................... 49

Fed. R. Evid. 801(d)(2)(D) ................................................... 34

Fed. R. Evid. 801(d)(2)(E) ................................................... 49

Fed. R. Evid. 805 ............................................................... 34

Fed. R. Evid. 807 ...........................................................34, 37

U.S.S.G. § 3B1.1 comment. n.1 ............................................ 88

U.S.S.G. § 3B1.1 comment. n.2 ............................................ 88

U.S.S.G. § 3B1.1 comment. n.4 ............................................ 88

U.S.S.G. § 3B1.1(b) ........................................................84, 88

U.S.S.G. § 5H1.4 ............................................................... 92

\*   Authorities principally relied on are marked with an asterisk.

xi

**Other Authorities**

1 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* (4th ed. 2013) § 1:41 ................................................................................. 56

4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* (4th ed. 2013) § 8:56 ................................................................................. 34

30B Charles Wright, Kenneth W. Graham & Michael H. Graham, *Federal Practice & Procedure: Evidence* (2014 ed.) § 7023 ...................................... 35

\*   Authorities principally relied on are marked with an asterisk.

## STATUTES, REGULATIONS, AND RULES

Relevant statutes and rules are included in the addendum to this brief.

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Br. | Named appellant's opening brief |
| DEA | Drug Enforcement Administration |
| JA | Appendix filed by appellants |
| SA | Supplemental appendix filed by the government |

## STATEMENT OF JURISDICTION

Defendants appeal from their judgments of conviction in a criminal case. The district court (Hon. Gladys Kessler) entered judgment against defendant Christian Fernando Borda on August 12, 2013. JA 571; SA 51. It entered judgment against defendant Alvaro Alvaran-Velez on October 7, 2013. JA 638. The district court had jurisdiction under 18 U.S.C. § 3231. Borda filed a timely notice of appeal on August 7, 2013, JA 570; Alvaran filed a timely notice of appeal on October 20, 2013, JA 643; *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

1. Whether a reasonable juror could conclude that defendants knew or intended that the cocaine that they conspired to distribute would be unlawfully imported into the United States.

2. Whether the district court abused its discretion by: (1) denying Borda's motion to admit an email from a confidential informant to a Drug Enforcement Administration (DEA) agent; (2) admitting evidence (real estate records and Borda's Florida driver's license) that documented that Borda previously lived in the United States; and (3) admitting testimony that a cooperating witness met Borda in prison and the record of Borda's federal drug conviction.

3. Whether the district court committed reversible error by admitting (1) Suarez's testimony about how he met Alvaran and what Alvaran first told Suarez about Borda; and (2) Montoya's testimony about how authorities learned of his organization's drug trafficking in 1996.

4. Whether the district court's instructions sufficiently identified for the jury the exhibits and testimony that it struck from the record.

5. Whether the district court correctly ruled that the government did not violate its obligation to disclose exculpatory information under *Brady v. Maryland*, 373 U.S. 83 (1963).

6. Whether the government committed misconduct in its summations.

7. Whether the district court improperly limited Alvaran's argument that was not supported by the record.

8. Whether Borda has established that the cumulative effect of the alleged errors warrants reversal.

9. Whether the district court correctly calculated Alvaran's advisory guidelines range and whether it sufficiently explained the reasons for imposing a 15-year sentence.

## STATEMENT OF THE CASE

### A.     Procedural History

After a jury trial in the United States District Court for the District of Columbia, defendants were convicted of conspiracy to distribute five kilograms or more of cocaine, knowing or intending that it would be imported into the United States, in violation of 21 U.S.C. §§ 959, 960, and 963. JA 571, 638. The district court sentenced Borda to 300 months of imprisonment, to be followed by ten years of supervised release, JA 572-573, and it sentenced Alvaran to 180 months of imprisonment, to be followed by five years of supervised release, JA 639-640.

### B.     Statement of Facts

Viewed in the light most favorable to the verdict, the evidence established the following.

#### 1.     Overview

Borda was a member of a Colombian drug-trafficking organization that had the capacity to supply huge quantities of cocaine at a time. SA 191; SA 89 ("the people I work with can do that [supply 5000 kilograms] and a lot more, piece of cake"). During the time periods charged in the indictment, it was customary for Colombian cocaine dealers to partner with Mexican drug traffickers: the Colombian suppliers would ship the cocaine to Mexico, and the

3

Mexican drug traffickers would take responsibility for distributing the drugs from there. SA 227-228. This case involved Borda's plans to deliver three such loads of cocaine to drug dealers in Mexico. Alvaran, a drug dealer with ties to both Colombia and Mexico, SA 144, helped in the planning, invested in at least one of the loads, and arranged for the delivery of the drug proceeds back to Borda.

The evidence primarily consisted of defendants' recorded telephone conversations and meetings with their co-conspirators and confidential informant Carlos Suarez and the testimony of Suarez and cooperating witness Juan Jaime Montoya-Estrada ("Montoya"), who worked for Borda as his right-hand man ("secretary") in Mexico. SA 297. Defendants did not contest that they were drug dealers; instead, the sole issue at trial was whether they knew or intended that the drugs would be imported into the United States. *E.g.*, SA 113-115, 210, 358-359, 361.

### 2.    The Palm Oil Deals

In January 2005, defendants began arranging for the shipment of 1500 kilograms of cocaine from Colombia to Mexico. SA 59, 124, 130, 150, 258. The cocaine would be concealed inside drums of palm oil and shipped through legal channels. SA 130, 132, 263. Borda had lined up the palm oil company on the Colombian end, and defendants needed someone to receive the shipment in

4

Mexico and distribute the cocaine. SA 131, 133. At Suarez's suggestion, defendants brought Raul Valladares Jr. ("Junior"), a Mexican drug trafficker with contacts at the Mexican port of Puerto Progreso, into the deal for that purpose. SA 127-129, 238-239. Junior met with Borda in Colombia, selected the quality of cocaine, and invested in a portion of the shipment. SA 130, 145, 150-151. Alvaran, Suarez, and another individual purchased an additional share of the load. SA 151.

In May 2005, the Golden Fruits Company shipped a container of palm oil – with 1553 kilograms of cocaine hidden inside – from Cartagena, Colombia to Progreso, Mexico. SA 58, 215, 275. The shipment arrived at the port during the first week of June, and Borda and Alvaran told Junior that he could bring the entire shipment to Monterrey. SA 149, 173, 215; SA 67 (Junior told Borda that "[i]t works out better for [Junior] to continue straight there [to Monterrey], everything at once," and Borda agreed that "[i]f you want to do all of it, then all right. . . Do it."); SA 173 ("Alvaran had also spoken with Junior and they had also agreed that the merchandise would proceed on to Monterrey."). According to Alvaran's calculations, Junior owed Borda $6,588,400 for Borda's share of the load (minus Junior's 18% transportation fee); Junior owed the Alvaran group approximately $979,000. SA 150-154. Junior was supposed to pay for the cocaine within ten days of receiving it. SA 158.

From the beginning, the partners had trouble getting Junior to pay. When Alvaran and Suarez met in Mexico City on June 15, Alvaran knew that "Junior had already started to send the merchandise either to the border or across the border," but he had not yet made any payments. SA 156-157; SA 63 (in discussion about Junior, Alvaran told Suarez that "[t]hey started to send partials up there . . ."). During their meeting the next day, Alvaran explained to Suarez that, although Borda gave Junior ten days to pay for the merchandise, "what was happening was that . . . [t]hey were full of merchandise in Monterrey, and it was not selling as fast as they thought it would." SA 158-159. Because Borda was coming to Mexico City the following week and would "start bothering us about whether that money is coming," Alvaran and Suarez would "have to talk very clearly with Junior, and then the money has to come." SA 158-159. At some point during the conversation, Alvaran spoke to Junior on the telephone and told Junior the same thing. SA 166 ("When Tony [Borda] gets here, he will be on top of me, and I want him off."). According to Alvaran, Junior said that he "already beg[an] selling at market price" and "he was already able to start delivering money in Monterrey." SA 167-168.

On July 20, 2005, Borda met with Alvaran and Suarez in Mexico City to discuss the money that Junior still owed. Alvaran and Suarez described the "unfortunate[]" market conditions that contributed to Junior's delays. SA 68;

SA 173-174 (Suarez stated that "his [Junior's] market went bad because the border got harder for him"). Alvaran explained that there was "chaos" at the border because the president of Mexico had replaced the police at the border towns (Matamoros and Mexicali) "where he brings the people down." SA 69; SA 174 ("And what happened was that they replaced the policemen by military personnel, army personnel. So therefore it was a lot harder from Monterrey to go to the border, to cross the border."); SA 69 ("[I]t was the most impressive road inspection, searches everywhere."). As a result, "[t]he people that would come to Monterrey to buy, couldn't bring the money down . . . and they didn't have a way to go up there [to the United States] either." SA 69, 178-179. Borda "underst[ood] that" but commented that "if a guy can't get merchandise out after two months on the border it's because he doesn't have the market." SA 69-70, 180. Alvaran added that Monterrey was a small town and lacked a market for the entire load. SA 180; SA 70 ("that is not a market for personal use").

The men also complained that Junior was paying less than the negotiated price. SA 73-74. Borda told the others that he "was a drug dealer in the United States" and that "[w]hen you give them a price at the office [Borda's supplier], you have to stand by it and if it changed it's your problem." SA 74, 181. Borda added that both Alvaran and Junior had told Borda that the price was $9200 per kilogram "so then he'll [Junior] have to do it at nine two." SA 74, 181. Borda

also referred to the fact that Junior's people "had taken it across the border at U.S. price[,] brought it back to Monterrey[,] and paid the price of Monterrey for it." SA 185; SA 86 ("A two month trip and with merchandise in Monterrey, they're sending the merchandise, they're finishing up the job and they're paying me the Monterrey price for it."). Borda's boss ["El Viejo"] had warned Borda that the Mexicans "tend to do that": "they get the merchandise, they say they'll take it, they pay us nine thousand in Monterrey and they go and sell it on the other side for, for fourteen thousand or fifteen thousand [dollars] and we're the ones that are losing because we lose time, money and everything else."[1] SA 87, 186-187.

According to Suarez, the entire palm oil load was brought into the United States, and he was "certain" that Junior transported 200 kilograms to New York. SA 233-234, 243. By October 2005, Junior had paid Borda approximately $6 million. SA 220. Junior's payments were all in United States dollars, mostly in $20 denominations. SA 220, 273, 309. Once the proceeds were in Monterrey, Alvaran arranged for their transport to Mexico City, SA 303; *see also* SA 160 (Alvaran could transport "about three times a week about $500,000"). Alvaran's

---

[1] Suarez testified that Monterrey is less than a two-hour drive from the United States border and that the price of cocaine increases at the border and further north into the United States. SA 128, 186-187. The $14,000 to $15,000 price that Borda mentioned corresponded to the price of a kilogram of cocaine in Houston or Atlanta. SA 187.

secretary ("Lucas") and others would then pick up the money in Mexico City and bring it to Montoya; occasionally Montoya accompanied Lucas as he retrieved the cash from the "security office." SA 223, 306-307. Next, the men brought the money to either Alvaran's apartment or to Montoya's apartment, where Lucas, Montoya, and Alvaran's friend Mauricio Cruz counted it, sometimes in Borda's and Alvaran's presence. SA 309-311. Alvaran, Borda, and Montoya all kept ledgers showing the dates Junior's payments were made in Monterrey and received in Mexico City, the amounts, and the transportation fees. SA 93-94, 305. Montoya's ledger also included the dates the money was delivered to the person who transported it to Borda's employees in Colombia and the amounts. SA 94. Although the ledgers were not identical, they showed that Junior paid anywhere between $153,000 and $1,020,000 every few days between June 17 and August 4. SA 93-94.

At the same time that Junior was paying for the first palm oil shipment, Borda, Alvaran, and Suarez talked about a second palm oil shipment. SA 161. Suarez suggested they again bring in Junior because they had already done "one run with [him]," and it was easier than finding someone new. SA 182. Defendants ordered the palm oil, and Junior invested some money in the new deal. SA 161-164, 209. Ultimately, Borda and Alvaran decided not to go ahead

9

with the transaction because of the problems they had with Junior on the first load. SA 89, 190-191.

### 3.    The "El Chino" Deal

Borda, Alvaran, and Suarez were working simultaneously on another deal, this time with a Mexican drug trafficker known as "El Chino." SA 126. The plan involved transporting 3000 kilograms of cocaine from Colombia to Mexico City by sea: the cocaine would be loaded on two "go-fast" boats in Colombia; the cocaine would then be transferred from the go-fast boats to a 62-foot Venezuelan fishing vessel; the fishing vessel would meet up with a boat sent by El Chino off the coast of Honduras; and El Chino's "people" would transport the cocaine to Mexico City. SA 197-201, 226, 285.

Borda, Alvaran, and Suarez discussed the El Chino deal during their July 20 meeting in Mexico City. SA 192. El Chino had already given Borda the money for his share of the load (350 kilograms), and Alvaran urged Borda to "run the errand." SA 195-196, 200.

The shipment did not go according to plan. One of the go-fast boats broke down, which meant that only 1500 kilograms of cocaine were transferred to the fishing vessel. SA 199. The fishing vessel had its own problems. On September 17, 2005, Coast Guard officials, having received information that the vessel was transporting cocaine, dispatched a helicopter to "get eyes" on the vessel, and

10

upon seeing the helicopter, the fishing boat's crew threw the cocaine overboard. SA 200, 278-279. When the Coast Guard officers boarded the vessel, it was traveling in a northwest direction off the coast of Venezuela. SA 281-283, 286. The officers found the compartments where the cocaine had been hidden but did not recover any drugs. SA 200, 202, 284.

El Chino demanded that Borda and Alvaran meet with him to explain what had happened to the load. SA 203-207. After lengthy negotiations, Borda agreed to give El Chino 335 kilograms of cocaine to reimburse him for his loss. SA 207, 212-213, 315-316.

## C.    Rulings Presented for Review

The rulings presented for review are identified in the certificate on page i.

### SUMMARY OF ARGUMENT

1. The evidence sufficiently established that defendants knew or intended that the United States was the planned destination of the cocaine that they conspired to distribute. The cocaine in the palm oil load was shipped to the Mexican port of Puerto Progreso, and defendants authorized Junior to move the cocaine from the port to the inland city of Monterrey, which was only about 200 kilometers from the United States border. Defendants also knew about Junior's activities. Shortly after the cocaine arrived in Mexico, Alvaran told Suarez that Junior had started to send some of the cocaine to the border or across it. At a

11

meeting about a month later, when Junior had not yet paid them as promised, defendants discussed Junior's problems at the border that contributed to his difficulties in selling the drugs and receiving the proceeds. When Junior finally paid for the cocaine, the payments were all in United States dollars.

2. The district court's challenged evidentiary rulings were not an abuse of discretion.

a. The district court did not err by excluding on relevance grounds Junior's March 2006 email to the DEA, reporting on information that he learned during a meeting with Borda and others. Junior was cooperating with the government at the time, and the email described Borda's offer to include Junior in a new drug deal to pay off Junior's debt. The last sentence of the email stated that "[h]e is not interested in sending anything to the United States. Nothing. He is interested in Spain, (Valencia) and Mex." SA 34. Borda's intent as to a future drug deal had no bearing on his knowledge of Junior's activities, months earlier, in connection with the palm oil load. The email also was double hearsay: it ostensibly contained Borda's out-of-court statement to Junior and Junior's out-of-court statement to the DEA agent.

b. The district court did not abuse its discretion by admitting real estate records that showed that Borda owned property in New York in 1994 and Borda's Florida driver's license that was issued in 1996. The jury could consider

12

Borda's prior ties to the United States to determine whether Borda was familiar with the United States drug market. Any error in admitting the evidence, which was brief and not mentioned in summation, was also harmless.

c. The district court properly admitted Montoya's testimony that he met Borda while the two men were serving sentences for unrelated drug trafficking convictions. The district court concluded that the evidence was admissible for the non-propensity purpose of explaining the bond that existed between the two men and why Borda trusted Montoya to oversee Borda's drug business in Mexico. The court also did not abuse its discretion by admitting Borda's prior conviction, which corroborated Montoya's testimony and helped establish Borda's familiarity with the United States drug market. The evidence was not unfairly prejudicial because Borda admitted during a recorded conversation that he had been a "drug dealer in the United States," SA 181, and the court gave an appropriate limiting instruction, SA 343. For the same reasons, any error in admitting the evidence was harmless.

3. Suarez's testimony that he met Alvaran through a pilot named Tato was not inadmissible hearsay because it did not contain a declarant's out-of-court statement. Suarez's brief description of what Alvaran told Suarez about defendants' plans to do a "run," JA 115, also was not hearsay but instead provided background information to explain why Alvaran brought Suarez to a

meeting with Borda and the origins of their drug trafficking collaboration. Any error in admitting Suarez's very brief description was also harmless.

The government agrees that Montoya's testimony about what he learned from other members of his organization about the circumstances leading to their arrests was inadmissible because it was not relevant. The error was harmless, however, because the testimony had no connection to Borda.

4. The district court sufficiently identified for the jury the audio recordings and transcripts that had been admitted into evidence but were subsequently struck. The jurors physically removed the transcripts at issue from their binders, and the court informed the jurors that the testimony pertaining to those exhibits was struck from the record as well. In both its opening and final instructions, the court also told the jury that it could not consider exhibits and testimony that had been struck. The court properly rejected Borda's proposed instruction that emphasized to the jury the references to the United States that were no longer in evidence and failed to summarize the testimony as a whole.

5. The government did not violate its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory information. The government's disclosure about two weeks before trial of Junior's statements during debriefings between September 2005 and March 2006 that Borda "is discussing a new route from Colombia to Europe and Canada" and that Borda "sold cocaine in

14

Mexico" but that he was "willing to ship cocaine to the United States," JA 89-90, was neither exculpatory nor suppressed. Any delay in the disclosure also was not material: the statements were inadmissible hearsay and defendants have not claimed that an earlier disclosure would have led to admissible evidence or changed the result at trial.

The government did not violate *Brady* by disclosing post-trial a DEA analyst's draft report of a January 2006 interview with Junior. That report included Junior's statement that Borda advanced 100 kilograms of cocaine each to Junior and another co-conspirator ("HB") and that "[u]nbeknownst to Borda," Junior and HB "took an additional 100 kilograms of cocaine believing they could sell it in Houston for a larger profit." SA 400-401. As the DEA analyst explained at the post-trial evidentiary hearing, the only information "unbeknownst" to Borda was Junior's and HB's plans to sell the additional 100 kilograms. That information did not undermine the evidence that established that Borda knew that Junior was selling cocaine at and across the border. Contrary to Alvaran's claim, that information also did not conflict with Suarez's testimony that he knew that Junior and another individual transported 200 kilograms of cocaine to New York – indeed it supported it – and the government did not violate *Napue v. Illinois*, 360 U.S. 264 (1959), when it had no reason to believe that Suarez's testimony was false.

15

6. The prosecutor's summations were not improper. To rebut a defense argument, the prosecutor explained to the jury that Borda's profit was the same whether he was paid the Monterrey price for cocaine and charged an 18% transportation fee or was paid the higher United States price with a corresponding higher transportation fee. The prosecutor plugged the relevant numbers into a hypothetical and calculated the transportation fee as a percentage of the price per kilogram. Although Suarez had testified that the transportation fee was based on a percentage of the total drug quantity in the load, the prosecutor did not materially misstate the evidence because the result was the same under both approaches. Moreover, the actual values were not contested and the prosecutor elsewhere accurately described Suarez's testimony. The court's instructions that attorneys' arguments were not evidence and that the jurors should rely on their own recollections mitigated any potential prejudice.

Defendants' claim, raised for the first time on appeal, that the evidence did not support the prosecutor's argument that Junior paid for the cocaine in U.S. dollars is unsupported. Based on Suarez's and Montoya's testimony that defendants were paid solely in dollars and recorded statements and documentary evidence to the same effect, the prosecutor's argument was a fair inference from the evidence.

16

The prosecutor's use of a metaphor during summation did not constitute misconduct, and in any event, was not prejudicial. The argument was very brief and, as the district court concluded, not prejudicial because it was "neither effective nor persuasive." JA 376 n.10.

7. The district court appropriately precluded Alvaran from asking the jury to infer, from the government's failure to introduce evidence of drug seizures in the United States, that Junior did not inculpate defendants during his debriefings. Although Alvaran was permitted to argue about the gaps in the government's evidence, his argument was improper because there was no evidence in the record about the substance of Junior's debriefings. Alvaran also was not prejudiced because he made a similar point without objection and Borda made the identical argument, which, if credited, would have applied equally to Alvaran.

8. Borda has not shown that the cumulative effect of any errors in the trial led to his conviction on "evidence too weak to be sustained." Borda Br. 58-59.

9. The district court did not clearly err in attributing 200 kilograms of cocaine to Alvaran at sentencing based on Suarez's credible testimony that Junior delivered that amount to the United States. As the court explained, the conspiracy continued through Junior's sale of the cocaine and his repayment to defendants after he sold the drugs. The evidence established that Alvaran knew

17

that Junior, upon moving the cocaine to Monterrey, would be selling some of the palm oil load in the United States, and his receipt of the proceeds in dollars confirmed that information. Given the scope of the conspiracy, it was therefore reasonably foreseeable to Alvaran that Junior brought at least 200 kilograms of cocaine to the United States. The district court also did not clearly err in applying a three-level enhancement under U.S.S.G. § 3B1.1(b) for Alvaran's role in the offense. Alvaran helped plan the palm oil venture from the beginning; he invested in it and stood to profit if the plan succeeded; he supervised many aspects of the deal once the load arrived in Mexico; and he was in charge of transporting the proceeds from Monterrey to Mexico City. The criminal activity, at a minimum, involved Alvaran, Borda, Junior, Montoya, and Lucas, and Alvaran directly supervised Lucas, who worked as his secretary and "right-hand man." SA 146, 297. In sentencing Alvaran, the court explicitly addressed Alvaran's arguments and explained the justification for imposing a 15-year sentence.

## ARGUMENT

## I.    THE EVIDENCE SUFFICIENTLY ESTABLISHED THAT BORDA AND ALVARAN KNEW THAT THE UNITED STATES WAS THE INTENDED DESTINATION OF THE COCAINE THAT THEY CONSPIRED TO DISTRIBUTE.

Defendants (Borda Br. 19-25; Alvaran Br. 9-13) challenge the sufficiency of the evidence, contending that the government did not prove that they knew

or intended that the cocaine that they conspired to distribute would be unlawfully imported into the United States. In pressing their claims, they ignore certain evidence altogether and construe the evidence they do address in the light most favorable to themselves. The evidence, when viewed in its entirety and in the light most favorable to the government, supports defendants' convictions.

## A.    Standard Of Review

In reviewing the sufficiency of the evidence, this Court will uphold a guilty verdict "where, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bostick*, 791 F.3d 127, 137 (D.C. Cir. 2015) (internal quotation marks and citation omitted). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Ibid.* (internal quotation marks and citation omitted). The Court also does not distinguish between direct and circumstantial evidence, and it "give[s] full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Glover*, 681 F.3d 411, 423 (D.C. Cir. 2012) (internal quotation marks and citation omitted).[2]

---

[2] Borda interchangeably challenges the sufficiency of the evidence and the district court's ruling on his motion for a judgment of acquittal under Fed. R. Crim. P. 29. This Court's review of the court's denial of Borda's Rule 29 motion

### B.  Defendants Knew Or Intended That Five Kilograms Or More Of Cocaine Would Be Imported Into The United States.

Section 959(a) makes it unlawful to conspire to distribute a controlled substance "intending that such substance . . . will be unlawfully imported into the United States . . . or (2) knowing that such substance . . . will be unlawfully imported into the United States." 21 U.S.C. § 959(a)(1) & (2) (1996). The government must prove that the defendant's knowledge was "actual," rather than constructive, but "[i]t is undisputed that such proof may take the form of circumstantial as well as direct evidence." *United States v. Chan Chun-Yin*, 958 F.2d 440, 443 (D.C. Cir. 1992).

To begin, simple geography alone strongly suggests that the cocaine in this case was destined for the United States. The first palm oil shipment was transported, with defendants' authorization, from the port at Puerto Progreso to the inland city of Monterrey, which is less than two hours from the United States border. SA 128, 269. Moving the drugs away from the port would make no sense if the shipment were bound for Europe, as defendants had contended. *See* SA 57

---

is the same as above. *See United States v. Laureys*, 653 F.3d 27, 31 (D.C. Cir. 2011) (Court reviews trial court's ruling on Rule 29 motion de novo, "considering the evidence in the light most favorable to the government and determining whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt.") (quotation marks and citations omitted).

20

(map); SA 239-240 (Puerto Progreso was a port from which ships went all over the world, including Europe). The jury could similarly rely on the route of the El Chino shipment to conclude that it was not headed for Europe. Although the Venezuelan shipping vessel was large enough to cross the Atlantic Ocean and make the trip to Europe, it was proceeding in the opposite direction towards Honduras and Mexico in an area patrolled by the U.S. Coast Guard. SA 276-277, 280, 282-283, 285-286. That route was consistent with the plan that defendants had devised with El Chino in which El Chino would bring the cocaine from Honduras to Mexico City. SA 226.

Second, the evidence established that both defendants were experienced international drug traffickers, and Borda had firsthand knowledge of the United States drug market because he "was a drug dealer" there. SA 74. Thus, even without considering the specific conversations that demonstrated defendants' familiarity with prices, markets, and the like, the jury could reasonably infer that they knew that the Mexican middlemen – Junior and El Chino – intended to import a portion of the huge amounts of cocaine in each shipment into the United States. SA 317 (Montoya testified that, when Borda was in Mexico, he was concerned about the Mexican authorities, as well as "the Colombian authorities and those of the DEA . . . [a]s well as the United States").

21

Third, defendants' conversations with each other, Suarez, and Junior about the palm oil load confirmed that they knew that Junior intended to import the cocaine into the United States. As explained above, Junior moved the cocaine from a port on Mexico's eastern coast to a small inland city that was close to the border with the United States, and contrary to defendants' claim, Junior received their authorization before he did so. *See* SA 173 (Borda told Junior that he could "go ahead and move the merchandise directly to Monterey"; Alvaran "had also spoken with Junior and they had also agreed that the merchandise would proceed on to Monterrey"). The jury could reasonably infer that defendants understood that "[i]t work[ed] out better for [Junior] to continue straight [to Monterrey], everything at once," SA 67, 172-174, because Junior intended to import the drugs into the United States.

Defendants also discussed Junior's plans at length. Shortly after the cocaine arrived in Monterrey, Alvaran told Suarez that Junior had already started to send "partials" to the border and "[t]hey were waiting for the money to come back from there." SA 156-157. Defendants' subsequent conversations about Junior's problems at the border similarly demonstrate that they knew the ultimate destination of the cocaine. Suarez told Borda that "Junior's market went bad because the border got harder for him," and Alvaran added the details. According to Alvaran, the military had taken over policing the border, and, as a

22

result, drug dealers could not "bring the money down" to Monterrey to buy the cocaine or get the "merchandise" back to the United States. SA 69, 179. Nor could Junior sell the drugs in Monterrey because it wasn't "a market for personal use." SA 70. Borda "underst[ood]" the situation but faulted Junior nonetheless: "if a guy can't get merchandise out after two months on the border it's because he doesn't have the market." SA 69-70. Junior's failure to pay as promised was even worse, from Borda's perspective, because "they" had taken the drugs across the border where the sales price was much higher but were only paying Borda "the price of Monterrey." SA 184-185; SA 86 ("I would think it and you would think it. A two month trip and with merchandise in Monterrey, they're sending the merchandise, they're finishing up the job and they're paying me the Monterrey price for it."). Indeed, "[a]nyone would think that" because, as Borda's boss told him, "Mexicans . . . tend to do that": "they pay . . . nine thousand in Monterrey and they go and sell it on the other side for . . . 14,000 or 15,000 [dollars]" (the price in Houston or Atlanta but not Europe). SA 86-87, 186-188.[3]

_____

[3] In arguing that the evidence was insufficient, Alvaran focuses on Suarez's response that "honestly that's not the case." Alvaran Br. 10-11 (quoting SA 87). Although no one questioned Suarez about what he meant, Alvaran relied on Suarez's statement during summation to argue that Junior was not "gypping" defendants by selling the cocaine in the United States. SA 375. The jury could reasonably find otherwise.

Fourth, defendants were paid entirely in U.S. dollars. *E.g.*, SA 214, 220, 224. Alvaran and Borda kept ledgers that showed the receipt of the U.S. currency, and they occasionally were present when Lucas and Montoya counted the money, which was mostly in $20 denominations. SA 93, 309, 311. The jury also could infer from the amounts and frequency of Junior's payments that the proceeds were generated in locations that were close to Monterrey.

Fifth, Suarez testified that he knew that the entire load was imported into the United States and that Junior and another individual transported 200 kilograms to New York. SA 233-234. Although Suarez did not testify that he shared that information with defendants, the jury could reasonably conclude that, as the primary organizers of the deal, they were privy to the same information as Suarez. *Cf. United States v. Martinez*, 476 F.3d 961, 969 (D.C. Cir. 2007).

In challenging the sufficiency of the evidence, defendants repeat the claims that the jury and the district court rejected below, and they fare no better here. Most importantly, they ignore the significance of their acknowledgements at the July 20 meeting that Junior was sending the drugs over the border and argue that the discussions were all "after the fact of the initial agreement" and "show only that the drugs made it to Monterrey." Borda Br. 22. That claim misstates the evidence about when they authorized Junior to move the cocaine to

24

Monterrey, *see* page 22 *supra*, and it is irrelevant that Junior lied about "having it 'squared away' with" Alvaran to obtain Borda's approval. Borda Br. 22 (quoting SA 67-68). Furthermore, it does not matter that the July 20 meeting took place after the cocaine arrived in Monterrey. The conspiracy was still ongoing at the time of the meeting, and defendants' discussion of Junior's problems at the border demonstrates that they knew that the cocaine they agreed to distribute was destined for the United States.

Defendants also challenge Suarez's testimony that the cocaine was, in fact, imported into the United States, but their claims are wrong on the law and the facts. The government did not have to prove that defendants knew that the cocaine was successfully imported into the United States; instead, Section 959 requires that they have knowledge or intent that the drugs "*will be* unlawfully imported into the United States." 21 U.S.C. § 959(a) (emphasis added). Moreover, defendants' reliance on Suarez's testimony that he was "not sure what Junior actually did" with the drugs (Borda Br. 22; Alvaran Br. 11) misconstrues the evidence. The cited testimony pertained to Suarez's explanation of his recorded comments to Montoya in November 2005 in which Suarez listed all the possibilities of what Junior could have done with "it," but Suarez was not sure at the time "what [Junior] actually did with it." JA 213; *see also ibid.* (as of November 22, 2005, Suarez "did not know" what Junior "had

25

done with everything"). Those statements do not contradict Suarez's other testimony about what he knew at the time of the trial, which must be viewed in the light most favorable to the verdict. And, even if Suarez's responses during cross-examination raise questions about the extent of his own knowledge, they do not necessarily mean that defendants' knowledge was similarly limited.[4]

Alvaran's reliance (Alvaran Br. 24-25) on Suarez's testimony about an April 2006 conversation is similarly misplaced. During the snippet of the recording that was played for the jury, two "unidentified men" asked Junior whether he took "it" to Japan, and Junior variously responded "[n]o man, to Monterrey," "to Italy," and "[t]o Japan." SA 106. Borda then asked Suarez on cross-examination whether "[t]he point of that is, no one knew what Junior had done with it, right," and Suarez responded "[c]orrect." SA 250. Contrary to Alvaran's claim (Alvaran 12, 25), he was not "one of the persons" who questioned Suarez, and the cryptic recording and Suarez's one-word response to

---

[4] Defendants also rely (Borda Br. 23) on the district court's "flip flop" in crediting Suarez's testimony that the entire load was imported into the United States in denying defendants' motions for judgments of acquittal and then holding defendants accountable for only 200 kilograms of cocaine at sentencing. The two standards are not the same. The question here, like the question before the district court in ruling on the motions for judgment of acquittal, requires viewing the evidence in the light most favorable to the verdict. Defendants' additional claim that Suarez's testimony should not be credited because the government has never explained how Suarez came to know of the cocaine's ultimate destination (Alvaran Br. 9-10) was one for the jury rather than this Court.

Borda's question do not "indisputably" show (Alvaran Br. 24) that Alvaran did not know that the cocaine had been imported into the United States.

Defendants also argue that the evidence was insufficient because some of the evidence was consistent with innocence. The question before the Court, however, is not whether the evidence is consistent with innocence, but whether, after giving the government the benefit of all legitimate inferences, a reasonable juror could find that defendants were guilty beyond a reasonable doubt. *Bostick*, 791 F.3d at 137. As argued above, that standard is satisfied here. Furthermore, the evidence on which defendants rely does not support the weight they place on it.

First, Borda points to evidence that he repeatedly rejected Suarez's offers to send cocaine to the United States because he did not want the "responsibility." Borda Br. 23 (citing JA 195-196, 215, 217). A reasonable juror, however, could interpret Borda's responses to mean that he did not want to be personally responsible for shipping the cocaine to the United States, and, for that reason, he worked with Mexican middlemen who assumed that risk in his stead. The evidence Borda cites also does not undermine the conclusion that, while Borda stayed clear of selling cocaine to American drug traffickers, he knew that Junior intended to do so.

27

Borda next argues that, if he knew that Junior was "changing the agreement" by moving the cocaine from Puerto Progreso to Monterrey, then he would have "further amended the agreement to account for increased compensation due to the increased risk in sending the cocaine to the United States." Borda Br. 24. The logic of that argument is not entirely clear, and the facts do not support it. There was no evidence that defendants intended to leave the cocaine at Puerto Progreso. The only "change" was that Junior brought the entire load to Monterrey instead of to Mexico City; Borda approved that plan before the cocaine was moved; and he paid an additional transportation fee to Junior for "mov[ing] the merchandise all the way to Monterrey." SA 183. From there, it was Junior who bore the "increased risk" of sending the cocaine to the United States. SA 302 ("when Christian Borda used to do transactions with Mexican drug traffickers, he liked to go half-and-half, that is he would take half of the risk" and "would be in charge of the drugs from Colombia, of sending them").

Borda also cites evidence showing that he had "the structure to receive and distribute" large quantities of cocaine in Europe. Borda Br. 24. In particular, he relies on a portion of a conversation on July 22 in which Borda refers to someone named "Alex," who lived in Holland, had worked with "the office," and could move 4000 to 5000 kilograms throughout Europe. Borda Br. 25

(quoting JA 214-216). That evidence, however, does not compel the conclusion that the palm oil shipment was headed for Europe rather than the United States. To the contrary, there was no evidence of an association between Junior and "Alex." Moreover, in discussing the "Alex" connection, Borda made clear that he was proposing a new business venture to Suarez and Alvaran; that Borda had only done a test load to Holland with 100 kilograms of cocaine; that he was not ready to send cocaine to Alex because "we need to get the merchandise"; and Borda didn't have "any merchandise here now." SA 98, 270-271.

Finally, defendants rely on snippets from Montoya's cross-examination about his admissions during debriefings "as reflected in a DEA-6" report. Alvaran Br. 12. Montoya's out-of-court statements to the agents are hearsay, and at most, impeach Montoya's previous testimony that "Borda was upset because Junior had sent the cocaine to the United States." SA 318.  Montoya's statement during the debriefing that Junior "was selling [the cocaine] on the Mexican side" also says nothing about what happened to the cocaine from there or what defendants knew about its ultimate destination.

## II.    THE DISTRICT COURT'S EVIDENTIARY RULINGS WERE NOT AN ABUSE OF DISCRETION.

Borda challenges several of the district court's evidentiary rulings.[5] None of his claims has merit.

### A.    Standard Of Review

This Court reviews a district court's evidentiary rulings for abuse of discretion. *United States v. Pole*, 741 F.3d 120, 124 (D.C. Cir. 2013). In ruling on admissibility of evidence under Fed. R. Evid. 404(b) and 403, the court is "extremely wary of second-guessing the legitimate balancing of interests undertaken by the trial judge." *United States v. McGill*, 815 F.3d 846, 880 (D.C. Cir. 2016) (internal quotation marks and citations omitted). Even if the district court erred, the Court will not vacate the conviction unless the error affected a defendant's "substantial rights," *i.e.*, it affected the outcome of the proceedings. *United States v. Coumaris*, 399 F.3d 343, 347 (D.C. Cir. 2005).

When a defendant claims that evidentiary rulings "violate[] his Fifth Amendment right to due process . . . the [C]ourt reviews the exclusion under the typical abuse of discretion standard for evidentiary rulings and the statutory harmless error review standard . . . except in the rare case in which a district court's application of a rule of evidence is so erroneous and unfair as to

---

[5] Alvaran adopts Borda's challenge to the district court's ruling that excluded Junior's email to his DEA contact from evidence. *See* pages 32-38 *infra*.

constitute a constitutional violation." *United States v. Mahdi*, 598 F.3d 883, 892

(D.C. Cir. 2010) (internal quotation marks and citations omitted).

### B. The District Court Properly Excluded Junior's 2006 Emails To His DEA "Handler."

1. In late August 2005, Junior agreed to cooperate with the government,

and he was provided an email account to use when he communicated with DEA

agents about his undercover activities.[6] SA 322-324. Borda sought to admit a

March 6, 2006, email from Junior's account to the DEA, with "Tony-Mexico-

Saturday 4 March" listed as the subject. SA 26-38. The email described Junior's

recent meeting with Borda and several others in which Borda offered Junior a

new deal to resolve Junior's "account." SA 34. Among other details, the email

reported that "[h]e is not interested in sending anything to the United States.

Nothing. He is interested in Spain, (Valencia) and Mex." SA 34. The

government opposed the admission of the email on relevance and hearsay

grounds. SA 40. It also argued that, if the court admitted the March 6 email, the

government would move to admit another email that Junior sent later that day

about his meeting with "Estevan." SA 40-47. In that email, Junior stated that he

told Estevan "about the business with Tony [Borda]," and that Estevan agreed

---

[6] Junior had disappeared by the time of the trial, and authorities suspected that he had been murdered. SA 242.

to receive "the containers." SA 37. The email also reported that "[o]n the trip
we receive from Tony, he wants to send to New York." SA 37.

The district court declined to admit the email. JA 278-280, 331-337. It first
concluded that the email was not relevant. JA 279 ("There is no reason to
assume that whatever Mr. Borda thought, knew or intended in March of 2006"
in connection with a new deal "has any relevance to what his knowledge or
intent was back in the period of January of 2005 through September of 2005.").
Although the court found the email's lack of relevance "dispositive," it added
that the use of pronouns made the email "less than clear," JA 279-280; the email
lacked "circumstantial guarantees of trustworthiness" and was therefore
inadmissible under the residual exception to the hearsay rule, SA 335-336; and
if the court allowed the first email, it would admit the second as well, and both
emails "would tend to totally confuse the jury" because they pertained to yet
another deal, SA 336-337.

2. Borda first argues that the district court's finding on the email's
relevance was wrong because "[t]he fact that [he] had these feelings [on the
subject of importing drugs to the United States] in March 2006 does make it
more likely that he felt that way in September 2005 when dealing with the same
individuals to ostensibly achieve the same goals." Borda Br. 35. There is no
logical reason why that is so.

32

Although Borda's March 2006 proposal may indeed have been part of the same overarching conspiracy charged in the indictment,[7] Borda's knowledge of a particular shipment's ultimate destination depended on the circumstances of the transaction. For example, Borda's lack of interest "in sending anything to the United States" in March 2006 may have been due to such factors as market conditions, police crackdowns, or a host of other factors that varied from deal to deal. More importantly, even if Borda's "intent" remained the same, his interest in sending the March 2006 shipment to Spain and Mexico has no bearing on what he previously knew about Junior's and El Chino's plans. Thus, the jury could reasonably conclude that Borda knew that the first palm oil shipment was destined for the United States based on his familiarity with the specific details of Junior's efforts to sell the cocaine, and his subsequent statement was not relevant to establishing (or negating) that prior knowledge.

---

[7] Borda's allegation (Borda Br. 36) that the government "chose" to limit the conspiracy to events occurring no later than September 2005 to "keep this helpful evidence out" is unfounded. Defendants repeatedly challenged the scope of the conspiracy and sought to dismiss the indictment on the ground that the single conspiracy charged in the indictment, in fact, involved multiple conspiracies. *E.g.*, SA 1-8, 18-24, 134-135. At defendants' urging, the court required the government to define "the exact scope of the conspiracy now, as of this moment [the third day of trial]," and, after the government identified the two palm oil loads and the El Chino deal, the court stated that "[t]he government will have to live with that statement." SA 137-141.

The email also was inadmissible double hearsay because it contained Junior's out-of-court statements to the DEA and Borda's out-of-court statements to Junior to prove that Borda was not interested in sending cocaine to the United States. Borda contends that Junior's email to the DEA is admissible either under Fed. R. Evid. 801(d)(2)(D), as an admission by the government's agent, or under the residual exception to the hearsay rule, Fed. R. Evid. 807. He never explains, however, how his out-of-court statement to Junior is admissible. Because "each part of the combined statements [must] conform[] with an exception to the hearsay rule," Fed. R. Evid. 805, the evidence is inadmissible on that ground alone.

Even if this Court were to consider Borda's agency argument under Rule 801(d)(2)(D), it should reject it. As one treatise explains, absent unusual circumstances, "statements by informants should not be viewed as admissions by the government" because, among other reasons, "informants are expected to deal in and report, rumor, speculation, suspicion, and opinion, and often they themselves are implicated in criminal ventures and labor under a mix of motives that is hard to unravel." 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* (4th ed. 2013) [hereinafter *Federal Evidence*] § 8:56. For somewhat different reasons, the Second, Third, and Seventh Circuits have excluded the statements of informants and other government agents as not within Rule

801(d)(2)(D)'s purview. *See United States v. Arroyo*, 406 F.3d 881, 888 (7th Cir. 2008) (government agents are not party-opponents for purposes of Rule 801(d)(2)); *United States v. Yildiz*, 355 F.3d 80, 81-82 (2d Cir. 2004) (following its pre-Rules decision in *United States v. Santos*, 372 F.2d 177 (2d Cir. 1967), to hold that "the out-of-court statements of a government informant are not admissible in a criminal trial pursuant to Rule 801(d)(2)(D) as admissions by the agent of a party opponent"); *Lippay v. Christos*, 996 F.2d 1490, 1499 (3d Cir. 1993) ("We do not believe that the authors of Rule 801(d)(2)(D) intended statements by informers as a general matter to fall under the rule, given their tenuous relationship with the police officers with whom they work.").

Borda relies on *United States v. Branham*, 97 F.3d 835 (6th Cir. 1996), but that case did not consider the issue in any depth because the government conceded the agency relationship and claimed instead that the informant's conversations with the defendant were not within the scope of the agency. The court summarily rejected the government's "scope of the existing agency" argument and went on to find that the statements were not hearsay because they were not offered for their truth. *Id.* at 851; *see also* 30B Charles Wright, Kenneth W. Graham & Michael H. Graham, *Federal Practice & Procedure: Evidence* (2014 ed.) § 7023 at n.11 (in "summarily" rejecting the government's argument, the

35

*Branham* court "simply overlooked" "the fact that admissibility is problematic").[8]

Borda's other arguments are similarly unpersuasive. He claims that Junior's representations in the email were trustworthy because an informant's "statements that do not please the government . . . [and] assist the speaker . . . are more trustworthy." Borda Br. 38. The reliability of Junior's statements is not at issue in determining admissibility under Rule 801(d)(2)(D), and, in any event, the district court had no basis to decide whether the specific statement was, in fact, accurate. The court also did not erroneously import a "within-the-scope-of-the-conspiracy" requirement, as Borda contends. Borda Br. 38. Instead, it noted that "as a practical matter," the evidence all pertained to the period from January 2005 through September 2005, and that the March 2006 email was not relevant to the conspiracy as narrowed by the government's proof at trial. JA 278-279.

---

[8] Although this Court has not yet ruled on the issue, it has held that informants' statements may be attributed to the government under Rule 801(d)(2)(B) if the government specifically adopts the statements or manifests its belief in their truth. *United States v. Morgan*, 581 F.2d 933, 937-938 & n.14 (D.C. 1978) (stating that it was not deciding "that just *any* statement the informant might have made is admissible against the government" but only that "where, as here the government has indicated in a sworn affidavit to a judicial officer that it believes particular statements are trustworthy," it may not object on hearsay grounds); *see also United States v. Warren*, 42 F.3d 647, 655-656 (D.C. Cir. 1994) (same as to statement contained in sworn affidavit to judicial officer, but concluding that police officer's statement in arrest report did not fall under Rule 801(d)(2)(B)).

36

The district court also did not abuse its discretion by refusing to admit the statement under the residual exception, Fed. R. Evid. 807. *See United States v. Washington*, 106 F.3d 983, 1000 (D.C. Cir. 1997) (a district court's ruling on the residual hearsay exception "may not be overturned unless this court has a definite and firm conviction that the court made a clear error of judgment") (internal quotation marks and citation omitted). This exception is "extremely narrow and require[s] [evidence] to be very important and very reliable." *Id.* at 1001 (internal quotation marks and citation omitted). For the reasons stated above, even if the email were relevant, it was only marginally so. The statement's use of pronouns undermined its usefulness even further. Nor does the statement possess the requisite degree of reliability. As the district court noted, Junior was a "long-practicing drug trafficker" whose credibility was "questionable." SA 336.

Borda has not shown that the district court abused its "broad discretion" in "assessing the probity and trustworthiness" of the email. *Securities & Exchange Comm'n v. First City Financial Corp.*, 890 F.2d 1215, 1225 (D.C. Cir. 1989) (quoted in *Washington*, 106 F.3d at 1001). The government never vouched for the reliability of Junior's information. Borda cites (Borda Br. 39) Agent Chavarria's post-trial testimony (Borda mistakenly identifies DEA Analyst Skidmore as the source of the testimony) to demonstrate the government's

37

"faith" in Junior's trustworthiness, but the agent did not attest to Junior's trustworthiness, JA 397.9, and the district court was not privy to any agent's view of Junior's reliability when it ruled on the email's admissibility. Borda also did not argue below that his own purported statements to Junior met the stringent conditions for admissibility under Rule 807.

For many of the same reasons, any error in excluding the evidence was harmless. Because the email had little probative value on the question before the jury, it would not have significantly improved Borda's ability to prove that he lacked the requisite knowledge. Moreover, as we discuss more fully below, Borda brought out other, more probative evidence to support his defense. *See* pages 64-65 *infra*.

Alvaran's claim fails for the same reasons. Moreover, other than stating (erroneously) that "evidence that exculpates Borda on the intent to import also exculpates Mr. Alvaran," Alvaran Br. 18, he has not explained how Borda's March 2006 statements that were incorporated in Junior's email were relevant to Alvaran's knowledge about the intended destination of the palm oil load. *See United States v. Renteria*, 720 F.3d 1245, 1251 (10th Cir. 2013) (stating that court will allow defendant to "'adopt by reference a part of another's brief'" pursuant to Fed. R. App. P. 28(i) "but only to the extent we can discern a clear and straightforward application to the facts that is fairly presented"); *cf. United States*

*v. Straker*, 800 F.3d 570, 588 n.1 (D.C. Cir. 2015) (citing *Renteria* and noting that "adoption by reference" "threatens to confuse those issues that litigants do not share" and that defendants "against whom the evidence was not admitted, fail to articulate how it affected their rights"), *cert. denied*, 136 S. Ct. 1170 (2016).

Alvaran's argument that the court's ruling deprived him of his constitutional right to refute the government's "basic theory," Alvaran Br. 18, is similarly meritless. First, his characterization of the government's theory – that all cocaine that passed through Mexico "necessarily" went to the United States – is wrong. Alvaran Br. 18. The government acknowledged that Borda may have considered sending drugs to Europe in 2006 but that the specific transactions at issue here were intended for importation into the United States. *See*, *e.g.*, SA 381-384; *see also* page 75 *infra* (addressing Alvaran's claim as to the government's summation).

Alvaran also has not shown that the district court's evidentiary rulings amounted to a constitutional violation. As this Court has explained, "[t]he Supreme Court has clearly instructed that 'rules excluding evidence from criminal trials . . . do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Lathern*, 488 F.3d 1043, 1045-1046 (D.C. Cir. 2007) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)) (other quotation

marks omitted). The district court's rulings that the evidence was not relevant and that the statements were inadmissible hearsay and confusing were not "so erroneous and unfair" as to "rise to the level of a constitutional violation." *Id.* at 1046.

> **C.    The District Court Did Not Abuse Its Discretion By Admitting Evidence That Borda Owned Property In New York And Had A Florida Driver's License.**

1. Borda filed a motion in limine to exclude from evidence real estate records pertaining to New York property that Borda and his wife purchased in 1994 and Borda's Florida driver's license issued in 1996. SA 10-14. The district court found "perfectly reasonable" the government's argument that the exhibits helped establish that, by living in the United States "for a period of time," Borda knew that the United States was a "major consumer of drugs." SA 108. It also explained that there was "nothing prejudicial about the information," which showed to Borda's benefit that he was "a stable person who is buying a home and driving a car legally." SA 108. It therefore denied the motion, and the evidence was later admitted through record custodians. SA 108; JA 255-257, 261-263.

2. The district court did not abuse its discretion by admitting the evidence. The government had to prove that Borda knew that the cocaine he sent to Mexico was ultimately destined for the United States, and the jury could

consider Borda's past ties to the United States to infer that he was familiar with the United States drug market. Although admittedly the evidence was not highly probative, it had "any tendency to make a fact" (*i.e.*, Borda's knowledge about the cocaine market in the United States) "more . . . probable than it would be without the evidence." Fed. R. Evid. 401. Similarly, the evidence helped rebut any claim that, as a Colombian citizen, Borda's understanding of drug markets was limited to that region.

In any event, any error in admitting the evidence was harmless. The evidence was extremely limited, and the government did not mention it during summations, let alone urge the jury to draw "an unfair and unrelated inference." Borda Br. 42.

### D.    The Court Did Not Err By Admitting Evidence Of Borda's Prior Conviction And Imprisonment.

1. Borda was convicted in 1998 in the Southern District of Florida of possession of cocaine with the intent to distribute and conspiracy to do so. The district court initially ruled that the government could not introduce the prior conviction or its underlying facts because the evidence was not relevant to the charged conspiracy and the danger of unfair prejudice outweighed any probative value. JA 75-76. Borda subsequently moved to preclude the government from eliciting any testimony that referred to his prior conviction, including Montoya's

41

testimony that he met Borda while the two were serving time in the same prison. JA 80-81.

The district court denied Borda's motion. JA 110. It credited the government's argument that Montoya's testimony would help explain the relationship between the two men and the basis for Borda's trust in Montoya. SA 109 (testimony helps "to explain why there would be such loyalty and trust that Mr. Borda would choose to hire Mr. Montoya to be an important . . . aid in running the trafficking business out of Mexico"). The court described the probative value of the evidence as "very significant" and found that the danger of prejudice did not outweigh the probative value. SA 109-110. It also ruled that in light of the government's more detailed explanation of the probative value of Borda's prior conviction, it would allow the government to introduce the conviction as well. JA 110 & n.1. In elaborating on its ruling, the court stated that the conviction was not "terribly prejudicial" because the jury "heard orally from witnesses about Mr. Borda's prior incarceration," the "formal document" corroborated that testimony, and the court's instructions would eliminate any potential confusion about its proper use. SA 326-327.

At trial, Montoya testified that he met Borda in 1997 or 1998 at a federal prison in Fort Dix, where Montoya and Borda were serving sentences for drug trafficking, and the two became friends. SA 292-293. After Montoya finished

42

serving his sentence and was deported to Colombia, he contacted Borda and eventually began working for Borda as his "right-hand man" in Mexico. SA 294-297.

The government also introduced Borda's prior conviction, SA 327, but did not mention it in summation. Borda, on the other hand, relied on the conviction to argue that Borda would never send drugs to the United States because he understood the consequences of a second conviction. SA 357-358.

During its final charge to the jury, the court instructed the jury that it could only consider Borda's conviction "in evaluating his intent and knowledge" and could not "draw any inference of guilt against [Borda] from his prior conviction." SA 343.

2. Borda contends (Borda Br. 47-48) that the district court improperly admitted Montoya's testimony that he met Borda in prison. Under Fed. R. Evid. 404(b), evidence of other crimes is admissible for any purpose other than criminal propensity. *See*, *e.g.*, *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000). The rule is one of "inclusion rather than exclusion." *Id.* at 929. That is especially so in conspiracy prosecutions where "the prosecution is usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime

43

developed." *McGill*, 815 F.3d at 879 (internal quotation marks and citations omitted) (alteration in original); *see also United States v. Santana*, 342 F.3d 60, 67 (1st Cir. 2003) ("It is proper to include evidence of prior bad acts in conspiracy cases if they explain the background, formation, and development of the illegal relationship and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust.") (internal quotation marks and citation omitted); *cf. Straker*, 800 F.3d at 590 (evidence of uncharged hostage takings was "relevant to . . . how those defendants started to work together as kidnappers"). The district may nonetheless exclude the otherwise admissible evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." *McGill*, 815 F.3d at 880 (quoting Fed. R. Evid. 403).

The district court properly exercised its discretion in admitting Montoya's testimony that he met Borda while the two were serving their drug trafficking sentences in the same prison. The evidence was offered not to demonstrate Borda's criminal propensity but to explain the origin of the bond between Borda and Montoya and the reason why Borda trusted Montoya to oversee Borda's day-to-day drug business in Mexico. *See* SA 109 (district court stated that jury "would understand that being friends in jail creates the same or similar kind of bond that people develop when they're in war together"). There is also no reason to second-guess the court's finding that "whatever prejudice comes from a 12 or

13 year old conviction" did not substantially outweigh the "very significant" probative value of the testimony. SA 110.

For similar reasons, the district court properly admitted the record of conviction. Contrary to Borda's contention, the district court explained that the document was admitted for the non-propensity purpose of corroborating Montoya's testimony. SA 327 ("It certainly corroborates the oral testimony that has been given, and if . . . for example, the jury chose to not believe the testimony it had heard, it is certainly entitled to see clear evidence of that particular fact."). The conviction also was relevant to establishing that Borda was knowledgeable about the drug trade in the United States. *See* pages 40-41 *supra*. Indeed, Borda relied on his own experience as a "drug dealer in the United States" to explain to Alvaran and Suarez why they should reject Junior's "tall tale." SA 181.

The record of conviction also was not unfairly prejudicial. The jury knew from Montoya's testimony that Borda had been convicted of a drug trafficking offense, and Borda confirmed to his associates that he trafficked in drugs in the United States. The court also gave a limiting instruction that cautioned the jury that the prior conviction was "not evidence that that defendant is guilty of the offense with which he is charged in this case" and that the jury should not "draw any inference of guilt" from the prior conviction. SA 343. *See*, *e.g.*, *United States v. Brown*, 597 F.3d 399, 400 (D.C. Cir. 2010) ("The district court's limiting

45

instructions guarded against the jury's reliance on impermissible inferences that might have been drawn from the Rule 404(b) evidence."); *United States v. McCarson*, 527 F.3d 170, 174 (D.C. Cir. 2008) ("Where, as here, there is no compelling or unique evidence of prejudice, we deem such a limiting instruction sufficient to protect a defendant's interest in being free from undue prejudice.") (internal quotation marks, brackets, and citation omitted); *United States v. Long*, 328 F.3d 655, 662 (D.C. Cir. 2003) ("limiting instructions ordinarily suffice to protect the defendant's interests").

Finally, even if the district court erred in admitting the challenged evidence, any error was harmless. Montoya's testimony about Borda's time in prison was one sentence long, and the only mention of the judgment of conviction was the prosecutor's statement in publishing the document that Borda "was convicted of conspiracy to possess with intent to distribute cocaine." SA 329. The prosecutor did not rely on the evidence during summations, and, as mentioned above, Borda admitted that he had been a drug dealer in the United States. Any erroneously admitted evidence would have had no effect on the verdict.

III.  **THE DISTRICT COURT DID NOT COMMIT REVERSIBLE ERROR IN ADMITTING SUAREZ'S TESTIMONY PROVIDING BACKGROUND INFORMATION AND MONTOYA'S BRIEF MENTION OF OTHER UNRELATED DRUG TRAFFICKING.**

Borda claims (Borda Br. 48-52) that brief snippets of Suarez's and Montoya's testimony were improperly admitted as nonhearsay co-conspirator statements. The challenged testimony was not hearsay and, in any event, played virtually no role in the government's proof.

A.    **Background**

In response to the questions about how Suarez met Alvaran and Borda, Suarez testified that he "encountered Mr. Alvaran . . . through a pilot his name was Tato" and that Suarez learned from Alvaran that "Borda was doing a run with one of Alvaran's family members," whom Suarez identified as El Rey Zambada (mistakenly spelled as "Sombala").[9] JA 115, 120-121. Suarez then explained that he accompanied Alvaran to a meeting, met Borda, and "found out" that Suarez "to do a run with a plane with them." SA 117-118. Suarez did not add further details, and after describing the mechanics of recording his conversations, he testified about his first recorded telephone call with Borda. SA 118-123.

---

[9] The court subsequently struck other testimony that mentioned Zambada "out of an excess of caution" and because "[i]t was not absolutely necessary." SA 136, 142.

Montoya began his testimony by providing background information, including his prior drug trafficking activities in the United States. SA 288-291. He stated that his "entire organization" was arrested in 1996 for distributing cocaine and explained that the authorities were able to "zero in" on the group after they arrested a Mexican national in Houston with 400 kilograms of cocaine and let him "continue on to New York City." SA 290; JA 247. Montoya identified the source of his knowledge as "Jorge Lamos and all of the others in the group." JA 247.

The court overruled defendants' objections to Suarez's testimony, JA 116, and provisionally admitted Montoya's testimony "subject to the government's tying it up appropriately," JA 247. The parties never revisited that testimony or the court's ruling.

## B.    Standard Of Review

This Court reviews for clear error a district court's determination that a particular statement was made during and in furtherance of a conspiracy. *United States v. Celis*, 608 F.3d 818, 843 (D.C. Cir. 2010). Even where hearsay statements are admitted in error, this Court will not reverse unless the error had a "substantial influence" on the verdict and will affirm where "the judgment was not substantially swayed by the error." *See United States v. Clarke*, 24 F.3d 257, 268 (D.C. Cir. 1994) (internal quotation marks and citations omitted).

48

### C.    The District Court Did Not Commit Reversible Error.

A statement that is not offered for its truth is not hearsay. *United States v. Hall*, 613 F.3d 249, 256 (D.C. Cir. 2010); *see* Fed. R. Evid. 801(c)(2) (hearsay is an out-of-court statement that is "offer[ed] in evidence to prove the truth of the matter asserted"). A statement also is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements are made in furtherance of a conspiracy if they "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Such statements include "those that keep a coconspirator updated on the status of the business, motivate a coconspirator's continued participation, or provide background information on key conspiracy members." *United States v. Carson*, 455 F.3d 336, 367 (D.C. Cir. 2006) (citations and internal quotation marks omitted). A conspirator's "casual comments" or "idle chatter," on the other hand, are not admissible under Rule 801(d)(2)(E). *Id.* at 366-367; *Tarantino*, 846 F.2d at 1412.

To begin, Suarez's testimony that he met Alvaran through a pilot named Tato was not hearsay because it did not contain a declarant's out-of-court "statement." *See* Fed. R. Evid. 801(a), (b) (defining "statement" and

"declarant"). Suarez's additional testimony that Alvaran told Suarez about Borda's plans for "a run" also was not hearsay. Instead, it provided background information that explained why Alvaran was bringing Suarez to a meeting with Borda and how defendants' collaboration with Suarez began.[10]

For similar reasons, Alvaran's mention of his plans with Borda was not hearsay under Rule 801(d)(2)(E) because it "provide[d] background information on [a] key conspiracy member[],"and "[could] reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy." *Carson*, 455 F.3d at 366-367 (D.C. Cir. 2006) (internal quotation marks and citation omitted); *see also United States v. Edmond*, 52 F.3d 1080, 1111 (D.C. Cir. 1995) (citing *United States v. Hitow*, 889 F.2d 1573, 1581-1582 (6th Cir. 1989), for the proposition that "statements identifying other conspirators and their roles are made in furtherance of conspiracy"); *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994) ("Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be 'in furtherance' of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives."). Contrary

---

[10] Although the government did not make this argument below, this Court may affirm on any ground apparent from the record and is not limited to the grounds offered by the district court. *See United States v. Garrett*, 720 F.2d 705, 710 (D.C. Cir. 1983).

to Borda's characterization, Alvaran's out-of-court statements were neither akin to "casual comments" nor improper "overview testimony." Borda Br. 51.

Any error in admitting the testimony was also harmless. The testimony consisted of only a few sentences, and the government never mentioned it again. Borda conceded all along that he was a drug dealer, and Alvaran's information about this separate plan did not mention the United States.

The government agrees that Montoya's testimony about what "Lamos and all of the others" told him was inadmissible but not on hearsay grounds. The government never asserted that Borda had any connection to Montoya's New York drug trafficking so the evidence was not relevant to a fact that was "of consequence" in determining Borda's guilt. *See* Fed. R. Evid. 401. Although evidence of Montoya's criminal history was relevant to the jury's determination of his credibility, the underlying details about the events that led to the arrest of the members of his organization were not.

The error, however, was harmless. The testimony was very brief, and it did not implicate Borda. Indeed, as described previously, Montoya did not meet Borda until he began serving his term of imprisonment for the New York conviction. *See* page 42 *supra*.

## IV.   THE DISTRICT COURT SUFFICIENTLY IDENTIFIED FOR THE JURY THE EVIDENCE THAT WAS STRUCK FROM THE RECORD.

Borda contends (Borda Br. 52-57) that the district court erred by not specifically identifying for the jury, other than by exhibit number, the evidence that the court struck from the record. That claim is without merit.

### A.   Background

During their meeting on June 16, 2005, Alvaran told Suarez that his nephew regularly sent 200 kilograms of cocaine to Juarez, a border city, and suggested that he and Suarez do the same. JA 147-148. Alvaran also told Suarez that his nephew was able to quickly obtain his return on the investment. JA 165-166. Based on his familiarity with Juarez, Suarez testified that "when cocaine goes to Juarez," "they are able to get it to El Paso, Texas and from there it comes into the United States." JA 166-167. The court provisionally admitted the evidence, overruling Borda's objection that the discussion pertained to a side deal between Alvaran and Suarez. JA 142, 144-146, 162-163.

During his cross-examination of Suarez, Borda played excerpts of an August 22, 2006 meeting between Borda, Suarez, "Chivo," and others in which Chivo mentioned that Junior made two trips to Italy with large quantities of cocaine and that Borda had given Junior money in connection with the Italian deals. SA 244-249. The court permitted the government during its redirect

examination to introduce excerpts from the same conversation which included, among other things, Chivo's statement that Borda would receive a "deposit" in two days because the money is routed "[f]rom Florida to Cartagena," SA 260-261; Chivo's references to Juarez, SA 264-267; Chivo's additional mention of a "small job" "being done" in Atlanta, SA 265, 267; and Borda's question about the price that "you guys sell it for in Atlanta," SA 267-268.

Near the end of the trial, the court ruled on the admissibility of several clips from the recordings that defendants had challenged as outside the scope of the conspiracy. It concluded that the government had not established by a preponderance of the evidence that the "short reference" to Alvaran's nephew was related to the charged conspiracy and that under its ruling "only one paragraph or so will come out." JA 273. The court also ruled that the government clips from the August 2006 meeting were not admissible as co-conspirator statements because the meeting took place "a substantial period of time beyond . . . the main part of the conspiracy," and it was difficult to identify the drug deals that were discussed. SA 48-49. It similarly did not admit Borda's exhibit from the same meeting, which had been presented to the jury but only conditionally admitted. SA 50.

When the jury next convened, the court advised it that government exhibits 35A and B (the specific clips mentioning Alvaran's nephew and the

corresponding transcripts), Borda Exhibit 42 (transcripts of excerpts from the August 2006 meeting), and government exhibits 77A and B (other excerpts from the same meeting and corresponding transcripts) "have been struck from the record." JA 281.1. The court allowed the jury "a minute or two . . . to find them in your folders" and return them to the court. JA 281.1-282.[11] Borda asked the court to also strike the testimony, although he noted that he "[didn't] know how this will work" and the jury "will have no idea what it is." JA 282. The court stated that it was "not going to say that in front of them" because "[t]hey're not going to understand the difference." JA 282. It also rejected Borda's request that the court "instruct especially regarding [government exhibit] 77B the testimony regarding Juarez, Florida and Atlanta," stating that it was "not going to focus on anything specific." JA 283. Despite that ruling, the court then told the jury that "I'm sure you all understand. The testimony, the actual testimony in court regarding those particular exhibits and clips, that testimony is struck from the record as well." JA 283.

---

[11] Borda's transcripts were in a separate bound binder, and the jury removed them the next day. JA 283; SA 393.

**B.     Standard Of Review**

This Court "defer[s] to the district court's choice of language [in an instruction] unless it constitute[s] an abuse of discretion." *United States v. White*, 116 F.3d 903, 924 (D.C. Cir. 1997).

**C.     The District Court's Instructions Cured Any Potential Prejudice From Admitting Evidence That Was Later Struck.**

The court did not abuse its discretion in instructing the jury about the evidence that was struck. Although the court referred to the exhibits only by number, the jurors knew precisely which exhibits and related testimony had been struck because they physically removed the transcripts from their folders immediately after the instruction (the government's exhibits) or the next day (Borda's exhibit). For that reason, the one- to two- week interval between the introduction of the evidence and the court's instruction did not impair their ability to identify the evidence at issue. And, if the jurors had any questions during their deliberations about whether specific evidence had been struck, they had the transcripts of all the recordings that had been admitted into evidence in the jury room and could therefore check. SA 392.

The court also granted Borda's request "to strike the testimony," JA 282, and it had good reason to reject Borda's additional request that the court "instruct especially . . . the testimony regarding Juarez, Florida and Atlanta."

55

JA 283. Borda's proposed instruction did not accurately summarize the testimony as a whole – mentioning only the references to the United States – and was therefore misleading. *Cf.* 1 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* (4th ed. 2013) § 1:41 at 281 ("The kind of limiting instruction to which a party is entitled under Rule 105 [of the Federal Rules of Evidence] is one that seeks to prevent misuse of evidence on certain issues or against certain parties. Rule 105 does not mean that a party has a right to an instruction that emphasizes the evidence for his benefit or explains its possible implications."). Nor would it have been feasible to objectively summarize the testimony as a whole because, as the court explained in striking the exhibits, the recorded conversations were hard to follow and the references were unclear. The instruction also could have contributed to the problem that Borda sought to minimize by emphasizing his links to the United States. *Cf. id.* at 1:41 at 279-280 & nn. 11-13 (summarizing support for proposition that limiting instructions and instructions to disregard evidence "do more to sensitize the jury to evidence than to dispel the risk that the jury will misuse it"); *United States v. Pagan-Ferrer*, 736 F.3d 573, 586 (1st Cir. 2013) (recognizing potential for prejudicial inference from court's instruction to jury to disregard inadmissible evidence about a separate civil trial, which, according to appellants, "magnified rather than remedied the risk of prejudice").

The court's other instructions also ensured that defendants were not prejudiced by the conditional admission of the evidence. *See generally McGill*, 815 F.3d at 899 ("We presume that juries follow the court's curative instructions unless there is reason to doubt compliance in a particular case."). In its final charge, the court instructed the jury that it could only consider during its deliberations "the evidence properly admitted in the trial," SA 339, and that any exhibits and testimony that were struck were "not evidence" and the jury "must not consider them." SA 341. The court gave a similar instruction at the beginning of trial. SA 112. The jury also knew that it could not consider evidence that had been struck because it had been advised on that (self-evident) point during the trial. *See* SA 142, 274.

Borda's analogy to cases involving a court's failure to give a limiting instruction when evidence is admitted only for a specific and limited purpose is inapt. Unlike the cases that Borda cites, in which there is a danger that the jury will use the evidence for a prohibited purpose without a limiting instruction, the issue here is whether the court's instructions cured any possible prejudice from the introduction of the evidence that was subsequently struck. For the reasons stated above, the jury understood that it could not consider the exhibits and testimony that the court struck from the record, and the court's instructions as a whole were sufficient to cure against potential prejudice.

57

For many of the same reasons, any error in failing to further identify the evidence that was struck was harmless. The jury knew exactly which exhibits had been struck, and they had a full set of the admitted transcripts in the jury room. It also is unlikely that the jury would have remembered, let alone relied on, Suarez's testimony about specific comments during the recorded conversations when it did not have a corresponding transcript.

Furthermore, even if the jury did consider Suarez's testimony, it would not have affected the verdict. There was uncontested evidence that all the drug proceeds from the palm oil deal were in U.S. dollars, and Chivo's statement, about a year after the palm oil deal was completed, that money would be routed through Florida on its way to Colombia was harmlessly cumulative. Chivo's references to Juarez and Atlanta also did not prejudice Borda because they involved deals that had not yet taken place, and Borda did not agree to participate in them.

## V.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE GOVERNMENT DID NOT VIOLATE *BRADY*.

Defendants argue (Borda Br. 26-34; Alvaran Br. 13-16) that the government violated its obligation to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), in two respects. First, they contend that the government delayed disclosing DEA reports documenting Junior's statements about Borda's interest in sending drugs to Europe and Canada and Borda's

58

statement that he sold drugs in Mexico until shortly before trial. Second, they argue that the government failed to disclose a draft report by DEA analyst Patricia Skidmore of an interview with Junior in January 2006. Alvaran also claims (Alvaran Br. 16) that the government failed to correct Suarez's allegedly false testimony, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).

### A.    Background

After the government represented that, "to the best of its knowledge," it had disclosed all exculpatory material, on October 18, 2005, it disclosed additional redacted reports of DEA agents' debriefings of Junior between August 2005 and March 2006. JA 83-84, 89. Those reports included Junior's statements that Borda "is discussing a new route from Colombia to Europe and Canada" (mentioned in a September 2005 debriefing) and that Borda told Junior that "Borda sold cocaine in Mexico but that if [Junior] had the means to send the cocaine to the United States, Borda was willing to ship cocaine to the United States." JA 89-90. The court denied Borda's motion to hold the government in contempt, concluding that "Borda's involvement in selling drugs to other countries outside of the United States is not *Brady* evidence." JA 98.

Following their convictions, defendants claimed that the government failed to disclose an exculpatory statement by a nontestifying co-conspirator ("HB") that Borda "did not want any cocaine sent to the United States." JA

502.[12] Finding that defendants had raised a "colorable claim," the district court ordered the government to disclose all DEA reports ("DEA-6s") and rough notes "relating to HB and/or Junior." JA 395.1-395.2. Based on those disclosures, defendants raised nine other *Brady* claims, including, as relevant here, the government's failure to disclose Ms. Skidmore's draft report of a January 2006 interview with Junior. According to the report, Junior stated that Borda "advanced" 100 kilograms of cocaine each to Junior and HB and that "[u]nbeknownst to Borda," Junior and HB "took an additional 100 kilograms of cocaine believing they could sell it in Houston for a larger profit." SA 400-401.

At an evidentiary hearing, Ms. Skidmore testified that she typed her draft report during the interview and that she never prepared a final report because Junior left the United States for Mexico shortly after the interview and was subsequently murdered. SA 395-397, 402, 411-412. She then explained that what was "unbeknownst" to Borda was that, in addition to the 200 kilograms that Borda had given Junior and HB, they took another 100 kilograms. SA 405. Ms. Skinner also testified that neither Junior nor the other cooperators she

---

[12] Borda learned of HB's statement from a fellow inmate, Rafael Mejia, who claimed that HB told him about Borda. The evidence at the hearings, including the testimony of HB and agents who debriefed him, established that HB never made those statements to government agents or to Mejia. JA 502-504.

60

interviewed ever stated that Borda did not know that the palm oil load was going to the United States and that she never saw any document by another agent that reported that Borda did not know, intend, or authorize the palm oil load to be imported into the United States. SA 406-409.

The district court denied defendants' post-trial motion to dismiss or for a new trial based on the alleged *Brady* violations in its entirety. JA 493-513. As relevant here, the court concluded that "Skidmore's testimony directly contradicts Defendants' interpretation of the draft report she wrote." JA 503 n.5.

### B.    Standard Of Review

With respect to alleged *Brady* violations, this Court reviews "findings of fact made by the district court, including determinations of credibility made both at trial and in post-trial proceedings . . . under an abuse of discretion standard." *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007). It reviews *de novo* whether the undisclosed evidence is material. *Ibid.* Because Alvaran did not raise his claim of a *Napue* violation below, this Court reviews it for plain error, "reversing only if we perceive that (1) there is error (2) that is plain and (3) that affects substantial rights, and (4) . . . the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Straker*, 800 F.3d at 604 (internal quotations and citations omitted).

61

**C.    Defendants Have Not Established Any *Brady* Violations.**

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *United States v. Brodie*, 524 F.3d 259, 268 (D.C. Cir. 2008) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999)). "To satisfy the third prong – prejudice – the withheld evidence must be material, which means there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010) (internal quotation marks omitted). And, "to be 'material' under *Brady*, undisclosed information or evidence acquired through that information must be admissible." *United States v. Wilson*, 605 F.3d 985, 1005 (D.C. Cir. 2010) (other internal quotation marks and citation omitted).

To establish a *Brady* violation where a disclosure was made before trial, the defendant must demonstrate "a reasonable probability that an earlier

disclosure of the records would have changed the trial's result." *McGill*, 815 F.3d at 923 (internal quotation marks and citations omitted). "[A] new trial is rarely warranted based on a *Brady* claim where the defendant[] obtained the information in time to make use of it." *United States v. Andrews*, 532 F.3d 900, 907 (D.C. Cir. 2008) (internal quotation marks and citation omitted).

### 1.    The Pretrial Disclosures

Defendants have not satisfied any of the *Brady* components. First, Junior's statement to DEA agents in September 2005 that Borda "*is* discussing a new route from Colombia to Europe and Canada" was not exculpatory. The palm oil load had been shipped via the "old" route from Colombia to Mexico and had arrived at the Mexican port about three months before Junior's debriefing. Borda's claim (Borda Br. 32) that his "interest[] in sending drugs to Europe . . . makes it . . . less likely that he was importing drugs into the United States" is belied by Junior's statement about Borda's interest in September 2005 in a new route directly from Colombia to Europe or Canada.

Junior's statement that Borda "sold cocaine in Mexico" also was not exculpatory. It was uncontested that Borda shipped the palm oil cocaine to Mexico and that Junior sold it from there. The statement has no bearing on Borda's knowledge about Junior's plans once Junior took possession of the load in Mexico. Significantly, Borda's paraphrasing of the information ("Borda

would sell his cocaine in Mexico (as opposed to sending it to the United States)," Borda Br. 31, omits Borda's "willing[ness] to ship cocaine to the United States" if Junior had the means to do so. JA 90.

Second, the information was not suppressed. The government disclosed the debriefing reports before trial, and it previously had disclosed recordings and transcripts that included information about Borda's interest in sending cocaine from Colombia to Europe. JA 88; SA 15-17.

Finally, any delay in disclosing the debriefing notes did not prejudice defendants. Junior's statements during the debriefing session were inadmissible hearsay, *see* pages 34-38 *supra*, and Borda does not claim that an earlier disclosure would have led to admissible evidence or changed the result at trial.[13]

The information also was cumulative of other evidence that supported Borda's defense. For example, during his cross-examination of Suarez, Borda elicited testimony that Borda rejected several of Suarez's overtures to send cocaine to the United States. SA 236-237, 243, 253-256. There also was testimony about the drug market in Europe, which commanded higher prices than in the United States or Mexico, and Suarez agreed that Borda discussed

---

[13] Borda claims that he "should have been permitted to reference [unredacted copies of the debriefing reports] at trial." Borda Br. 34. We have not been able to find anything in the record that shows that Borda asked for unredacted reports or that he sought their admission at trial.

sending cocaine to several countries in Europe, including Holland, Italy, Spain, Switzerland, and Portugal. SA 228-231, 251-252, 259. Based on that evidence, Borda argued in summation that Borda "had connections from Mexico to Europe and that's why he was going." SA 352; *see also*, *e.g.*, SA 353 ("What [Borda] was doing was clearly to Europe, Holland, Canada which is not in Europe; Italy, England, but he was not doing it to here."); SA 354 ("They said he's a businessman. Well, this is the business. He can get more money for the same material in Europe. That's why he is sending to Europe.").

Alvaran also has not shown prejudice. Although he adopts Borda's argument, he has not argued in particular how the information was material to his case. For that reason, his claim necessarily fails. *See* pages 37- 38 *supra*.

### 2.    The Post-Trial Disclosure

The government did not violate *Brady* by failing to disclose Ms. Skidmore's draft report describing information that was "unbeknownst" to Borda. Defendants' understanding of the sentence at issue is at odds with its plain meaning – that the only information "unbeknownst" to Borda was the fact that Junior and HB "took an *additional* 100 kilograms of cocaine believing they could sell it in Houston for a larger profit" (emphasis added). SA 401. The Mexican drug traffickers' side dealings did not exculpate defendants or undermine the evidence establishing what they did know, *i.e.*, that the entire

palm oil load could not be sold in Mexico and that Junior was selling some of the cocaine at the border.

Alvaran's additional contentions are without merit. The fact that the report contained "no other importations into the United States of the Palm Oil cocaine," Alvaran Br. 14, was not exculpatory, especially when the focus of the report was not on Borda or the palm oil deal. SA 398-400, 402-403, 410. And, contrary to Alvaran, Junior's statement to the agents that Borda advanced Junior and HB 100 kilograms "to play with," SA 404, was consistent with Suarez's testimony that he knew that Junior and "another person" transported 200 kilograms of cocaine to New York. SA 233-234.[14]

Defendants also have not satisfied the materiality prong. Like other information provided by Junior to DEA agents, Skidmore's report was inadmissible hearsay. *See* pages 34-38 *supra*. It also would not have made any difference at trial. If Skidmore had been permitted to testify about Junior's statement, she would have explained exactly what was "unbeknownst" to Borda and testified that Junior never claimed that Borda did not know that the palm

---

[14] Alvaran also contends that, had he known about the report, he "would not have shied from confronting Camilio Suarez with HB's allegations that Camilio had ordered the murder of Junior." Alvaran Br. 15. He does not explain the connection between the report and the murder. In any event, the parties agreed not to question Suarez about the allegations concerning his involvement in Junior's murder. SA 242.

oil load was destined for the United States. And even if defendants could have used the information to further question Suarez about whether Borda knew that Junior brought 200 kilograms of cocaine to New York, any additional cross-examination would not have "put the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley*, 514 U.S. 419, 435 (1995), because Suarez never claimed that defendants knew about Junior's New York trip.

Alvaran's related claim (Alvaran Br. 16) that the government failed to correct Suarez's testimony that he knew that 200 kilograms of the palm oil load were brought to New York is without merit. "A *Napue* violation occurs when the government introduces false or misleading testimony or allows it to go uncorrected, . . . even though the government knew or should have known that the testimony was false." *Straker*, 800 F.3d at 603. As discussed above, Alvaran has not established that Suarez's testimony was false, let alone that the government knew or should have known that it was false. To the contrary, testimony at the post-trial hearing confirmed Suarez's testimony about the 200 kilograms. *See* SA 413-420.

## VI.   THE PROSECUTOR'S CLOSING ARGUMENTS WERE PROPER, AND THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING DEFENDANTS' MOTION FOR A NEW TRIAL.

Defendants contend (Borda Br. 59-60; Alvaran Br. 20-25) that the prosecutor's closing arguments were improper in three respects: the prosecutor (1) misstated the evidence about the fees charged for transporting cocaine; (2) improperly argued that defendants were paid in U.S. dollars; and (3) relied on an improper metaphor. The arguments were not impermissible, and, in any event, any errors were cured by the district court's instructions.

### A.   Background

1. To support their claim that they did not know that the cocaine would be imported into the United States, defendants argued in summation that Junior only charged Borda an 18% fee for transporting the cocaine from the port to Monterrey rather than the higher fee (40-45%) typically charged when drugs are brought into the United States. Borda similarly relied on the fact that Borda accepted the Monterrey price for cocaine ($9100 per kilogram) rather than the higher price that cocaine commands in the United States. *See* SA 350-351 ("If Mr. Borda knew or intended that the cocaine will be delivered or imported into the United States why would he accept the lower price in Mexico?"; "If Christian Borda and Junior were sending the cocaine to the United States, why on earth is Junior charging him, Mr. Borda, the Mexican rate of 18 percent

68

rather than the 45 percent to the United States?"); *see also* SA 362-365 (Alvaran argument to the same effect). The prosecutor argued in rebuttal that the differences in prices and fees corresponded to the risk of sending the cocaine over the border. Thus, Borda was willing to accept the lower Monterrey price for the cocaine because he "knows that by putting that cocaine into the hands of Junior in Monterrey that it is Junior who assumes the responsibility and the risk if the load is stopped at the border or if a load is seized in the United States." SA 385-386. The prosecutor then gave an example to demonstrate that Borda's profit was the same whether he accepted the Monterrey price ($9100) and was charged an 18% transportation fee or was paid the higher Houston or Atlanta price ($40,000) but was charged a 40% transportation fee. SA 386-387. In his hypothetical, the prosecutor calculated the transportation fee as a percentage of the price per kilogram, SA 386-387, rather than as a percentage of the number of kilograms in the load, as Suarez had testified, SA 151-152, 154.

The prosecutor mentioned at various times in his summations that Junior paid Borda in U.S. dollars to support the government's argument that defendants knew that the cocaine had been sent to the United States rather to Europe. *See*, *e.g.*, SA 348, 388-389. Defendants did not object to any of those assertions.

In concluding his rebuttal summation, the prosecutor argued that defendants "knew exactly what was going on" when they "effectively placed [1,553 kilograms of cocaine] in Monterrey, 140 miles or so from the border." SA 390-391. He then asked the jury to consider the following metaphor:

> [L]et's say that Mr. Borda and Mr. Alvaran had [come] to Monterrey with a container of 1,553 bees . . . and before they released and opened up . . . that container in unison they said to the bees, now look, we are going to release you, but we don't want you to go north. We only want you to go east, and west, and south. . . . And they opened that box, and those bees flew away. Where do you think they went? Did they heed the admonition of Mr. Borda and Mr. Alvaran, don't go north? I don't think so.

SA 390-391. The prosecutor then continued to argue that, "based on the proof that [the jury] heard in this trial," it should find defendants guilty. SA 391.

2. Defendants filed a motion for a new trial, claiming, among other things, that the prosecutor misrepresented Suarez's testimony as to the transportation fees and that the "bees" metaphor invited the jury to speculate about their knowledge or intent. JA 370. The district court denied the motion. As to the argument about the transportation fees, the court explained that, although the government did not accurately convey Suarez's testimony that the 18% transportation fee was based on drug quantity, the jury heard "a great deal of evidence about the transportation fees" and "had a very substantial opportunity to judge the accuracy of the evidence offered, about which there was little if any conflict." JA 373. The court also stated that its numerous instructions about

70

closing arguments and attorneys' comments "were sufficient to mitigate any prejudice to Defendants' substantial rights caused by the Government's misstatements." JA 374-375. The court additionally found that the government's "'box of bees' metaphor" could not have prejudiced defendants' substantial rights because the argument "was barely comprehensible, and certainly neither effective nor persuasive." JA 376 n.10.

## B.    Standard Of Review

This Court reviews the denial of a new trial for alleged prosecutorial impropriety in closing arguments for abuse of discretion. *United States v. Alexander,* 331 F.3d 116, 128-129 (D.C. Cir. 2003). It reviews for plain error comments that were not objected to below. *United States v. Rawlings*, 522 F.3d 403, 410 (D.C. Cir. 2008).

## C.    Any Misstatement About The Transportation Fee Calculation Was Not Reversible Error.

"A prosecutor errs in closing argument by making a statement unsupported by evidence, misstating evidence or misquoting testimony." *United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010). Unsupported statements, however, do not require reversal unless the defendant has been substantially prejudiced. *United States v. Watson*, 171 F.3d 695, 700 (D.C. Cir. 1999); *see also United States v. North*, 910 F.2d 843, 898 (D. C. Cir. 1990) (stating that the Court reverses a conviction based on a prosecutor's summation "in only the rarest and

71

most prejudicial circumstances"), *superseded on other grounds on reh'g*, 920 F.2d 420 (1990). This Court considers three factors in determining whether substantial prejudice resulted: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks. *North*, 910 F.2d at 895. In applying these factors, the Court presumes "that a jury acts with common sense and discrimination" when confronted with an erroneous comment. *United States v. Childress*, 58 F.3d 693, 716 (D.C. Cir. 1995) (internal quotation marks and citation omitted). Moreover, this Court "owes deference" to the district court's ability to assess the possible prejudice resulting from any impermissible remark. *Ibid.*

The prosecutor's summation did not materially misstate Suarez's testimony about the transportation fees. In his initial summation, the prosecutor accurately stated that Junior was "paid in cocaine for his transportation fee," SA 347, as was El Chino, SA 349 ("remember the testimony of Suarez"). The prosecutor also accurately cited the transportation percentages in his rebuttal summation, using the same figures that defendants had argued in their summations. SA 386-387. Because the point of the prosecutor's example was to demonstrate that Borda's profit would have been the same if he were paid the Houston price but charged the Houston transportation fee, the prosecutor expressed the transportation fee in dollars rather than kilograms. Any error,

72

however, was in name only because it did not affect the bottom-line result.[15] *See*

*Watson*, 171 F.3d at 704 ("A misstatement is error, but only to the extent that

[it] overstate[s] the testimony.") (Garland, C.J., dissenting) (internal quotation

marks and citations omitted).

Even if the prosecutor's argument was erroneous, the error did not

substantially prejudice defendants. First, for the reasons stated above, the

purported misconduct was negligible because it did not distort the substance of

Suarez's testimony. In addition, the district court gave several instructions that

ensured that the jury understood that attorneys' arguments were not evidence

and that the jury should rely on its own recollection of the evidence rather than

that of the prosecutor. SA 339, 342; *see United States v. Gartmon*, 146 F.3d 1015,

1026 (D.C. Cir. 1998) ("We have repeatedly said this kind of instruction can

mitigate the impact of erroneous jury argument."). Finally, although the district

court characterized the evidence of defendants' guilt as "not overwhelming," JA

372, it is almost certain that the challenged misstatement did not contribute to

the verdict in light of its insignificance and the undisputed underlying facts.

---

[15] In the prosecutor's example, the fee for transporting a kilogram of cocaine to
Houston would have been $6,000 (40% of $15,000), and Borda's profit would
have been $9,000 per kilogram ($15,000-$6,000). SA 387. Under the alternative
calculation, the transportation fee would have been 400 grams (40% of one
kilogram); the 400-gram fee would be equivalent to $6,000; and Borda's profit
would still be $9,000.

**D.    The Prosecutor's Argument That Junior Paid Defendants In U.S. Dollars Was A Fair Inference From the Evidence.**

The prosecutor's argument that defendants were paid for the cocaine in U. S. dollars was not error, let alone reversible plain error. "The prosecutor may draw inferences from evidence that support the government's theory of the case so long as the prosecutor does not intentionally misrepresent the evidence." *McGill*, 815 F.3d at 916 (internal quotation marks and citation omitted). The government drew such a permissible inference here. Suarez and Montoya both testified that defendants were paid in U.S. dollars, and Montoya added that defendants were occasionally present when he counted the money, which was mostly in $20 denominations. SA 214, 220, 224, 309. Alvaran's and Montoya's ledgers similarly documented the receipt of money from Junior in U.S. dollars, SA 93-94, and defendants referred to U.S. dollars in their discussions about Junior's payments. SA 163, 193.

Defendants argue that no one identified the currency as U.S. dollars until the drug proceeds arrived in Mexico City, and the fact that the money "passed through a money exchange house negated any logical inference that it had originated as dollars." Alvaran Br. 21. The evidence refutes that claim. Montoya testified that the money was brought to the exchange house for security reasons, and, upon its arrival, Lucas and others would open the padlocked canvas bags containing the money, transfer it to Office Depot boxes, and bring it to Alvaran's

74

apartment to be counted. SA 308-309; *see also* SA 160 (Alvaran told Suarez that he would need Junior to help him transport some of the money to Mexico City because Alvaran's company "was only able to transport [$]500,000 each time, three times a week").

### E.    The Prosecutor's Use Of The "Bee Container" Metaphor Was Not Misconduct.

Finally, the prosecutor's use of the "bee container" metaphor, while perhaps inapt, does not constitute misconduct. Contrary to defendants' claim, the prosecutor did not invite the jurors to speculate about defendants' knowledge or intent; to the contrary, immediately after the prosecutor offered the metaphor, he urged the jurors to rely on the evidence to find that defendants knew "exactly what was going on." SA 391. And even if the argument was improper, it does not warrant reversal. The remarks were extremely brief, non-inflammatory, and beside the point. The court's instructions made clear that the jury had to find that defendants actually knew or intended that the cocaine would be imported into the United States and that it could only consider the evidence in reaching its verdict. SA 339-340, 344-345.

## VII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY LIMITING ALVARAN'S CLOSING ARGUMENT ON AN ISSUE LACKING EVIDENTIARY SUPPORT.

Alvaran contends that the district court precluded him from arguing that "there was a lack of evidence that cocaine had been imported into the United

States." Alvaran Br. 26. Alvaran's characterization of the court's ruling is inaccurate, and the district court did not abuse its discretion in sustaining the government's objection to Alvaran's proposed line of argument.

## A.    Background

During his summation, Alvaran described the events that led agents to arrest Junior in Houston, and he then asked the jurors to imagine the debriefing. SA 366-367 ("You are the DEA agents. You take [Junior] into a room. You start asking him questions. What do you ask?"). In response to the government's objection, Alvaran explained (at sidebar) that he intended to "ask the jury to infer from the evidence that is in, which is that DEA agents debrief informants, that they would have asked Junior about what he had shipped, and if he had given them a name, an address, a time, they could have investigated . . . ." SA 368-369; *see also* SA 370 ("And if they had seized drugs from what Junior told them, they could have brought it in."). The court sustained the government's objection, stating that "[t]here is nothing to support [the defense argument] in the evidence." SA 369. Following the court's ruling Alvaran continued to argue that the jury "can draw inferences that [Junior] was debriefed" and "the government has produced no evidence that [DEA agents] seized any cocaine in the United States." SA 371. He further argued that the jury should disregard

Suarez's testimony that the cocaine was "seized in the U.S." because no cocaine was introduced into evidence. SA 371-372.

## B.    Standard Of Review

This Court reviews the district court's decision to limit the scope of defense counsel's argument for abuse of discretion. *United States v. Stubblefield*, 643 F.3d 291, 295 (D.C. Cir. 2011). "[A]n abuse of . . . discretion will be found only where the effect of the trial court's ruling is to prevent defense counsel from making a point essential to the defense." *United States v. Hoffman*, 964 F.2d 21, 24 (D.C. Cir. 1992) (internal quotation marks and citation omitted). By contrast, a district court does not abuse its discretion when it precludes defense counsel from "mak[ing] statements as to facts not proven." *Ibid.*

## C.    Alvaran's Argument Was Not Supported By The Record.

Alvaran asserts that the record "fully supported his argument" and that he was "simply asking the jury to conclude from the lack of evidence that the government had not proved its case." Alvaran Br. 27-28. He is incorrect. Although the evidence established that Junior agreed to cooperate, the record was silent as to what information, if any, Junior provided, and it was improper to ask the jury to infer that Junior did not provide any inculpatory information because the government would have introduced the fruits of that information if he had. *See Johnson v. United States*, 347 F.2d 803, 805 (D.C. Cir. 1965) ("It is

elementary . . . that counsel may not premise arguments on evidence which has not been admitted.").

*Hoffman*, *supra*, is instructive. In that case, the defense theory was that a police officer had lied when he testified that he found drugs in the defendant's bag. Defense counsel argued to the jury that, if the officer was telling the truth, "wouldn't he . . . have sent [the drugs] to be examined for fingerprints" and defense counsel "wouldn't be here making any argument at all if this bag containing cocaine had been examined by the police lab like they should have done." *Hoffman*, 964 F.2d at 23.

This Court held that, although it would have been proper to argue that the government had not presented any fingerprint evidence, defense counsel "moved from arguing fair inferences from the record to arguing the existence of facts *not* in the record – *viz.*, that the police did not look for fingerprints, that fingerprints could have been obtained from the plastic bags containing the narcotics and that standard police procedure required fingerprint analysis." Because there was no evidentiary foundation for any of those assertions, the Court held that the district court "did not err, much less abuse its discretion, in refusing to permit the argument." *Id.* at 25.

Here, too, Alvaran properly argued that the government had not introduced any evidence that drugs had been seized in the United States. *See* SA

78

371-374, 376-380. But the additional inference that he was asking the jury to draw – that because the government did not produce any cocaine, the jury could infer that Junior's information was not helpful to the government – was improper.[16] *Compare United States v. Lawson*, 494 F.3d 1046, 1053 (D.C. Cir. 2007) (defense counsel properly pointed out "the kinds of evidence that [the jury] might have expected to see but did not in a case to prove that illegal drugs were sold" and "did not even ask the jury to infer, either directly or in a meaningful indirect manner, that [a participant who was equally available as a witness to both parties] would have testified against the government's case.").

There is also no merit to Alvaran's related argument that "the closing argument phase of the trial was not well balanced." Alvaran Br. 32 (quoting *United States v. DeLoach*, 504 F.2d 185, 192 (D.C. Cir. 1974)). In support of his claim, Alvaran complains (Alvaran Br. 33) that when he objected to the prosecutor's misstatement that the money from Junior was delivered "to an armored car company" in Mexico City, the court overruled his objection and simply stated that "[t]he jury's recollection of the evidence is what counts." SA

---

[16] Alvaran also argues that the district court erroneously viewed him as attempting to "get around" the court's ruling that Alvaran was not entitled to a missing-witness instruction. Alvaran Br. 30 (citing SA 370). As the district court correctly explained in rejecting Alvaran's identical claim below, although it mentioned Alvaran's request for a missing-witness instruction, it precluded the argument because "it was purely speculative in nature and not based on any evidence presented at trial." JA 391 (citing SA 367, 369-370).

388-389. His comparison is unfounded. The prosecutor described, albeit inaccurately, testimony that was in the record. *See* SA 374 (court found that prosecutor "conflated the type of car used to transport the money from Monterrey (an armored car) with the place where the money was exchanged (a money exchange house)."). Alvaran's argument, on the other hand, was based on matters completely absent from the record (what Junior told the DEA agents) and would have asked the jury to draw an inference without any foundation to support it.

*DeLoach*, *supra*, which Alvaran cites, is inapposite. In that murder case, the trial judge prevented defense counsel from arguing that certain factual inferences could be drawn from the evidence that were at the heart of the defense. *DeLoach*, 504 F.2d at 189. The Court found the argument phase "not well balanced" because of the court's "erroneous restrictions." Thus, defense counsel was not permitted to speculate about the motive and state of mind of the government's main witness, whom the defense claimed was the murderer, while the government was permitted to "freely engage[] in similar speculation about the defendant's." *Id.* at 192. Unlike the trial judge in *DeLoach*, the district court did not prevent Alvaran from arguing his theory; instead, it correctly ruled that Alvaran could not ask the jury to draw an unsupported inference.

Nor does it "[a]dd[] to the imbalance" that Borda was permitted to make the same argument without objection. Alvaran Br. 33. Because Alvaran and Borda had the same interests in regard to the deficiencies of the government's case, the purported imbalance between their arguments is insignificant. The government's failure to object to Borda's equally improper argument – and the district court's failure to strike it sua sponte – worked only to Alvaran's advantage.

Finally, any error in limiting Alvaran's summation did not affect his substantial rights. *See Lawson*, 494 F.3d at 1054 (concluding that district court did not commit reversible error in striking portion of defense argument because the error did not affect the defendant's substantial rights). Alvaran argued a variation of the precluded argument later in his summation. SA 376-377 ("Either one of those informants [Suarez or Junior] – [Suarez] could have said, hey, the cocaine just went to the U.S. . . . If it went to the U.S., we should have the cocaine here. I have not seen it."). In addition, Borda, whose interests were nearly identical to Alvaran's on this point, made the identical argument in his summation without objection. SA 355-356. And, contrary to Alvaran's claim, the court's ruling did not preclude him from emphasizing throughout his summation that there was no evidence that the cocaine had reached the United States.

## VIII. THE CUMULATIVE EFFECT OF ANY ERRORS THAT ARGUABLY OCCURRED DOES NOT WARRANT REVERSAL.

Borda contends that the errors in his trial, even if not individually reversible, cumulatively created "a real danger that he was convicted on evidence too weak to be sustained." Borda Br. 58-59. As shown above, he has not shown any errors, other than the admission of fleeting hearsay testimony that did not implicate him, let alone a series of errors whose collective impact rendered his trial fundamentally unfair. *See United States v. Celis*, 608 F.3d 818, 847 (D.C. Cir. 2010); *United States v. Brown*, 508 F.3d 1066, 1076 (D.C. Cir. 2007) ("The critical inquiry is an analysis of the probable impact, appraised realistically, of the particular [errors] upon the jury's factfinding function.") (internal quotation marks omitted).

## IX. ALVARAN'S SENTENCE WAS PROCEDURALLY REASONABLE.

Finally, Alvaran contends (Alvaran Br. 35-45) that the district court erred in calculating the quantity of cocaine for which he was responsible and applying a three-level enhancement for his role in the offense. He also claims that the court failed to take into account his medical condition and should have imposed a term of imprisonment that would result in his release by the time he was 65.

## A.    Background

At sentencing, the district court found that Alvaran was responsible for 200 kilograms of cocaine. As it had explained in more detail at Borda's sentencing (and included by reference in Alvaran's sentencing hearing, JA 619), Suarez's credible testimony established that Junior delivered 200 kilograms of cocaine to the United States and that amount was reasonably foreseeable to both defendants "given the scope of the agreement or the conspiracy into which they had all entered." JA 536, 624. The court described the conspiracy as "essentially" including defendants' agreement to import the cocaine into Mexico and Junior's selling the cocaine and repaying Borda and the others for the load. JA 624-625. "Given the fact that the end point of the conspiracy was that Mr. Borda would . . . get paid for the cocaine he had arranged to have sent to [Junior], it was perfectly foreseeable that when [Junior] could not manage to sell it or sell it for an appropriate price in Monter[r]ey, that he would then send it to the United States." JA 625; *see also* JA 536-543 (court's explanation of drug quantity finding at Borda's sentencing).

The district court also concluded that "there is absolutely no question that Mr. Alvaran was neither a minimal nor a minor participant" and instead was a manager or supervisor. JA 623. The court stated that Alvaran "was involved the moment that the drugs reached Mexico," and it listed the "many things"

83

Alvaran "arranged . . . to happen with the other members of the conspiracy" (*e.g.*, introducing Borda to Suarez, traveling to Monterrey to make sure that Junior had moved the cocaine there, arranging for the drug proceeds to be transported to Mexico City, directing his secretary Lucas to bring the drug proceeds to Alvaran's apartment, attending meetings with Borda or on his behalf with other co-conspirators). JA 623-624, 626. As to the other requirements for a three-level enhancement under U.S.S.G. § 3B1.1(b), the court found that the criminal activity involved at least five participants and that Alvaran supervised Lucas. JA 625-626. For that reason (as well as others), the district court denied Alvaran's claim that he was eligible for relief under the "safety valve," 18 U.S.C. § 3553(f). JA 627-628.

With a total offense level of 41 and a criminal history category of I, Alvaran's advisory guidelines range was 324-405 months of imprisonment. JA 628. In explaining its consideration of the Section 3553(a) factors, the court weighed heavily the "extremely serious" nature of the offense. JA 630. The court then considered Alvaran's history and characteristics, noting that Alvaran's health problems were not at the "imminently threatening stage" and were being treated. JA 629. The court also found that "[g]iven the defendant's age, lack of criminal history and health issues, . . . it's not necessary to impose a sentence for the purpose of protecting the public from further crimes by [Alvaran]," and it

84

agreed with the government that Alvaran's sentence should be lower than Borda's. JA 631. Weighing the "severity of the [non-binding] guideline range," Borda's sentence, "and of course . . . all the other factors that defense counsel has raised," it was "appropriate and proper under 18 U.S.C. §3553, in light of the seriousness of this offense to impose a sentence of 180 months." JA 631-632.

## B.    Standard Of Review

This Court reviews a sentencing court's factual findings, including drug-quantity findings and role in the offense enhancements, for clear error. *United States v. Stover*, 329 F.3d 859, 871 (D.C. Cir. 2003) (drug quantity); *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (role in the offense). Under the clear-error standard, this Court "affirm[s] unless [it is] left with the definite and firm conviction that a mistake has been committed." *United States v. Brockenborrugh*, 575 F.3d 726, 738 (D.C. Cir. 2009) (internal quotation marks omitted); *see also United States v. Mohammed*, 693 F.3d 192, 202 (D.C. Cir. 2012) (holding court's factual findings not clearly erroneous where inferences it drew from evidence were "plausible"). A district court's credibility determinations are "entitled to the greatest deference from this court on appeal." *United States v. Delaney*, 651 F.3d 15, 18 (D.C. Cir. 2011) (internal quotation marks omitted). The Court gives "'due deference'" to a district court's application of the Guidelines to the facts. *United States v. Henry*, 557 F.3d 642, 645 (D.C. Cir. 2009).

### C.    The District Court's Sentencing Findings Were Supported By The Record.

1. In calculating a defendant's base offense level under the guidelines, a district court must take into account "all relevant conduct." *United States v. Seiler*, 348 F.3d 265, 268 (D.C. Cir. 2003). In drug conspiracy cases, the amount of drugs attributable to a defendant as relevant conduct is limited to "the reasonably foreseeable transactions in furtherance of that codefendant's jointly undertaken criminal activity. . . ." *United States v. Wyche*, 741 F.3d 1284, 1292-1293 (D.C. Cir. 2014) (internal quotation marks and citations omitted). "A court may rely on evidence of a defendant's relationship to and involvement with the conspiracy in order to draw permissible inferences regarding the scope of his agreement to the conspiratorial conduct and the foreseeability of his co-conspirators' conduct." *Id.* at 1292 (internal quotation marks and citation omitted).

The district court correctly applied those principles here. As the court explained at Borda's sentencing, the scope of defendants' agreement "was not limited merely to shipping cocaine from Colombia to Mexico, but extended to" Junior's decision to transport the cocaine from the port to Monterrey, his sale of the cocaine, and his payment to the investors from the drug proceeds. JA 539-540. It also was reasonably foreseeable to defendants that, upon authorizing Junior to move the cocaine to a city close to the border, Junior would sell some

86

of the palm oil load in the United States. JA 540. In fact, Alvaran knew more. As evidenced by his comments in the recorded conversations, he also knew that: (1) Junior could not sell all 1553 kilograms in Monterrey; (2) by June 15, 2005, Junior had started to send "partials" to the border; and (3) Junior could not pay Borda and Alvaran as quickly as he had promised because he was having trouble at the border. *See* JA 541-543, SA 63.

The court's drug quantity finding (200 kilograms) also was not clearly erroneous. The court relied on Suarez's "credibl[e] [testimony] that he was 'certain' that . . . [Junior] delivered at least 200 kilograms of the palm oil load to New York," JA 536, and the record suggests that the actual amount was likely a great deal more.

Alvaran disputes (Alvaran Br. 36) the court's finding by summarily referring to the arguments he made in challenging the sufficiency of the evidence. For the reasons stated above, those arguments are unsupported. *See* pages 24-29 *supra*. Alvaran also argues that he should not be held liable for the same drug quantity as Borda because it would "frustrate[]" the guidelines' objective to eliminate "unwarranted disparity." Alvaran Br. 36. As he acknowledged below, however, the role in the offense adjustment takes into account defendants' relative responsibilities. *See* JA 595-596.

87

2. Section 3B1.1(b) of the guidelines provides for a three-level enhancement when a defendant is "a manger or supervisor (but not an organizer or leader)" and "the criminal activity involved five or more participants or was otherwise extensive." The commentary specifies that "the defendant must have been the . . . manager[] or supervisor of one or more other participants," and it defines "a participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 comment. nn.1, 2. In determining whether an aggravated role enhancement is appropriate, this Court considers "several factors," including: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Olejiya*, 754 F.3d at 990 (citing U.S.S.G. § 3B1.1 comment. n.4). No single factor is dispositive. *Ibid.*

The district court did not clearly err in finding that a three-level enhancement was warranted for Alvaran's role in the offense. Alvaran participated in the planning of the palm oil transaction from the beginning, and, as an investor, stood to profit if the venture succeeded. He also managed or supervised many aspects of the illegal enterprise. He recruited Suarez as an

accomplice, SA 117-118, kept tabs on whether Junior was fulfilling his part of the bargain (*e.g.*, authorizing Junior to move the cocaine to Monterrey, SA 173, traveling to Monterrey to ensure that the cocaine was there, SA 71, monitoring Junior's payments, SA 93, 216-220, 222), and reported on Junior's progress to Borda, *e.g.*, SA 170-172, 175-179, 182, 193-194. Alvaran also organized the transport of the drug proceeds from Monterrey to Mexico City and the counting and safeguarding of the proceeds once there. *See* pages 8-9 *supra* and record citations therein. Contrary to Alvaran's claim (Alvaran Br. 37), Alvaran's role was not minor simply because Borda had greater responsibility (and, accordingly, was assigned four levels for his leadership role in the offense, JA 549). *Cf. United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998) (Section 3B1.1 "creates three relevant tiers for conspiracies that are 'extensive': a tier for leaders and organizers, a tier for managers and supervisors, and a tier for everyone else.") It is also not true that "Borda received all the proceeds," Alvaran Br. 37; Alvaran received a return on his investment and decided how Junior's payments would be allocated. SA 166 (Alvaran told Suarez that "the first part of the money that Junior would send, [Alvaran] would only take the part that was for us, and all of the rest of it was going to be sent to the office"); SA 93 (spreadsheet reflected that Alvaran received $192,180 from Junior's sales).

The district court also correctly found that the criminal activity involved at least five participants, including Alvaran, Borda, Borda's Colombian supplier, Junior, and Montoya, and that Alvaran supervised Lucas, who worked at Alvaran's direction. Specifically, Suarez and Montoya testified that Lucas was Alvaran's "secretary" or "right hand man" in Mexico, SA 146, 297, and "would help [Alvaran] do several different things," like "picking up the money." SA 165.

Alvaran contends that, while Alvaran and Lucas "were friends," it "is clear" that Lucas worked for Borda. Alvaran Br. 38-39 (citing Montoya's testimony describing Lucas as Borda's employee and stating that Borda gave instructions about security matters to Lucas, Montoya, and Mauricio Cruz). That testimony is not inconsistent with the court's finding that Lucas worked directly for Alvaran, and Montoya acknowledged that Lucas was, in fact, Alvaran's "right-hand man." SA 297.

Alvaran also argues (Alvaran Br. 41-42) that Lucas should not be counted as a participant because there was no evidence that he knew that the cocaine would be imported into the United States.[17] The court could reasonably infer

---

[17] The district court also included Alvaran's friend Mauricio Cruz as a participant. JA 626. The evidence established that Cruz helped count the money at Alvaran's or Montoya's apartment in Mexico City. SA 311, 313-314, 320-321. Because his involvement in the conspiracy was not as extensive as Lucas's, the

that Lucas, who accompanied Alvaran to meetings, *e.g.*, SA 147, 204, 298-300, and was Alvaran's "right-hand man," SA 297, was privy to the same information as Alvaran. Lucas also knew that the proceeds from Junior's sales were in U.S. dollars because he was directly involved in receiving the money in Mexico City, transferring it from padlocked bags into boxes, and counting it. This case is therefore unlike *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001), where the participant was described as "unwitting," and *United States v. Bisong*, 645 F.3d 384, 397-398 (D.C. Cir. 2011), where the defendant's employees did not assist him in the fraudulent scheme.

### D.    The District Court Provided A Reasoned Basis For Its Decision.

Finally, Alvaran contends (Alvaran Br. 43-44) that the district court failed to consider his nonfrivolous arguments for a lower sentence. *See*, *e.g.*, *United States v. Locke*, 664 F.3d 353, 357 (D.C. Cir. 2011) (sentencing court must explain at the time of sentencing the reasons for imposing the particular sentence and provide "a 'reasoned basis' for its decision and consider all 'nonfrivolous reasons' asserted for an alternative sentence") (quoting *Rita v. United States*, 551 U.S. 338, 356–357 (2007)). Specifically, he argues that the court failed to impose

---

government is not counting him as one of the participants that Alvaran supervised.

a term of imprisonment that would result in his release by the time he was 65, as it had in Borda's case.

Alvaran's claim is without merit. The court explicitly stated that it considered Alvaran's age, lack of criminal history, and health problems and that it was "very unlikely" that Alvaran would commit additional crimes. JA 631. Under Alvaran's formula, the court would have had to sentence him to six years of imprisonment, which the court justifiably rejected for this "extremely serious" offense. JA 630-632. And, although Alvaran will be older than Borda upon his release, Alvaran's 15-year sentence was still 10 years less than Borda's.

Alvaran also argues that the government relied on an incorrect standard in opposing his request "for consideration of his medical problems." Alvaran Br. 43-44. The government correctly cited the standard for a downward departure under U.S.S.G. § 5H1.4, and it did not argue that the same standard applied to a variance from the guidelines. In any event, the basis for the government's opposition is beside the point because the court considered Alvaran's argument as to his medical condition in weighing the Section 3553(a) factors. JA 629, 631.[18]

---

[18] Alvaran also requests a remand to the district court so that he can argue for a lower sentence under the retroactive amendment to the cocaine sentencing guidelines (Alvaran Br. 44-45). Pursuant to this Court's "established procedure," it should remand to permit Alvaran to submit a motion for a reduced sentence

## CONCLUSION

The judgments of the district court should be affirmed.

Respectfully submitted,

LESLIE R. CALDWELL
   Assistant Attorney General

PAUL W. LAYMON
   Attorney
   Narcotics and Dangerous
   Drugs Section

SUNG-HEE SUH
   Deputy Ass't Attorney General

 /s/ Kirby A. Heller
_____

KIRBY A. HELLER
   Attorney
   Criminal Division, Appellate Section
   U.S. Department of Justice
   950 Pennsylvania Ave., N.W., #1264
   Washington, DC 20530
   (202) 307-0085

---

under 18 U.S.C. § 3582(c)(2). *United States v. Davis*, 377 Fed. Appx. 19, 20 (D.C. Cir. 2010) (citing *United States v. Jones*, 567 F.3d 712, 719 (D.C. Cir. 2009)).

93

## CERTIFICATE OF COMPLIANCE

The foregoing Brief for the United States is proportionally spaced, has a typeface of 14 points or more, and contains 21,680 words and therefore complies with this Court's Order, dated June 24, 2016, stating that the government's brief may not exceed 22,000 words. This certification is based on the word count of the word-processing system used in preparing the government's brief: Microsoft Office Word 2013.


/s/ Kirby A. Heller
_____
KIRBY A. HELLER
Appellate Section, Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., #1264
Washington, DC 20530
(202) 307-0085
kirby.heller@usdoj.gov

July 8, 2016

## CERTIFICATE OF SERVICE

I hereby certify that, on July 8, 2016, I electronically filed the foregoing Brief for the United States with the Court via the CM/ECF system, which will send the notice of docket activity to the following counsel for appellants:

Marcia G. Shein
Elizabeth A. Brandenburg
Federal Criminal Law Center
2392 North Decatur Road
Decatur, GA 30033

Carmen D. Hernandez
7166 Mink Hollow Road
Highland, MC 20777

I further certify that, on July 8, 2016, I caused eight paper copies of the Brief and seven paper copies of the Supplemental Appendix to be filed with the Court via Federal Express, and caused two paper copies of the Brief and one paper copy of the Supplemental Appendix to be served via Federal Express on counsel for appellants at the above addresses.

/s/ Kirby A. Heller
_____
KIRBY A. HELLER
Appellate Section, Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., #1264
Washington, DC 20530
(202) 307-0085
kirby.heller@usdoj.gov

95

# ADDENDUM

| Statute | Page |
| --- | --- |
| 21 U.S.C. § 959 (1996)........................................................................Add. 1 | |
| Fed. R. Evid. 801.............................................................................Add. 2 | |

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 13. Drug Abuse Prevention and Control (Refs & Annos)
      Subchapter II. Import and Export (Refs & Annos)

This section has been updated. Click here for the updated version.

21 U.S.C.A. § 959

§ 959. Possession, manufacture, or distribution of controlled substance

Effective: October 13, 1996 to May 15, 2016

**(a) Manufacture or distribution for purpose of unlawful importation**

It shall be unlawful for any person to manufacture or distribute a controlled substance in schedule I or II or flunitrazepam or listed chemical--

**(1)** intending that such substance or chemical will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States; or

**(2)** knowing that such substance or chemical will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States.

**(b) Possession, manufacture, or distribution by person on board aircraft**

It shall be unlawful for any United States citizen on board any aircraft, or any person on board an aircraft owned by a United States citizen or registered in the United States, to--

**(1)** manufacture or distribute a controlled substance or listed chemical; or

**(2)** possess a controlled substance or listed chemical with intent to distribute.

**(c) Acts committed outside territorial jurisdiction of United States; venue**

This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States. Any person who violates this section shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia.

**CREDIT(S)**

(Pub.L. 91-513, Title III, § 1009, Oct. 27, 1970, 84 Stat. 1289; Pub.L. 99-570, Title III, § 3161(a), Oct. 27, 1986, 100 Stat. 3207-94; Pub.L. 104-237, Title I, § 102(a), (b), Oct. 3, 1996, 110 Stat. 3100; Pub.L. 104-305, § 2(b)(2)(A), Oct. 13, 1996, 110 Stat. 3807.)

## Federal Rules of Evidence Rule 801, 28 U.S.C.A.

## Rule 801. Definitions That Apply to This Article; Exclusions From Hearsay

**(a) Statement.** "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.

**(b) Declarant.** "Declarant" means the person who made the statement.

**(c) Hearsay.** "Hearsay" means a statement that:

> **(1)** the declarant does not make while testifying at the current trial or hearing; and

> **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement.

**(d) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:

[ . . . ]

> **(2) An Opposing Party's Statement.** The statement is offered against an opposing party and:

>> **(A)** was made by the party in an individual or representative capacity;

>> **(B)** is one the party manifested that it adopted or believed to be true;

>> **(C)** was made by a person whom the party authorized to make a statement on the subject;

>> **(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

>> **(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

Add. 2